_____

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

RACHEL WELTY and AFTYN BEHN,

*Plaintiffs/Appellees/Cross-Appellants,*

v.

BRYANT DUNAWAY et al.,

*Defendants/Appellants/Cross-Appellees.*

_____

On Appeal from the United States District Court for the
Middle District of Tennessee, No. 3:24-cv-768

_____

# PRINCIPAL BRIEF OF
# PLAINTIFFS/APPELLEES/CROSS-APPELLANTS

Daniel A. Horwitz
Sarah L. Martin
Laura E. Cantwell
HORWITZ LAW, PLLC
4016 Westlawn Drive
Nashville, TN 37209
(615) 739-2888
daniel@horwitz.law

William Powell
*Counsel of Record*
Rupa Bhattacharyya
Elizabeth R. Cruikshank
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Avenue NW
Washington, DC 20001
(202) 661-6629
whp25@georgetown.edu

*Attorneys for Plaintiffs/Appellees/Cross-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs/Appellees/Cross-Appellants Rachel Welty and Aftyn Behn are neither subsidiaries nor affiliates of any publicly owned corporation. There is no publicly owned corporation, not a party to this appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iv

STATEMENT CONCERNING ORAL ARGUMENT ................................................. 1

STATEMENT OF JURISDICTION ............................................................................ 2

STATEMENT OF ISSUES ........................................................................................... 3

INTRODUCTION ........................................................................................................ 4

STATEMENT OF THE CASE ..................................................................................... 5

    I.   Statutory Background ....................................................................................... 5

    II.  Factual Background ......................................................................................... 6

    III. Procedural History ........................................................................................ 10

SUMMARY OF ARGUMENT .................................................................................... 11

STANDARD OF REVIEW ......................................................................................... 13

ARGUMENT ............................................................................................................... 13

    I.   Plaintiffs have standing to challenge the recruitment provision. ......................... 13

       A.   Plaintiffs' speech is arguably protected by the First Amendment ................. 14

       B.   Plaintiffs' intended speech is arguably prohibited by the recruitment provision ................................................................................................ 17

       C.   Plaintiffs face a credible threat of enforcement. ........................................ 25

    II.  The recruitment provision violates the First Amendment, both as applied and on its face. ............................................................. 33

       A.   The recruitment provision violates the First Amendment as applied to Plaintiffs' speech. ........................................................... 34

       B.   The recruitment provision is facially unconstitutional because it discriminates based on viewpoint. ................................................. 35

       C.   The recruitment provision is unconstitutionally overbroad ......................... 38

    III. Alternatively, the recruitment provision is unconstitutionally vague. ................. 51

IV. The district court appropriately enjoined Defendants
from enforcing the recruitment provision against nonparties.............................56

CONCLUSION ......................................................................................................62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................5

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ..........................................................40, 44

*Ashcroft v. ACLU,*
535 U.S. 564 (2002) ..............................................................49

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002) ..............................................................40

*B & H Med., L.L.C. v. ABP Admin., Inc.,*
526 F.3d 257 (6th Cir. 2008) ...................................................35

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ....................................................25, 28, 31

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
482 U.S. 569 (1987) ..............................................................40

*Bell v. Hood,*
327 U.S. 678 (1946) ..............................................................17

*Bigelow v. Virginia,*
421 U.S. 809 (1975) ....................................................15, 16, 41

*Boone Cnty. Republican Party Exec. Comm. v. Wallace,*
132 F.4th 406 (6th Cir. 2025) ..................................................28

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ..........................................................58, 59

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ....................................................43, 49, 50

*Bryant v. Woodall,*
1 F.4th 280 (4th Cir. 2021) ....................................................29

*Cash-Darling v. Recycling Equip., Inc.,*
62 F.4th 969 (6th Cir. 2023) ...................................................13

*Cath. Charities of Jackson, Lenawee, & Hillsdale Cntys. v. Whitmer,*
162 F.4th 686 (6th Cir. 2025) ...........................................passim

iv

*Christian Healthcare Ctrs., Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) .................................................. 28, 30

*Citizens United v. FEC*,
558 U.S. 310 (2010) .................................................................58

*City of Houston v. Hill*,
482 U.S. 451 (1987) .................................................................39

*Clark v. Martinez*,
543 U.S. 371 (2005) .................................................................22

*Commonwealth v. Dabney*,
90 N.E.3d 750 (Mass. 2018) ............................................... 52, 55

*Connection Distrib. Co. v. Holder*,
557 F.3d 321 (6th Cir. 2009) (en banc)....................... 39, 56, 57, 59

*Crawford v. U.S. Dep't of Treasury*,
868 F.3d 438 (6th Cir. 2017) ....................................................25

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
158 F.4th 732 (6th Cir. 2025) (en banc) ...........................26, 29, 31

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ...................................................................5

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .................................................................40

*Escobar v. Baker*,
814 F. Supp. 1491 (W.D. Wash. 1993) .......................................53

*Ex parte Young*,
209 U.S. 123 (1908) .................................................................60

*FEC v. Cruz*,
596 U.S. 289 (2022) ........................................................... 22, 33

*FEC v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007) .................................................................15

*Fischer v. Thomas*,
52 F.4th 303 (6th Cir. 2022) ...............................................passim

*Ginsberg v. New York*,
390 U.S. 629 (1968) .................................................................50

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010) ........................................................... 21, 53

*Green Party of Tenn. v. Hargett,*
  791 F.3d 684 (6th Cir. 2015) ...................................................32

*Henderson v. Springfield R-12 Sch. Dist.,*
  163 F.4th 478 (8th Cir. 2025) (en banc) ...............................26

*Hill v. Colorado,*
  530 U.S. 703 (2000) .................................................... 16, 41

*Iancu v. Brunetti,*
  588 U.S. 388 (2019). ................................................... 35, 37

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
  3 F.4th 887 (6th Cir. 2021) ..................................................35

*Johnson v. United States,*
  576 U.S. 591 (2015) .................................................... 51, 56

*Johnson v. Williams,*
  568 U.S. 289 (2013) ..........................................................58

*Kareem v. Cuyahoga Cnty. Bd. of Elections,*
  95 F.4th 1019 (6th Cir. 2024) ........................................passim

*Kentucky v. Yellen,*
  54 F.4th 325 (6th Cir. 2022) .....................................13, 14, 17

*Kilborn v. Amiridis,*
  131 F.4th 550 (7th Cir. 2025) ..............................................26

*L.W. ex rel. Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ...............................................61

*Laird v. Tatum,*
  408 U.S. 1 (1972) ..............................................................26

*Lopez v. Candaele,*
  630 F.3d 775 (9th Cir. 2010) ..............................................33

*Mangual v. Rotger-Sabat,*
  317 F.3d 45 (1st Cir. 2003) ..................................................14

*Matal v. Tam,*
  582 U.S. 218 (2017) ..........................................................37

*Matsumoto v. Labrador,*
  122 F.4th 787 (9th Cir. 2024) ........................................passim

*McCullen v. Coakley,*
  573 U.S. 464 (2014) .................................................... 16, 41

vi

*McKay v. Federspiel,*
  823 F.3d 862 (6th Cir. 2016) ...................................................... 26, 28

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ........................................................... 39, 46, 58

*NAACP v. Button,*
  371 U.S. 415 (1963) ............................................................... 27, 44

*Online Merchs. Guild v. Cameron,*
  995 F.3d 540 (6th Cir. 2021) ...................................................... 28, 31

*Peck v. McCann,*
  43 F.4th 1116 (10th Cir. 2022) ........................................................ 14

*Peoples Rights Org., Inc. v. City of Columbus,*
  152 F.3d 522 (6th Cir. 1998) .......................................................... 54

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati,*
  822 F.2d 1390 (6th Cir. 1987) ......................................................... 29

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.,*
  769 F.3d 447 (6th Cir. 2014) ...................................................... 30, 32

*Prime Media, Inc. v. City of Brentwood,*
  485 F.3d 343 (6th Cir. 2007) .......................................................... 30

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ........................................................... 35, 37, 49

*Ramsey v. Town of Oliver Springs,*
  998 S.W.2d 207 (Tenn. 1999) .......................................................... 31

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ...................................................... 34, 36, 37, 38

*Reno v. ACLU,*
  521 U.S. 844 (1997) .................................................................. 52

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ........................................................... 34, 35, 36

*S.D. Warren Co. v. Me. Bd. of Env't Prot.,*
  547 U.S. 370 (2006) .................................................................. 21

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) .................................................................. 35

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) .......................................................... 29

*Speech First, Inc. v. Schlissel,*
939 F.3d 756 (6th Cir. 2019) ...................................................... 26, 27

*Speet v. Schuette,*
726 F.3d 867 (6th Cir. 2013) .................................................................39

*State v. Capps,*
No. 2023-01419, 2024 WL 5135477 (Tenn. Crim. App. Dec. 17, 2024) .................43

*State v. Cartee,*
577 N.W.2d 649 (Iowa 1998) ................................................................52

*State v. Casper,*
297 S.W.3d 676 (Tenn. 2009) ...............................................................54

*State v. Deberry,*
651 S.W.3d 918 (Tenn. 2022) ...............................................................17

*State v. Dorantes,*
331 S.W.3d 370 (Tenn. 2011) ...............................................................25

*State v. Young,*
196 S.W.3d 85 (Tenn. 2006) .................................................................56

*Stewart v. IHT Ins. Agency Grp.,*
990 F.3d 455 (6th Cir. 2021) ................................................................35

*Stewart v. Martin,*
143 F.4th 675 (6th Cir. 2025) ..............................................................2

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ............................................... 14, 25, 26, 32

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ............................................... 57, 59, 60, 61

*United States v. Hansen,*
599 U.S. 762 (2023) ............................................... 38, 39, 44, 58

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................... 40, 48, 49, 51

*United States v. Williams,*
553 U.S. 285 (2008) ............................................................. 38, 39

*Universal Life Church Monastery Storehouse v. Nabors,*
35 F.4th 1021 (6th Cir. 2022) .....................................................passim

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982) ............................................................. 52, 54

*Vill. of Schaumburg v. Citizens for a Better Env't,*
444 U.S. 620 (1980) ........................................................... 40, 44

*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) ........................................................ 14, 29, 30

*Virginia v. Hicks,*
539 U.S. 113 (2003) ............................................................ 39, 58

*Vitagliano v. County of Westchester,*
71 F.4th 130 (2d Cir. 2023) ...................................................... 31

*Warth v. Seldin,*
422 U.S. 490 (1975) ................................................................. 17

*Welty v. Dunaway,*
145 F.4th 628 (6th Cir. 2025) (per curiam) .................................... 11

*Whitmore v. Arkansas,*
495 U.S. 149 (1990) ................................................................. 17

*Womack v. Corr. Corp. of Am.,*
448 S.W.3d 362 (Tenn. 2014) .................................................... 23

*Yellowhammer Fund v. Marshall,*
776 F. Supp. 3d 1071 (M.D. Ala. 2025) ....................................... 17

*Yoder v. Bowen,*
146 F.4th 516 (6th Cir. 2025) .................................................. 29, 33

*Zillow, Inc. v. Miller,*
126 F.4th 445 (6th Cir. 2025) .................................................... 39

**Statutes**

28 U.S.C. § 1291 ....................................................................... 2

28 U.S.C. § 1331 ....................................................................... 2

42 U.S.C. § 1983 ................................................................... 2, 60

2019 Tenn. Pub. Acts, ch. 351, § 3 ............................................... 5

Jurisdiction and Removal Act of 1875, 18 Stat. 470 ........................ 60

Tenn. Code Ann. § 8-7-103 ....................................................... 31

Tenn. Code Ann. § 16-2-508 ...................................................... 56

Tenn. Code Ann. § 39-11-103 ..................................................... 57

Tenn. Code Ann. § 39-11-302 ..................................................... 24

Tenn. Code Ann. § 39-11-402 ................................................................44

Tenn. Code Ann. § 39-12-102 ................................................................44

Tenn. Code Ann. § 39-15-201 ..........................................................passim

Tenn. Code Ann. § 39-15-213 ..........................................................5, 19

Tenn. Code Ann. § 40-12-104 ................................................................31

Tenn. Code Ann. § 40-12-105 ................................................................31

**Other Authorities**

*#WeCount Report: April 2022 to June 2024*,
Soc'y of Fam. Planning (Oct. 22, 2024) ..........................................47

Abigail R.A. Aiken et al., *Provision of Medications for Self-Managed Abortion
Before and After the* Dobbs v. Jackson Women's Health Organization *Decision*,
331 JAMA 1558 (2024) ...................................................................46

Suzanne O. Bell et al., *US Abortion Bans and Fertility*,
333 JAMA 1324 (2025) ...................................................................46

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
131 Harv. L. Rev. 417 (2017) ..........................................................61

Kimya Forouzan, *Minors' Access to Abortion Care*,
Guttmacher Inst.(Nov. 24, 2025) .....................................................48

*Harbor,* Merriam-Webster Dictionary ...................................................21

Isaac Maddow-Zimet & Kimya Forouzan, *Stability in the Number of Abortions
from 2023 to 2024 in US States Without Total Bans Masks Major Shifts in Access*,
Guttmacher Inst. (Apr. 2025) ..........................................................46

Geoff Mulvihill, *Abortions Rose in 2024 Due to Pills Available Through Telehealth,
Report Finds*, PBS News (June 23, 2025) ...........................................46

Post-Trial Jury Instrs., *United States v. Withers*,
No. 16-CR-0005, ECF No. 126-2 (W.D. Wis. Apr. 28. 2017) ..................53

Lauren Ralph et al., *The Role of Parents and Partners in Minors' Decisions to Have an
Abortion and Anticipated Coping After Abortion*,
54 J. of Adolescent Health 428 (2014) ..............................................47

*Recruit*, Cambridge Dictionary ....................................................18, 21

*Recruit*, Merriam-Webster Dictionary ...........................................18, 52

*Recruit*, Oxford English Dictionary ..........................................18, 36, 52

States Amicus Br., *Henderson v. Springfield R-12 Sch. Dist.*,
  163 F.4th 478 (8th Cir. 2025) (en banc) (Nos. 23-1374, 23-1880) ............................26

Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ..............................................................53

*Transport*, Merriam-Webster Dictionary ...........................................................................21

*Uncle Sam: We Want You*, The National WWI Museum and Memorial ..........................21

## STATEMENT CONCERNING ORAL ARGUMENT

Plaintiffs do not oppose Defendants' request for oral argument in this important case concerning the constitutionality of the recruitment provision of Tenn. Code Ann. § 39-15-201.

## STATEMENT OF JURISDICTION

Plaintiffs filed this civil-rights action under 42 U.S.C. § 1983, alleging that the recruitment provision of Tenn. Code Ann. § 39-15-201(a) violates the First and Fourteenth Amendments. Compl., R.1, PageID #9-15. The district court had jurisdiction under 28 U.S.C. § 1331. *Id.* at PageID #3. On July 18, 2025, the district court granted summary judgment to Plaintiffs on their First Amendment claims, granted summary judgment to Defendants on Plaintiffs' vagueness claim, and permanently enjoined Defendants from enforcing the challenged provision. Mem. Op., R.81, PageID #1131-32. The district court issued its final judgment on July 24, 2025. Judgment, R.84, PageID #1138-39. Defendants filed a timely notice of appeal on August 17, 2025. Notice of Appeal, R.86, PageID #1146-48. Plaintiffs filed a timely notice of protective cross-appeal on August 18, 2025. Notice of Appeal, R.87, PageID #1149-51. This Court has jurisdiction over Defendants' appeal and Plaintiffs' protective cross-appeal under 28 U.S.C. § 1291. *See Stewart v. Martin*, 143 F.4th 675, 685 (6th Cir. 2025).

## STATEMENT OF ISSUES

1.      Whether Plaintiffs have standing.

2.      Whether the recruitment provision of Tenn. Code Ann. § 39-15-201(a) violates the First Amendment as applied to Plaintiffs' speech counseling young women about access to legal abortion care, as the district court held and as Defendants do not challenge on appeal.

3.      Whether the recruitment provision is facially unconstitutional as a viewpoint-based restriction on protected speech.

4.      Whether the recruitment provision is facially overbroad because its applications to protected speech substantially outweigh its plainly legitimate sweep.

5.      Whether the recruitment provision is void for vagueness.

6.      Whether the district court properly enjoined Defendants from enforcing the recruitment provision against nonparties.

## INTRODUCTION

Plaintiffs Rachel Welty and Aftyn Behn are two of Tennessee's most prominent advocates for abortion rights. Welty is a family-law attorney and board member for an abortion fund. Behn is a social worker and state legislator. They counsel people, including unemancipated minors, that abortion is legal, safe, and normal. When someone decides to seek abortion care, Plaintiffs validate and facilitate that decision by providing information about how and where to access legal abortions.

Plaintiffs filed this lawsuit to challenge the recruitment provision of Tenn. Code Ann. § 39-15-201(a), which threatens them with criminal prosecution based on their abortion-related speech. The provision bans "intentionally recruit[ing] … a pregnant unemancipated minor" in Tennessee "for the purpose of" "[p]rocuring" an abortion that would be illegal in Tennessee or "[o]btaining an abortion-inducing drug … for the purpose of" such an abortion. *Id.* The law applies to recruiting for abortions that would be illegal in Tennessee even if they in fact occur legally in other states. *Id.* And contrary to Defendants' suggestion, the law is not limited to abortions that occur without parental consent.

The district court correctly held that the recruitment provision is unconstitutional both as applied and on its face. Defendants have forfeited on appeal any challenge to the district court's as-applied ruling. The provision facially violates the First Amendment for two reasons: First, it discriminates based on viewpoint by banning speech encouraging minors to obtain abortions while permitting speech discouraging

minors from obtaining abortions. Second, the provision is overbroad because its unconstitutional applications to protected speech about legal abortions far outweigh its fleetingly rare applications to unprotected speech about criminal abortions. Indeed, the Ninth Circuit affirmed a preliminary injunction barring enforcement of a similar Idaho law under the First Amendment. *Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024).

At bottom, the First Amendment "protect[s] the speech rights of all comers, no matter how controversial … many may find the message at hand." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600-01 (2023). When the Supreme Court "return[ed] the issue of abortion to the people's elected representatives," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022), it did nothing to alter the First Amendment's protections for abortion-related speech. To the contrary, the Court made clear that the issue of abortion ought not "distort[] First Amendment doctrines." *Id.* at 287. Tennessee may not criminalize Plaintiffs' speech, and the district court's decision should be affirmed.

## STATEMENT OF THE CASE

### I. Statutory Background

After *Dobbs*, Tennessee's abortion ban took effect. *See* 2019 Tenn. Pub. Acts, ch. 351, § 3. Under that law, it is a felony "criminal abortion" to "perform[] or attempt[] to perform an abortion" in all but a few exceptional circumstances. *See* Tenn. Code Ann. § 39-15-213. The ban, however, "does not subject the pregnant woman upon whom an abortion is performed or attempted to criminal conviction or penalty." *Id.* § 39-15-213(e).

In 2024, Tennessee criminalized "abortion trafficking." *See* Bill, R.1-1, PageID #16-18. As relevant here, Tenn. Code Ann. § 39-15-201 imposes criminal liability on adults who "intentionally recruit[], harbor[], or transport[] a pregnant unemancipated minor within [Tennessee] for the purpose of" either "[p]rocuring an act that would constitute a criminal abortion under" Tennessee law, "regardless of where the abortion is to be procured," or "[o]btaining an abortion-inducing drug … for the purpose of an act that would constitute a criminal abortion under" Tennessee law, "regardless of where the abortion-inducing drug is obtained." The statute does not define "recruit." *Id.* In addition to criminal penalties, violators "may be held liable in a civil action for the wrongful death of an unborn child who was aborted." *Id.* § 39-15-201(e)(1). The statute does not apply to a pregnant minor's parent or legal guardian or to a person who has obtained written, notarized consent from the parent or guardian. *Id.* § 39-15-201(c). The law likewise "does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care." *Id.* § 39-15-201(f)(1).

## II.    Factual Background

Plaintiff Rachel Welty is an outspoken abortion advocate and family-law attorney who helps minors access legal abortion care as part of her practice. Hr'g Tr., R.35, PageID #354-356. Before Tennessee's criminal abortion ban took effect, Welty helped pregnant Tennessee teens obtain judicial bypass authorization to access abortion care without parental consent. *Id.* Based on that work, Welty became a visible champion for young people seeking legal abortion care, and she receives outreach from pregnant

minors across the state and referrals from advocacy groups and other lawyers. *See id.* at PageID #383, 385.

Although Tennessee has now banned abortion, Welty continues to counsel pregnant minors on their options for seeking legal abortion care. *Id.* at PageID #356-357. Welty "put[s] the word out" that she "will help" minors who "need information about abortion services." *Id.* at PageID #385-386. She does not generally ask whether a minor client has "the consent of their parent" for an abortion. *Id.* at PageID #357. Welty does not tell minor clients whether to seek abortion care; rather, she provides them with information so they can "make these decisions for themselves." *Id.* at PageID #357-360, 374. When pregnant minors seek guidance, Welty informs them that abortion is safe, common, and normal. *Id.* at PageID #359. She knows this information sometimes persuades clients to seek abortions. *Id.* at PageID #359, 381. When her clients decide to obtain abortions, Welty supports and encourages that decision. *Id.* She facilitates their access to abortion care by "connecting them with resources" or informing them "what clinics are available for them" out of state. *Id.* at PageID #374-375. After Tennessee enacted the recruitment provision, Welty became concerned that these discussions could expose her to criminal or civil liability. *Id.* at PageID #363.

Welty serves on the board of Abortion Care Tennessee (ACT), a fund that provides grants to abortion clinics outside Tennessee "earmarked" for use by Tennessee residents. *Id.* at PageID #363-364. ACT gives minors information about how to access legal abortions, including by traveling out of state or pursuing self-managed medication

abortions. *Id.* at PageID #364-366. Welty regularly hands out literature concerning these options, including to people who are "likely" minors. *Id.* at PageID #366-368; *see* Pamphlets, R.1-2, PageID #19-21.

Welty also speaks publicly about abortion access. For example, she created a social media account "[t]o provide information to Tennesseans about abortion care," including "information about abortion pills and their safety and where they can be accessed." Hr'g Tr., R.35, PageID #369. Welty's public messaging about abortion reaches Tennessee minors. *See id.* at PageID #368-369. But after Tennessee enacted the recruitment provision, Welty stopped posting information about abortion on social media, fearing her statements had been "criminaliz[ed]." *Id.* at PageID #369-370.

Welty was so worried about prosecution under the recruitment provision that she sought clarity on the law's scope from state prosecutors before it went into effect. *See* Letter, R.1-4, PageID #25-27. Welty wrote to the Tennessee district attorneys general within the Middle District of Tennessee and requested their "position on what 'recruits' means" as used in the law. *Id.* at PageID #26. Welty further expressed concern that the recruitment provision reaches "pure speech and *advocacy*," and thus asked them to "disavow" enforcement of the provision against her. *Id.* at PageID #27. None of the district attorneys general even responded to Welty's pre-suit letter. Defs.' SUMF Resp., R.70, PageID #866.

Plaintiff Aftyn Behn is a licensed social worker, an elected official who represents District 51 in the Tennessee House of Representatives, and an outspoken advocate for

reproductive rights. Hr'g Tr., R.35, PageID #387-389. She communicates daily with her constituents and other Tennesseans about topics including abortion access. *Id.* at PageID #388-389. As a social worker and legislator, she holds herself out as a resource for people seeking information about abortion. *Id.* at PageID #390-392. She tells Tennessee residents how to obtain legal abortion care, including by going to out-of-state clinics. *Id.* While she does not verify anyone's age, Behn believes the constituents she advises include minors. *Id.* at PageID #389-390. Like Welty, Behn does not pressure pregnant minors to obtain abortions; instead, she gives them "information so that they can make an informed decision." *Id.* at PageID #392-395. When a client or constituent decides to seek abortion care, Behn validates, supports, and encourages that decision. *Id.*

Behn spoke out against the bill that became Tenn. Code Ann. § 39-15-201. *Id.* at PageID #396. She posted on X that the law "would criminalize supporting young people in Tennessee when they are considering or seeking an abortion" and could cover "publicly shar[ing] information about how to seek an abortion." X Post, R.1-5, PageID #38-39. She added: "I welcome the opportunity to take a young person out of state who wants to have an abortion even if it lands me in jail." *Id.* at PageID #40.

During the House debate on the bill, Behn's social-media post loomed large. When asked what recruitment under the bill "would look like," the bill's sponsor declined to define the term and instead offered two examples. House Tr., R.1-6, PageID #60-61. First, he urged legislators to "Google the story" of Planned Parenthood in

Missouri allegedly "recruiting children to take them across state lines to abort their babies." *Id.* Second, he pointed to Behn's social-media post and said: "that is what recruitment looks like." *Id.* Behn took the episode as a "threat" that she could be prosecuted for her advocacy. Hr'g Tr., R.35, PageID #401-402.

## III.    Procedural History

Fearing prosecution, Plaintiffs brought a pre-enforcement challenge to the recruitment provision before it went into effect. *See* Compl., R.1, PageID #1-15. They sued 11 of Tennessee's 32 district attorneys general. Plaintiffs alleged that the recruitment provision violates the First Amendment, both facially and as applied to Plaintiffs' speech, and is unconstitutionally vague. *Id.* at PageID #9-15.

Over the course of the litigation, Defendants have offered shifting arguments in support of the recruitment provision. At first, they read the provision to encompass any successful persuasion. Defs.' PI Opp'n, R.22, PageID #218-219. And they argued that the law could constitutionally be applied to Plaintiffs because their speech was integral to criminal conduct and thus exempt from the First Amendment, "even when the underlying criminal [abortion] would take place in a jurisdiction where it is legal." *Id.* at PageID #222. They said Supreme Court precedent holding that the First Amendment protects speech about legal abortions had been implicitly overruled by *Dobbs.* Defs.' Br. 51-52, *Welty v. Dunaway*, 145 F.4th 628 (6th Cir. 2025) (No. 24-5968) ("Defs.' PI Appeal Br."). Later, Defendants abandoned their argument that the law could be constitutionally applied to Plaintiffs' speech about legal abortions and instead

argued that the law does not apply to Plaintiffs at all. Defs.' MSJ Reply, R.75, PageID #933.

Following an evidentiary hearing, the district court preliminarily enjoined Defendants from enforcing the recruitment provision. Mem., R.40, PageID #538-586. While Defendants appealed the preliminary injunction, the parties filed cross-motions for summary judgment. Nearly every material fact was undisputed. *See* Defs.' SUMF Resp., R.70, PageID #856-885.

The district court granted Plaintiffs' motion for summary judgment as to their First Amendment claims, ruled for Defendants on vagueness, permanently enjoined Defendants from enforcing the recruitment provision, and entered final judgment. Mem. Op., R.81, PageID #1101-1132; Judgment, R.84, PageID #1138-39. This Court held that the entry of final judgment mooted the preliminary injunction appeal. *Welty v. Dunaway*, 145 F.4th 628, 629-30 (6th Cir. 2025) (per curiam). Defendants then appealed the final judgment, and Plaintiffs filed a protective cross-appeal.

<u>**SUMMARY OF ARGUMENT**</u>

**I.** Plaintiffs have pre-enforcement standing to challenge the recruitment provision. The First Amendment arguably protects Plaintiffs' speech advocating for abortion rights, sharing information about how and where to obtain legal abortions, and counseling minors about their options for seeking legal abortions. The recruitment provision arguably criminalizes that speech: the plain meaning of "recruit" encompasses speech that encourages someone to do something. And Plaintiffs' fear of prosecution

is credible. The provision objectively chills speech because it would cause a reasonable speaker to self-censor. Both the law's legislative sponsor and Defendants' own amici have said that Plaintiffs' speech violates the recruitment provision, giving credence to the risk of enforcement. And Defendants have declined to disavow prosecution.

**II.** The recruitment provision violates the First Amendment three times over. First, the district court correctly held that the recruitment provision is unconstitutional as applied to Plaintiffs because it discriminates against their speech based on viewpoint. Defendants have forfeited any challenge to that as-applied holding on appeal. The recruitment provision is facially unconstitutional for the same reason. It bans speech that supports minors' decision to obtain legal abortions, while permitting speech seeking to dissuade minors from having abortions. Such facial viewpoint discrimination triggers strict scrutiny, which Defendants do not even attempt to satisfy. The provision is also unconstitutionally overbroad because its unconstitutional applications to protected speech about legal abortions far outweigh its legitimate sweep.

**III.** Alternatively, the recruitment provision is unconstitutionally vague. Ordinary citizens cannot determine what the provision proscribes because the word "recruit" makes no sense in the context of abortion.

**IV.** The district court properly enjoined Defendants from enforcing the recruitment provision. Contrary to Defendants' suggestion, the injunction is not "statewide." It applies to only 11 of Tennessee's 32 district attorneys general, all of whom have jurisdiction only within the Middle District of Tennessee. The injunction

prevents enforcement of the recruitment provision against nonparties, but that is appropriate to remedy the provision's overbreadth and consistent with the history of equity.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Cash-Darling v. Recycling Equip., Inc.*, 62 F.4th 969, 974-75 (6th Cir. 2023).

## ARGUMENT

**I.     Plaintiffs have standing to challenge the recruitment provision.**

To establish Article III standing, a plaintiff must satisfy three familiar elements: injury in fact, causation, and redressability. *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024). Defendants do not contest causation or redressability, nor could they. This Court has held that when a plaintiff seeks to enjoin a "potential" prosecution under a Tennessee statute, a district attorney general "would cause that injury by filing the charges, and the district court could redress it by enjoining [him] from doing so." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022). That leaves only the injury-in-fact requirement in dispute.

An injury in fact must be "actual or imminent and concrete and particularized." *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022). "[A] law need not be enforced against a speaker" for that speaker to "establish an imminent injury to her free speech rights." *Kareem*, 95 F.4th at 1022. "[S]elf-censorship" is "a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393

(1988); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014) (recognizing that speakers may "refrain[] from core political speech" rather than "risking costly" enforcement proceedings). To guard against laws that chill speech, courts apply a "specialized framework … to determine whether an enforcement action is sufficiently imminent to support Article III jurisdiction." *Yellen*, 54 F.4th at 336. Plaintiffs have standing for a pre-enforcement challenge if "(1) they intend to engage in expression that the Free Speech Clause arguably protects, (2) their expression is arguably proscribed by the challenged [law], and (3) they face a credible threat of enforcement." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (citing *Driehaus*, 573 U.S. at 159).

"[T]he rationale for pre-enforcement challenges applies with particular force to the First Amendment." *Kareem*, 95 F.4th at 1023. "The Supreme Court has often found standing to challenge criminal statutes on First Amendment grounds even when those statutes have never been enforced." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003). Standing "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022).

## A. Plaintiffs' speech is arguably protected by the First Amendment.

Plaintiffs have demonstrated "an intent to engage in 'expression that the Free Speech Clause arguably protects.'" *Kareem*, 95 F.4th at 1022 (quoting *Fischer*, 52 F.4th at 307). Plaintiffs engage in "three categories" of "protected speech." Mem. Op., R.81, PageID #1109. First, Plaintiffs engage in "public advocacy" by "express[ing] their views

on abortion." *Id.* Welty is "an outspoken and unapologetic advocate for safe and healthy access to abortion care" who "has given speeches, participated in marches, and talks to a lot of reporters about abortion access." Defs.' SUMF Resp., R.70, PageID #857, 859. Behn "has been one of the most vocal proponents of abortion access in Tennessee for quite some time" and engages in "public advocacy and discussion of abortion care." *Id.* at PageID #870-871. The First Amendment protects that core political speech. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469-70 (2007); *Matsumoto*, 122 F.4th at 812 ("Public advocacy and education campaigns on issues of public interest are … protected political speech.").

Second, Plaintiffs "share information about legal abortion, including how to obtain a legal out-of-state abortion." Mem. Op., R.81, PageID #1110. Welty serves on the board of an abortion fund that has a website with abortion-related information and distributes "lots of literature" about abortion options. Hr'g Tr., R.35, Page ID #366-367. Behn provides constituents and the public information about "how to contact the nearest abortion provider outside" Tennessee. *Id.* at PageID #391. Sharing information about legal abortion "involve[s] the exercise of the freedom of communicating information and disseminating opinion." *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975); *see also Matsumoto*, 122 F.4th at 812.

Third, and most significant, Plaintiffs "counsel, support, and encourage unemancipated minors seeking legal abortions." Mem. Op., R.81, PageID #1110. Welty advises unemancipated minor clients "who come to her for assistance … about ways

they can legally obtain an abortion." Defs.' SUMF Resp., R.70, PageID #860. She tells "her clients that abortion is safe, common, and normal." *Id.* And once a client decides to obtain an abortion, Welty helps them "execute" that plan "by connecting them with resources, including financial resources; giving them information about what clinics are available for them out of state; or giving them information about abortion pills." *Id.* at PageID #862. Behn similarly advises unemancipated minor clients about legal abortion options. *Id.* at PageID #876-877. "On a few occasions," a client who "began a conversation" with Behn "unsure about what they wanted to do" ultimately "left that conversation convinced that they should have an abortion." *Id.* at PageID #878 (internal quotation marks omitted). The First Amendment protects that speech, too. Speech counseling women not to obtain abortions is constitutionally protected, and the same must also be true of speech with the opposite message. *See McCullen v. Coakley*, 573 U.S. 464, 472-73, 496-97 (2014); *Hill v. Colorado*, 530 U.S. 703, 708, 714-15 (2000); *Matsumoto*, 122 F.4th at 811-12. Similarly, "talk therapy to further a minor client's goal" is "at least arguably protected by the First Amendment." *Cath. Charities of Jackson, Lenawee, & Hillsdale Cntys. v. Whitmer* (*Cath. Charities*), 162 F.4th 686, 690 (6th Cir. 2025).[1]

---

[1] Although Defendants do not contest that Plaintiffs' speech is arguably protected, *see* Defs.' Br. 21-22, one of Defendants' amici contends Plaintiffs' speech is unprotected because it is integral to criminal conduct, *see* Thomas More Amicus Br. 8-10. But the amicus brief identifies no criminal conduct furthered by Plaintiffs' speech. Plaintiffs' advocacy concerns only *legal* abortions, and a state may not criminalize "disseminating information about an activity that is legal in [another] [s]tate." *Bigelow*, 421 U.S. at 824-25. When an adult "recruits" a minor to procure a legal abortion, "there is no underlying

**B.** **Plaintiffs' intended speech is arguably prohibited by the recruitment provision.**

A court's "threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). For purposes of pre-enforcement standing, therefore, Plaintiffs need not prove conclusively that their speech violates the recruitment provision, but only that the provision "*arguably* proscribe[s] this speech.*" *Fischer*, 52 F.4th at 307 (emphasis added). If a challenged law "when 'given one construction' would establish jurisdiction and would defeat it when 'given another,' then the plaintiff has established jurisdiction." *Yellen*, 54 F.4th at 349 n.16 (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)).

On any plausible reading of the recruitment provision, Plaintiffs' "expression is arguably prohibited." *Kareem*, 95 F.4th at 1022. Indeed, even Defendants' amicus agrees that "the district court correctly recognized that the plaintiffs' abortion counseling falls squarely within the prohibition in section 39-15-201." Thomas More Amicus Br. 8.

**1.** Tennessee courts interpret statutes according to their text. *State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022). The recruitment provision makes it a crime to "recruit[]" an unemancipated minor "for the purpose of" "[p]rocuring" an abortion that

---

offense but the recruitment itself." *Matsumoto*, 122 F.4th at 814. And merely "[l]abeling protected speech as criminal speech cannot, by itself, make that speech integral to criminal conduct." *Id.*; *see also Yellowhammer Fund v. Marshall*, 776 F. Supp. 3d 1071, 1106-08 (M.D. Ala. 2025).

would be illegal in Tennessee, "regardless" of where the abortion occurs. Tenn. Code Ann. § 39-15-201(a). Plaintiffs' speech arguably satisfies each element of the statute.

The parties' disagreement about the meaning of the provision has largely centered on the word "recruit." As a verb, "recruit" has many definitions, but the most relevant are "to seek or enlist new members, supporters, or employees" or "[t]o induce or enlist (a person) to participate or provide assistance." *Recruit*, Oxford English Dictionary, https://perma.cc/NY83-59PK; *see also, e.g.*, *Recruit*, Merriam-Webster Dictionary, https://perma.cc/J37P-Z8L8 ("to seek to enroll"; "to enlist new members"); *Recruit*, Cambridge Dictionary, https://tinyurl.com/3h9v34th ("to persuade someone to become a new member of an organization" or "to find new people to take part in an activity or event, or to help you in some way"). Analyzing these definitions, the Ninth Circuit concluded that "[t]he ordinary meaning of the verb 'recruit' is to seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event." *Matsumoto*, 122 F.4th at 808. Defendants have consistently conceded this definition is "correct." Defs.' PI Appeal Br. 52-53; Defs.' MSJ Mem., R.69, PageID #846.

That definition of "recruit" arguably encompasses Plaintiffs' speech. Plaintiffs advocate for abortion access, disseminate information about how and where to obtain legal abortions, and counsel individual unemancipated minors about legal abortion options—and that speech induces some minors to obtain abortions. Welty "is aware, based on her experience, that providing her minor clients accurate information about

18

legal abortion care options persuades some of them to get an abortion." Defs.' SUMF Resp., R.70, PageID #861. Likewise, "[i]ndividuals who were unsure about whether to have an abortion have sought information about abortion care from Ms. Behn and then decided afterward to obtain a legal abortion." *Id.* at PageID #876-877. That arguably qualifies as recruiting. As the Ninth Circuit explained, "recruiting" could include providing "information … regarding the provider, time, place, or cost of an available abortion," as well as "financial support and logistical assistance," "[l]egal advice" that "persuades a minor to obtain a legal abortion," and "expressions of persuasive encouragement." *Matsumoto*, 122 F.4th at 809-10.

Plaintiffs' speech also arguably meets the statute's other elements. They speak "intentionally" and "for the purpose of" helping minors "[p]rocur[e]" abortions. Tenn. Code Ann. § 39-15-201(a). It is undisputed that "[w]hen Ms. Welty's clients decide they want an abortion, Ms. Welty supports and encourages that decision." Defs.' SUMF Resp., R.70, PageID #861. Likewise, "[w]hen people make the decision to obtain a legal abortion, Ms. Behn validates it, supports it, and encourages it." *Id.* at PageID #878. And although the abortions that Plaintiffs help facilitate are legal where they occur, they would be illegal in Tennessee. Tenn. Code Ann. § 39-15-213. Plaintiffs' speech thus arguably violates the recruitment provision.

The Court need not take Plaintiffs' word for it. Three Ninth Circuit judges concluded that speech like Plaintiffs' advocacy and counseling violated the recruitment provision of Idaho's materially identical abortion trafficking law. *See Matsumoto*, 122

F.4th at 808-11; *see also id.* at 819 (Bea, J., concurring in the judgment in part and dissenting in part) (agreeing plaintiffs faced a credible threat of prosecution). And Defendants' own amicus insists Plaintiffs are violating Tennessee's recruitment provision by "help[ing] minors in Tennessee kill their unborn children by encouraging them to travel to jurisdictions where abortion remains legal." Thomas More Amicus Br. 1. If a sister circuit, the two district court judges who considered this case below, and Defendants' own supporters believe Plaintiffs' speech constitutes recruitment, then surely that position is at least arguable. Indeed, Defendants themselves told the district court that speech much like Welty's could "[o]f course" be covered. *Compare, e.g.*, Defs.' MSJ Mem., R.69, PageID #828 ("Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for 'recruiting.'"), *with* Defs.' SUMF Resp., R.70, PageID #862 (Welty explaining that she helps individual clients "execute" their plan to obtain out-of-state abortions).

**2.** Defendants' contrary arguments are unpersuasive. Defendants contend that the recruitment provision applies only to "targeted conduct that seeks to drive a person to engage in a particular action." Defs.' Br. 18. But nothing in the law's text supports that unnaturally narrow interpretation.

Defendants first attempt to locate their "intentional targeting" requirement in the word "recruit." Defs.' Br. 17-18. But even their cherry-picked definition—"to induce or enlist (a person) to participate"—does not say anything about targeting. *Id.* at

18. A general public message could induce participation. The Army's iconic Uncle Sam poster, which stated "I Want You" and "Nearest Recruiting Station," surely constituted recruiting. *See Uncle Sam: We Want You*, The National WWI Museum and Memorial, https://perma.cc/534S-GX7H. Other definitions of "recruit" are broader, referring to recruiting directed to plural "people." *See Recruit*, Cambridge Dictionary, *supra* ("to find new people to take part in an activity or event").

Defendants' appeal to "[c]ontext and canons of construction" is also unavailing. *See* Defs.' Br. 18-20. Defendants argue that the statute's three verbs—"recruit[]," "harbor[]," and "transport[]"—should be read together under the *noscitur a sociis* canon. Defs.' Br. 19-20. But *noscitur a sociis* "is no help absent some sort of gathering with a common feature to extrapolate." *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 379-80 (2006). "A list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010). Here, the word "recruit" has nothing in common with "harbor" or "transport." *See* Mem., R.40, PageID #575 ("By the defendants' logic, a person who said that he had eaten 'corn, green beans, and steak' for dinner would be saying that steak is a vegetable."). And in any event, none of the three terms includes an intentional targeting requirement that could be imported to the others. *See Transport*, Merriam-Webster Dictionary, https://perma.cc/CH7G-69WN ("to transfer or convey from one place to another"); *Harbor,* Merriam-Webster Dictionary, https://perma.cc/5VY7-CRSQ ("to give shelter or refuge to").

Defendants also invoke constitutional avoidance. Defs.' Br. 20-21. But that canon does not apply to standing. "For standing purposes," this Court must "accept as valid the merits of [Plaintiffs'] legal claims" by assuming the recruitment provision is unconstitutional. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). Avoidance comes in only when a court reaches the merits. The canon "is a tool for choosing between competing plausible interpretations of a statutory text," presuming that the legislature "did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Adopting an interpretation to defeat standing would not resolve constitutional doubts. It would merely prevent Plaintiffs from raising them.

Defendants insist that the recruitment provision is limited to "elective abortion[s]" that occur "without parental consent." Defs.' Br. 18. But that is both wrong and irrelevant to standing. It is wrong because the law's parental-consent exception applies only to "[a] person who has obtained the written, notarized consent of the unemancipated minor's parent or legal guardian" for the *recruiting*, not for the underlying *abortion*. Tenn. Code Ann. § 39-15-201(c). A person can thus violate the provision by recruiting without notarized parental consent, even if a minor's parents ultimately consent to any resulting abortion. And it is irrelevant because Plaintiffs do not obtain written, notarized parental consent before counseling minors, so the exception cannot defeat their standing.

Another problem with Defendants' interpretation is that it would render superfluous the law's exception for "the provision of a medical diagnosis or

consultation regarding pregnancy care." Tenn. Code Ann. § 39-15-201(f)(1). There would have been no need for such an exception if the statute applied only to intentional targeting. Tennessee courts would not adopt an interpretation that gives this exception no work to do. *See Womack v. Corr. Corp. of Am.*, 448 S.W.3d 362, 373 (Tenn. 2014).

Common usage does not support Defendants' interpretation either. *See* Defs.' Br. 20. In everyday speech, recruiting can include communications directed at an audience of more than one. A company with several job openings might host a recruiting event open to the public. Or a college basketball coach might hold an open tryout to recruit walk-ons to round out the team. Recruiting can also occur without an intent to persuade. A legal recruiter might work with a law firm associate to find a new position, without intending to persuade her to accept any particular job. Or a college football coach might host a top high school player for a campus recruiting visit, even while insisting the player should make whatever decision is best for him.

At bottom, the most natural understanding of the recruitment provision is that it encompasses speech advocating for legal abortion, providing information about legal abortion, and counseling unemancipated minors on the decision to procure a legal abortion. *Matsumoto*, 122 F.4th at 809-10. On that interpretation, Plaintiffs' speech is covered.

**3.** Even on Defendants' narrower interpretation, Plaintiffs arguably violate the recruitment provision by helping unemancipated minors procure abortions. Although Plaintiffs may not initially set out to persuade their minor clients, once the client decides

to have an abortion, Plaintiffs speak with the purpose of helping and encouraging those minors to carry out their plans. *See, e.g.*, Hr'g Tr., R.35, PageID #360 ("[O]nce they choose a path, I help them execute it."); *id.* at PageID #381 (agreeing that providing minor clients with "accurate information is persuasive to some of them"); *id.* at PageID #395 ("If [minor clients] make [the] informed decision to obtain an abortion … [I] support them in doing so."). That one-on-one encouragement arguably constitutes the sort of individualized inducement that Defendants say counts as recruiting. Although they largely ignore this aspect of Plaintiffs' speech on appeal, *see* Defs.' Br. 21-22, Defendants have never disputed that Plaintiffs engage in individualized counseling that helps minors obtain abortions. *See* Defs.' SUMF Resp., R.70, PageID #861-862, 878.

Plaintiffs also arguably satisfy the statute's mens rea elements, even on Defendants' interpretation. To be liable under the recruitment provision, a person must "intentionally recruit[]" a minor "for the purpose of" "[p]rocuring" an abortion that would be illegal in Tennessee. Tenn. Code Ann. § 39-15-201(a). The requirement that recruitment be "intentional[]" does little work because, under Tennessee law, an act is intentional either if the actor intends the result or merely intends to engage in the conduct. *See* Tenn. Code Ann. § 39-11-302(a). Plaintiffs satisfy this element because they intend to engage in their speech.

As for the requirement that the recruiter act "for the purpose of" procuring an abortion, Defendants are wrong that Plaintiffs have "disavowed any such intent." Defs.' Br. 23. Although Plaintiffs do not set out to persuade their minor clients, once the

minor decides to have an abortion, Plaintiffs speak for the "purpose" of encouraging those minors and helping them to obtain legal abortions. That is arguably covered by the statute.

Regardless, "a plaintiff who wishes to challenge the constitutionality of a law" is not required "to confess that he will in fact violate that law." *Driehaus*, 573 U.S. at 163. In *Driehaus*, the plaintiff organization "insist[ed] that its speech [was] factually true," but the Supreme Court recognized that a ban on "knowing[ly]" false statements still might be applied to the organization's speech. *Id.* Here, Plaintiffs deny setting out to persuade, but a prosecutor and jury might disagree—not by misreading the statute, but based on a different view of Plaintiffs' conduct. In Tennessee, mens rea "may be established exclusively by circumstantial evidence," *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), and Plaintiffs' counseling arguably constitutes targeted inducement.

### C. Plaintiffs face a credible threat of enforcement.

Lastly, "there exists a credible threat of prosecution." *Driehaus*, 573 U.S. at 158-59 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "In a First Amendment pre-enforcement case, this test is met when 'the threat of future enforcement' under the statute 'is substantial.'" *Cath. Charities*, 162 F.4th at 691 (quoting *Driehaus*, 573 U.S. at 158).[2]

_____

[2] Relying on stray language from *Crawford v. U.S. Department of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017), Defendants suggest that a "*certain*" threat of prosecution is required. But that misstatement of the law is not binding here. It is inconsistent with Supreme

"[A] variety of facts can demonstrate a credible threat of enforcement." *Fischer*, 52 F.4th at 307. "[T]he first and most important factor is whether the challenged action chills speech." *Id.* (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)). Where a law creates an "objective chill," that "direct injury" alone shows a credible threat of enforcement. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764-65 (6th Cir. 2019). A law imposes an objective chill if it is "regulatory, proscriptive, or compulsory" and the plaintiff's speech is "subject to the regulations, proscriptions, or compulsions." *Id.* at 765 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). "The inquiry is whether the government official's conduct would cause a person of 'ordinary firmness' to self-censor." *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 492 (8th Cir. 2025) (en banc); *see also Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025) ("Article III injury exists where there is an objectively reasonable chilling effect on the plaintiff's speech and he self-censors as a result."). Although Defendants skip the objective-chill analysis in their opening brief, Tennessee has previously recognized it as an independent basis for standing. *See, e.g.*, States Amicus Br. 13-14, *Henderson*, 163 F.4th 478 (Nos. 23-1374, 23-1880) (arguing plaintiffs have standing if they are "objectively reasonably chilled").

---

Court precedent, which requires only a "credible" threat of enforcement, *Driehaus*, 573 U.S. at 158-59, and the error was recently corrected by this Court sitting en banc, *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 742 (6th Cir. 2025) (en banc).

Here, the recruitment provision "objectively chill[s] speech," which alone establishes a credible threat of enforcement. *Schlissel*, 939 F.3d at 765. The recruitment provision "expressly bans speech in which the plaintiffs seek to engage" and "threatens them" with criminal prosecution. *Cath. Charities*, 162 F.4th at 691. In *Schlissel*, this Court held that a campus speech response team with no "formal disciplinary power" created an objective chill by making referrals to authorities and inviting students to meetings. 939 F.3d at 765. If those actions created an objective chill, then surely the possibility of criminal prosecution under the recruitment provision does too. And any ambiguity in the law's coverage only increases the chilling effect. *See NAACP v. Button*, 371 U.S. 415, 438 (1963).

Even in the absence of an objective chill, a plaintiff can demonstrate a credible threat of enforcement by establishing a "subjective chill," *Fischer*, 52 F.4th at 307, in combination with some further indication that the risk of prosecution is real, *Kareem*, 95 F.4th at 1022-23. Plaintiffs here have indisputably shown a subjective chill. Defendants did not contest at summary judgment that Plaintiffs' "fear of prosecution is 'subjectively credible.'" Defs.' SUMF Resp., R.70, PageID #868, 874-875. Both Plaintiffs fear prosecution for their abortion-related speech. *See* Hr'g Tr., R.35, PageID #361-363, 369-371, 401-402. And Welty has limited her protected expression because of this fear. *See id.* at PageID #369-370. "That chill is proof by omission—the plaintiffs want to speak on a topic, but do not—that they face a credible threat of enforcement." *Cath. Charities*, 162 F.4th at 691.

Once subjective chill is established, the question becomes whether a plaintiff's "fear of criminal prosecution" is credible rather than "imaginary or wholly speculative." *Babbitt*, 442 U.S. at 302. "Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer*, 52 F.4th at 307. In conducting this "holistic[]" analysis, *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 418 (6th Cir. 2025), courts in this circuit sometimes look to four "commonly recurring factors" that indicate a probability of enforcement, *Fischer*, 52 F.4th at 307. Those factors are (1) "a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," (3) "an attribute of the challenged statute that makes enforcement easier or more likely," and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *McKay*, 823 F.3d at 869. But the *McKay* factors "are not exhaustive, nor must each be established." *Kareem*, 95 F.4th at 1023 (quoting *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)). "At bottom, [the] inquiry distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (quoting *Nabors*, 35 F.4th at 1034).[3]

---

[3] Defendants are wrong to suggest that *McKay* creates a balancing test in which a weaker showing on one factor requires a stronger showing on another. Defs.' Br. 32-33. This Court has emphasized that the factors are neither a "laundry list," *Fischer*, 52 F.4th at 307, nor "exhaustive," *Kareem*, 95 F.4th at 1023. And the Court has frequently found standing based on chilled speech plus only one or two additional factors, including in

Here, surrounding circumstances, including some combination of the non-exhaustive *McKay* factors, show that Plaintiffs credibly fear prosecution. To start, the recruitment provision is a new law that will presumably be enforced. *See Nabors*, 35 F.4th at 1035 (finding standing to challenge a law that had not "fallen into desuetude"). When dealing with a recently enacted law, this Court has found that "the statutory language" itself can "evince[] a credible threat of prosecution." *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987). Other courts of appeals have likewise recognized a heightened risk of prosecution under new laws. *See, e.g.*, *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020). "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Am. Booksellers Ass'n*, 484 U.S. at 393. To the contrary, the law's fiscal note assumed prosecutions would occur under the recruitment provision. *See* Fiscal Note, R.29-1, PageID #328-330.

In considering credible fear, this Court has also looked to the "explanation" for a law. *See Nabors*, 35 F.4th at 1034. Remarkably, in explaining the purpose of the recruitment provision, the bill's sponsor did not just point to speech similar to that of Plaintiffs; he pointed to Behn's own words. *See* House Tr., R.1-6, PageID #61.

_____

several cases decided within the past few months. *E.g.*, *Cath. Charities*, 162 F.4th at 691; *Defending Educ.*, 158 F.4th at 741; *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025).

Defendants cannot plausibly argue that there is no credible threat when one of the law's drafters identified Behn's specific speech as "what recruitment looks like." *Id.*

The criminal nature of the recruitment provision further justifies Plaintiffs' fears. Criminal laws more readily support pre-enforcement standing, *Kareem*, 95 F.4th at 1025, because a law with "penal implications" can produce "self-censorship." *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007); *see also Am. Booksellers*, 484 U.S. at 393.

Turning to the *McKay* factors, the first two, concerning past enforcement and warning letters, carry little weight in this case because Plaintiffs challenged the recruitment provision before it went into effect. As the district court correctly recognized, viewing the lack of enforcement history and warning letters as dispositive under these circumstances would "effectively be an outright bar on any suit challenging a newly enacted Tennessee criminal law." Mem. Op., R.81, PageID #1117; *see Nabors*, 35 F.4th at 1035 (noting that it was "unsurprising" that "no one ha[d] been prosecuted under" a law enjoined "[a]lmost as soon as [it] went into effect"). This Court has routinely found pre-enforcement standing where neither factor is present. *See, e.g., Cath. Charities*, 162 F.4th at 691; *Christian Healthcare Ctrs.*, 117 F.4th at 848-49; *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014). For instance, the en banc Court recently found pre-enforcement standing even though a challenged policy had been in place for a decade without being enforced against the type of conduct at issue. *See Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158

F.4th 732, 741 (6th Cir. 2025) (en banc). And rightfully so: "[T]he Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff." *Vitagliano v. County of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023). The state cannot rely on the mere fact that a "criminal penalty provision has not yet been applied and may never be applied" to defeat pre-enforcement review. *Babbitt*, 442 U.S. at 302.

The credibility of Plaintiffs' fear is bolstered by several "attributes of the law that would make enforcement more likely." *Online Merchs. Guild*, 995 F.3d at 551. This Court recently found this factor satisfied merely because "anyone can file a complaint alleging" a violation of a criminal law, "thereby initiating a possible investigation." *Cath. Charities*, 162 F.4th at 691. In Tennessee, members of the public can do that and more. Under Tennessee's unique grand jury system, meetings must be publicly announced, inviting "[a]ny person having knowledge or proof that an offense has been committed" to testify. Tenn. Code Ann. § 40-12-105(a); *see also id.* § 40-12-104(a). And district attorneys general have "both a 'constitutional and statutory obligation to prosecute offenses committed in'" their jurisdictions. *Nabors*, 35 F.4th at 1035 (quoting *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999)); *see* Tenn. Code Ann. § 8-7-103. Citizens can make arrests, too. *See* Tenn. Code Ann. § 40-7-109. And in addition to the possibility of citizen-initiated criminal prosecutions, the recruitment provision includes a private enforcement mechanism that subjects Plaintiffs to the risk of liability "in a civil action for … wrongful death." Tenn. Code Ann. § 39-15-201(e)(2); *see Driehaus*,

573 U.S. at 164. Where "any person—not just a prosecutor or state agency—may initiate enforcement," the risk is more credible. *Platt*, 769 F.3d at 452.

The possibility of citizen-initiated enforcement is far from fanciful given Plaintiffs' identities and the nature of their speech. Plaintiffs are highly visible public figures, and one is an elected official, making them "easy targets" for "political opponents." *Driehaus*, 573 U.S. at 164. As the district court observed, Plaintiffs speak out on a topic that is "strongly disfavored by many Tennesseans" and has created an "acrimonious environment." Mem., R.40, PageID #560. Meanwhile, one of Defendants' amici accuses Plaintiffs of helping minors "kill their unborn children" and might well seek to initiate an investigation or prosecution against them. *See* Thomas More Amicus Br. 1.

Defendants have also consistently refused to disavow enforcement of the recruitment provision against Plaintiffs. A failure to "explicitly disavow[] enforcing [a law] in the future" supports pre-enforcement standing. *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015); *Nabors*, 35 F.4th at 1035; *Cath. Charities*, 162 F.4th at 691. Before commencing litigation, Welty wrote to all Defendants asking them to "disavow" enforcement of the recruitment provision against her. *See* Letter, R.1-4, PageID #25-27. None even responded. Defs.' SUMF Resp., R.70, PageID #866. Defendants also declined to clarify their intentions by testifying at the preliminary-injunction hearing or by providing declarations, even after the district court invited them to do so. *See* Mem., R.40, PageID #562.

Defendants are wrong that their counsel's statements in briefing qualify as disavowing enforcement. This Court recently clarified that the disavowal must come "in a non-litigation context" and be "'more than a mere litigation position.'" *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) (quoting *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010)); *see also, e.g.*, *Cruz*, 596 U.S. at 299-301 (finding pre-enforcement standing despite "the Government arguing" that the plaintiffs' intended conduct "would *not* violate the statute"). Worse yet, Defendants' counsel here disclaimed prosecution only for standing purposes while simultaneously arguing on the merits that Plaintiffs' speech could constitutionally be prosecuted. *See* Defs.' PI Opp'n, R.22, PageID #221-222 (contending that if the law did apply to Plaintiffs, they could be prosecuted because their speech induced illegal activity). That is not a valid disavowal.

## II.    The recruitment provision violates the First Amendment, both as applied and on its face.

Defendants do not challenge on appeal the district court's holding that the recruitment provision is unconstitutional as applied to Plaintiffs' speech. At a minimum, therefore, this Court must affirm the district court's judgment on Plaintiffs' as-applied claim, which is correct in any event. The recruitment provision also facially violates the First Amendment for two reasons. First, it restricts speech based on viewpoint and thus triggers at least strict scrutiny, which Defendants make no attempt to satisfy. Second, it is unconstitutionally overbroad because the law's unconstitutional applications substantially outweigh its constitutional ones.

### A. The recruitment provision violates the First Amendment as applied to Plaintiffs' speech.

As Defendants concede, Defs.' Br. 12, the district court held that the recruitment provision violates the First Amendment as applied to Plaintiffs' speech, Mem. Op., R.81, PageID #1124. Defendants mount no challenge to that holding on appeal. Defendants' forfeiture means the district court's as-applied ruling must be affirmed.

As the district court explained, Plaintiffs' abortion advocacy is "protected speech." Mem. Op., R.81, PageID #1124. Because Plaintiffs "seek[] only to recruit minors for purposes of obtaining a *legal* abortion," their speech does not implicate the First Amendment exception for "speech integral to crime." *Id.*; *see also supra*, at 16 n.1. And as applied to Plaintiffs' protected speech, the recruitment provision constitutes a content- and viewpoint-based restriction because it "favors speech that dissuades abortion over speech that encourages abortion." Mem. Op., R.81, PageID #1123. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Laws that discriminate based on content or viewpoint are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But Defendants in the district court neither contested that the recruitment provision was content- and viewpoint-based as applied to Plaintiffs' speech nor attempted to satisfy strict scrutiny. Mem. Op., R.81, PageID #1124. The district

court accordingly—and correctly—held that the recruitment provision is unconstitutional as applied to Plaintiffs' speech. *Id.*

On appeal, Defendants make no effort to challenge the district court's as-applied ruling. Defendants have thus forfeited any challenge to it. *See B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 267 (6th Cir. 2008). And at least with respect to party-specific relief for Plaintiffs—which is all Defendants contend is available, *see* Defs.' Br. 53-66—the as-applied ruling is alone sufficient to sustain the district court's judgment. A party "cannot prevail by challenging only one of the bases for the district court's decision," so Defendants' "forfeiture" as to the district court's as-applied holding "dooms their appeal." *Stewart v. IHT Ins. Agency Grp.*, 990 F.3d 455, 457 (6th Cir. 2021).

## B. The recruitment provision is facially unconstitutional because it discriminates based on viewpoint.

Because the recruitment provision discriminates based on viewpoint, it is also "facially unconstitutional." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992); *see Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893-95 (6th Cir. 2021). Viewpoint discrimination is a particularly "egregious form of content discrimination" that punishes speech based on "the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. A law with a "facial viewpoint bias" is facially unconstitutional. *Iancu v. Brunetti*, 588 U.S. 388, 395, 398-99 (2019).

The recruitment provision "on its face burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011). To start, the provision is

"a regulation of speech." *Reed*, 576 U.S. at 163. To "recruit" means to "to seek or enlist new members, supporters, or employees" or "[t]o induce or enlist (a person) to participate or provide assistance." *Recruit*, Oxford English Dictionary, *supra*. As the Ninth Circuit explained, when used in the context of abortion, the word "recruit" is fairly understood to encompass providing "information" about "the provider, time, place, or cost of an available abortion," as well as "[l]egal advice" and "[e]ven expressions of persuasive encouragement." *Matsumoto*, 122 F.4th at 809-10. On any definition, including on Defendants' interpretation, recruitment inherently involves speech.

The recruitment provision regulates that speech based on viewpoint. The law "permits speech on a particular topic only if the speech expresses a viewpoint that the government itself approves." *Cath. Charities*, 162 F.4th at 692. Although Defendants invoke an interest in protecting parental control of minors' healthcare, Defs.' Br. 44-46, they do so only when recruiters express a particular view. Opponents of abortion will be free to publicly and privately discourage minors from seeking lawful abortion care—even without their parents' consent to that speech—but those with the opposite viewpoint will be unable to encourage minors to obtain legal abortions. The recruitment provision thus criminalizes "speech because of its message" and is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

Defendants attempt to salvage the recruitment provision by suggesting that it can be constitutionally applied to unprotected speech, such as speech facilitating an

illegal abortion. Defs.' Br. 39-48. According to Defendants, these constitutional applications of the law mean that Plaintiffs' facial challenge must be analyzed through the lens of overbreadth. Defs.' Br. 37. But the Supreme Court rejected this exact argument in *Iancu*, explaining that it "has never applied" "overbreadth doctrine" "to a viewpoint-discriminatory law." 588 U.S. at 398-99. Every viewpoint-based law could be applied to unprotected speech, but that has never stopped the Supreme Court from striking down content- and viewpoint-based laws on their face, without addressing overbreadth.

In *Matal v. Tam*, 582 U.S. 218 (2017), for example, the Supreme Court "did not pause to consider whether" a viewpoint-discriminatory ban on disparaging trademarks "might admit some permissible applications (say, to certain libelous speech) before striking it down." *Iancu*, 588 U.S. at 399. "The Court's finding of viewpoint bias ended the matter." *Id.* Likewise, in *Reed*, the Town of Gilbert's content-based sign ordinance could have constitutionally been applied to signs containing unprotected speech, such as obscenity, true threats, fighting words, and defamation, yet the Supreme Court held that the law was facially invalid. 576 U.S. at 164. Indeed, in *R.A.V.*, the Supreme Court held a law facially unconstitutional even though it applied *only* to unprotected fighting words, because the law singled out fighting words expressing a particular viewpoint. 505 U.S. at 393-94. A law that discriminates based on viewpoint thus triggers strict scrutiny regardless of whether some of the speech to which it applies might be constitutionally unprotected.

Because the recruitment provision singles out pro-abortion viewpoints for criminal prosecution, it is subject to at least strict scrutiny, *Reed*, 576 U.S. at 164, and "might be unconstitutional per se," *Cath. Charities*, 162 F.4th at 696. Defendants thus bear the burden of showing that the law is "narrowly tailored" to serve a "compelling governmental interest." *Reed*, 576 U.S. at 171. They make no effort to satisfy strict scrutiny, nor could they meet that demanding standard if they tried. The law is significantly broader than necessary to serve the state's interest in preventing trafficking of minors for illegal abortions because it applies to abortions that are legal where they occur. And it is substantially broader than necessary to serve the state's purported interest in preventing abortions that occur without parental consent, because the law requires parental consent for *recruiting* but makes no exception if there is parental consent to the underlying *abortion*. The legislature easily could have drafted the law to apply only to abortions that are illegal where they occur, including because the minor lacks parental consent for an abortion in a state where such consent is required, but it declined to do so. Because strict scrutiny applies, the recruitment provision must fall.

### C. The recruitment provision is unconstitutionally overbroad.

Under the First Amendment, a statute is overbroad if it "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). In such circumstances, "society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid."

*Id.*; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024) (an overbroad law "may be struck down in its entirety"). The overbreadth analysis requires courts to consider "the statute's effect on other parties not before the court." *Zillow, Inc. v. Miller*, 126 F.4th 445, 457 (6th Cir. 2025). This is because of the "concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

The first step in the analysis is to "construe the challenged statute," because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293. This inquiry focuses on "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Speet v. Schuette*, 726 F.3d 867, 873 (6th Cir. 2013) (quoting *City of Houston v. Hill*, 482 U.S. 451, 458-59 (1987)). The second step is "decid[ing] which of the laws' applications violate the First Amendment" and "measur[ing] them against the rest." *Moody*, 603 U.S. at 725.

Defendants are incorrect that a plaintiff must meet a particular evidentiary bar to prevail on an overbreadth claim. *See* Defs.' Br. 49-53. As this Court has recognized, "'[l]itigation by hypothetical' … is sometimes *required* in free-speech cases," because "the whole point of … an overbreadth challenge[] is to permit the claimant to strike the law in its entirety based on its application to other individuals not before the court." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc). The Supreme Court has repeatedly struck down laws as facially overbroad based solely on whether a

hypothesized set of unconstitutional applications substantially outweigh the law's "plainly legitimate sweep," without requiring a detailed factual accounting of the law's applications. *See, e.g.*, *Ams. for Prosperity Found. v. Bonta* (*APF*), 594 U.S. 595, 617 (2021); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247 (2002); *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636-37 (1980); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213, 217 (1975); *cf. United States v. Stevens*, 559 U.S. 460, 476 (2010) (relying on amicus submissions, not evidentiary record). But even if a factual showing were required, Plaintiffs presented ample evidence that the law is overbroad.

### i. The recruitment provision prohibits a substantial amount of protected speech.

**1.** The law criminalizes intentionally recruiting a pregnant unemancipated minor in Tennessee for the purpose of procuring an abortion or abortion-inducing drug that would be illegal in Tennessee. Tenn. Code Ann. § 39-15-201(a). It expressly applies to abortions and abortion-inducing drugs procured legally out of state. *Id.* § 39-15-201(a)(2), (3) (covering abortions that "would" be illegal in Tennessee "regardless" of where they occur). And it does not require that an abortion actually occur. *Id.*

As discussed above, the recruitment provision applies to a broad range of speech. *See supra*, at 17-25, 35-36. "Recruit" means to "seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event." *Matsumoto*, 122 F.4th at 808. Applied to

abortion, "recruiting" includes "providing information," "especially information trying to persuade a girl to have an abortion or regarding the provider, time, place, or cost of an available abortion." *Id.* at 809. Things like "financial support and logistical assistance," "[l]egal advice" that "persuades a minor to obtain a legal abortion," and "expressions of persuasive encouragement" are all covered. *Id.* at 810.

That speech is constitutionally protected. The First Amendment applies to general advocacy and one-on-one counseling regarding abortion. *See McCullen*, 573 U.S. at 472-73, 487-89; *Hill*, 530 U.S. at 714-15; *cf. Cath. Charities*, 162 F.4th at 690. It also covers commercial advertisements regarding the availability of legal out-of-state abortions, even in states where abortion is illegal. *Bigelow*, 421 U.S. at 819, 822-23, 825. In short, the First Amendment covers "information related to the availability of abortions, education on reproductive health care options, and instruction as to how to access an abortion legally," all of which are encompassed by the plain meaning of the recruitment provision. *Matsumoto*, 122 F.4th at 812.

**2.** Defendants contort the statute's text in an effort to narrow its unconstitutional applications and broaden its constitutional ones. But Defendants' interpretation has no basis in the text, and Tennessee courts would not adopt it.

To start, as already explained, the recruitment provision reaches far more protected speech than Defendants recognize. The provision is not limited to targeted, individual interactions, but can encompass advocacy and information sharing, so long

as it is done with the purpose of procuring an abortion or abortion-inducing drugs. *See supra*, at 20-25. These interactions are all constitutionally protected.

Moreover, contrary to Defendants' repeated suggestion, the recruitment provision does not require that an offender seek to recruit a minor for an abortion that occurs without parental consent. *See* Defs.' Br. 38 (describing the provision as applying to "obtaining an elective abortion *without parental consent*" (emphasis added)); *see also, e.g., id.* at xv, 1, 7-8, 17-23, 27, 39, 48. The statute prohibits "recruit[ing] … a pregnant unemancipated minor … for the purpose of … [p]rocuring an act that would constitute a criminal abortion" in Tennessee or "[o]btaining an abortion-inducing drug for the pregnant unemancipated minor for the purpose of an act that would constitute a criminal abortion" in Tennessee. Tenn. Code Ann. § 39-15-201(a)(2)-(3). Because an abortion that occurs lawfully with parental consent in another state "would constitute a criminal abortion" if it occurred in Tennessee, the law criminalizes recruiting for such parentally supported abortions. The law's exceptions are not to the contrary. The statute does not apply to someone who has "the written, notarized consent" of parents to recruit their minor child, Tenn. Code Ann. § 39-15-201(c)(1)-(2), but the law includes no exception tied to whether the minor's parents ultimately consent to an abortion. The recruitment provision thus applies to recruiting a pregnant unemancipated minor to obtain an abortion, even if the recruiting takes the form of telling the minor that she may legally obtain an abortion *with* parental consent or judicial bypass in a state that requires such consent.

Defendants misread the law in other ways in an effort to expand its legitimate sweep, but again their interpretation conflicts with the text. Defendants insist that the Act "constitutionally applies to recruiting incident to extortion, coercion, or the concealment of other criminal conduct," Defs.' Br. 43, but there is no "natural and ordinary meaning" of the word "recruit," *see id.* at 18, that would encompass extorting or coercing a person through "blackmail[]" or "threats of physical harm," *id.* at 43. Indeed, that the recruitment provision does not cover blackmail or threats shows that it is "wildly underinclusive when judged against its asserted justification," raising "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Similarly, although Defendants suggest that Tennessee could validly constrain "recruiting incident to the crimes of 'harboring' and 'transporting' minors," Defs.' Br. 42, that is not how the statute operates. Recruiting, harboring, and transporting are connected in the statute by a disjunctive "or," making recruitment a separate offense from harboring or transporting. *See State v. Capps*, No. 2023-01419, 2024 WL 5135477, at *6 (Tenn. Crim. App. Dec. 17, 2024). The statute thus contemplates that the recruitment provision is violated only if an adult recruits an unemancipated minor to procure *an abortion or abortion-inducing drugs*, *see* Tenn. Code Ann. § 39-15-201(a)—not if the adult "recruits" the minor to be harbored or transported. A person who "recruits" for harboring or transporting might be guilty of solicitation or facilitation of the

harboring or transporting offenses, *see id.* §§ 39-11-402, 39-12-102, but they would not violate the recruitment provision.

Even if the recruitment provision actually covered coercion, extortion, or recruiting incident to harboring or transporting, "[b]road prophylactic rules in the area of free expression are suspect," and "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 438; *see also, e.g., APF*, 594 U.S. at 612-15. The State's "legitimate interest[s] in preventing" these unprotected acts "can be better served by measures less intrusive" than a blanket ban on recruitment that sweeps in a substantial amount of constitutionally protected speech. *Vill. of Schaumburg*, 444 U.S. at 637-38.

Properly construed, the recruitment provision reaches far more protected speech—and far less unprotected speech—than Defendants recognize.

ii.      **A vanishingly small subset of speech covered by the recruitment provision is constitutionally unprotected.**

Once the recruitment provision is properly interpreted, nearly all of its applications restrict protected speech, substantially outweighing its all-but-nonexistent legitimate sweep. *See Hansen*, 599 U.S. at 770. Defendants' contrary arguments overstate the law's applications to speech integral to criminal conduct and misstate the role of parental rights in the First Amendment analysis.

**1.** The vast majority of the speech to which the recruitment provision applies concerns lawful abortions. Although Plaintiffs agree that the recruitment provision

could be constitutionally applied to adults recruiting unemancipated minors to obtain illegal abortions, *see* Defs.' Br. 40-41, that application is unrealistic. Given the availability of legal, safe abortion care in many states, as well as legal medication abortion, it would make no sense to recruit a minor for an illegal abortion in Tennessee, and it would be especially bizarre to recruit a minor to get an abortion in another state where it is illegal. *See* Mem., R.81, PageID #1125-1126; *see also Matsumoto*, 122 F.4th at 813.

The legislative record demonstrates that the recruitment provision's core applications are to protected speech about legal abortions. During floor debates, the law's sponsor did not reference recruitment for unlawful abortions in Tennessee or elsewhere; the only justifications he offered for the bill involved Tennesseans going "across state lines" to get abortion care. *See* Mem., R.81, PageID #1126-1127 (citing House Tr., R.1-6, PageID #60-61). The fiscal note accompanying the law was similarly categorical: In calculating the expected fiscal impact of the law, the General Assembly's Fiscal Review Committee did not anticipate *any* prosecutions arising from illegal abortions procured in Tennessee or other states where it is banned and instead forecast the law's application only to abortions in states where abortion is legal. *See id.* (citing Fiscal Note, R.29-1, PageID #328-329).

Plaintiffs' testimony provided further evidentiary support for the law's unconstitutional applications. Plaintiffs provided extensive information about a wide array of activity covered by the law, including directly counseling minor legal or social work clients regarding legal abortion care options; connecting pregnant minors with

out-of-state abortion clinics; informing minors about their options for seeking legal abortion care; raising money for and giving block grants earmarked for Tennessee residents to out-of-state abortion clinics; giving speeches about self-managed abortions and other topics; and posting on social media regarding safe and legal abortion options. *See, e.g.*, Hr'g Tr., R. 35, PageID #356-359, 363-369, 374-375, 389-391, 394-396, 405, 413. Each of these activities is constitutionally protected expression that is targeted by the recruitment provision, demonstrating that the law's "full set of applications" is nearly entirely unconstitutional. *Moody*, 603 U.S. at 718.

Substantial data supports Plaintiffs' position that the recruitment provision's potential applications nearly all pertain to protected speech about legal abortions. After *Dobbs*, abortions in states where abortion was banned or severely restricted plummeted,[4] while the number of people traveling out of state for abortion care skyrocketed,[5] as did the percentage of self-managed medication abortions.[6] The story in Tennessee matched the national trend: Over six months in 2020, when abortion was legal in Tennessee,

---

[4] *See, e.g.*, Suzanne O. Bell et al., *US Abortion Bans and Fertility*, 333 JAMA 1324, 1331 (2025), https://jamanetwork.com/journals/jama/fullarticle/2830297.
[5] *See* Isaac Maddow-Zimet & Kimya Forouzan, *Stability in the Number of Abortions from 2023 to 2024 in US States Without Total Bans Masks Major Shifts in Access*, Guttmacher Inst. (Apr. 2025), https://perma.cc/4LCV-BRVN.
[6] *See* Abigail R.A. Aiken et al., *Provision of Medications for Self-Managed Abortion Before and After the* Dobbs v. Jackson Women's Health Organization *Decision*, 331 JAMA 1558, 1560 (2024), https://jamanetwork.com/journals/jama/fullarticle/2816817; Geoff Mulvihill, *Abortions Rose in 2024 Due to Pills Available Through Telehealth, Report Finds*, PBS News (June 23, 2025), https://perma.cc/CQV6-7M4B.

4,045 Tennesseans obtained in-state abortions and 1,095 traveled for out-of-state abortions. In an equivalent six-month window in 2023, after Tennessee banned abortion, 5,265 Tennesseans traveled for out-of-state abortions and 1,820 obtained medication abortions from out-of-state providers.[7] There is no reason to think that any significant number of criminal abortions are occurring within the State, much less that anyone is being recruited for such abortions. Defendants' primary justification for the law—that it targets recruitment for illegal abortions as speech integral to criminal conduct—is thus illusory.

Defendants are simply wrong that the recruitment provision can constitutionally apply to speech concerning abortions that occur in states that "require parental involvement before a minor can obtain an elective abortion." Defs.' Br. 50. It is legal for minors to obtain abortions in states requiring parental involvement, and the First Amendment protects speech recruiting unemancipated minors for such abortions. Most minors involve at least one parent in the decision to obtain an abortion,[8] and the recruitment provision applies even to an adult who encourages a minor to procure an abortion in a parental-consent state *with* parental consent for the abortion, *see supra*, at 22, 42. Moreover, all but one of the states requiring parental involvement in the abortion

---

[7] *#WeCount Report: April 2022 to June 2024* at 21, Soc'y of Fam. Planning (Oct. 22, 2024), https://perma.cc/BCC6-6E95.

[8] *See, e.g.*, Lauren Ralph et al., *The Role of Parents and Partners in Minors' Decisions to Have an Abortion and Anticipated Coping After Abortion*, 54 J. of Adolescent Health 428, 430 (2014), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2813%2900520-X.

decision offer a judicial bypass alternative.[9] But an adult who "recruits" an unemancipated Tennessee minor to obtain an abortion by notifying her of judicial bypass options in parental-consent states would still violate the recruitment provision. In the real world, the recruitment provision will reach fleetingly little, if any, speech integral to criminal conduct.

**2.** Defendants' contention that parental rights exclude the recruitment provision from First Amendment scrutiny is meritless. *See* Defs.' Br. 44-48. Even if there were a history and tradition of protecting parental rights over medical decision-making for their minor children, that would not affect the First Amendment analysis unless there were also a historical tradition of regulating third-party *speech* about such decisions. As this Court recently explained, "it takes more than a general tradition of regulation, in some domain of human activity, to validate content- and viewpoint-based restrictions on speech." *Cath. Charities*, 162 F.4th at 693. Instead, "[t]o put a category of speech outside" First Amendment protection, "the government must identify a 'long-settled tradition of subjecting *that speech* to regulation.'" *Id.* at 693-94 (quoting *Stevens*, 559 U.S. at 469). Defendants make no attempt to identify a history or tradition of regulating speech directed at minors regarding their legally available medical decisions.

---

[9] Kimya Forouzan, *Minors' Access to Abortion Care*, Guttmacher Inst.(Nov. 24, 2025), https://perma.cc/8H7P-BRDU.

Nor could they. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). The Supreme Court has identified only "a few limited areas" of unprotected speech, and the government may not "disregard these traditional limitations." *Stevens*, 559 U.S. at 468 (quoting *R.A.V.*, 505 U.S. at 383). "These historic and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—are well-defined and narrowly limited." *Id.* (citations and internal quotation marks omitted). There may be "some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such." *Id.* at 472. "But without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.'" *Brown*, 564 U.S. at 792 (alteration in original) (quoting *Stevens*, 559 U.S. at 470). There is no evidence that the recruitment provision fits into any such tradition.

Providing information and counseling to minors regarding legally available medical decisions is constitutionally protected speech. *See supra*, at 15-16, 41. And speech does not become unprotected merely because it is directed to minors. *See Brown*, 564 U.S. at 794, 802 (states lack a "free-floating power to restrict the ideas to which

children may be exposed" and may not "punish[] third parties for conveying protected speech to children *just in case* their parents disapprove of that speech"). Rather, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Id.* at 804-05. The government may "adjust the boundaries of an existing category of unprotected speech" in light of its effect on children, but attempts to "create a wholly new category of content-based regulation that is permissible only for speech directed at children" are "unprecedented and mistaken." *Id.* at 794 (discussing *Ginsberg v. New York*, 390 U.S. 629, 638 (1968)). Defendants' effort to "make [the recruitment provision] look like obscenity regulation"—and thereby shoehorn a novel subject matter into an existing category of unprotected speech—has been squarely rejected by the Supreme Court. *See id.* at 792. Individuals have the right to communicate, and unemancipated minors have the right to receive, information about lawful abortions. And parental rights do not render this speech constitutionally unprotected.

Defendants also suggest that the First Amendment right to communicate with minors about legal abortion "could be limited when the government has a countervailing compelling interest," like protecting parental rights. Defs.' Br. 47-48. Defendants appear to suggest that a balancing test short of strict scrutiny should apply to the recruitment provision because of the state's purported interest in "fostering parental rights." *Id.* at 47. But "the courts cannot engage in" an "ad hoc balancing of relative social costs and benefits" in deciding whether "a category of speech … is protected by the First Amendment." *Cath. Charities*, 162 F.4th at 694 (quoting *Stevens*,

559 U.S. at 470). If the government bans and subjects to criminal liability a category of speech that is not within one of the "few limited areas" that fall outside First Amendment protection, *Stevens*, 559 U.S. at 468, the law must satisfy strict scrutiny. Defendants cannot meet that standard and make no effort to do so.

## III. Alternatively, the recruitment provision is unconstitutionally vague.

If this Court rules against Plaintiffs on their First Amendment claims, it should affirm on the alternative ground, raised in Plaintiffs' protective cross-appeal, that the recruitment provision is unconstitutionally vague.

The recruitment provision does not define what it means to "recruit" a person to obtain an abortion or abortion-inducing drugs. Neither dictionary definitions, judicial interpretations, the statutory context, nor the legislative history sheds sufficient light on the term or makes sense in the abortion context. Tennesseans are thus unable to discern what conduct is proscribed by the statute.[10]

A law is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Vague criminal laws are especially problematic, because "the consequences of imprecision" are "severe." *Vill. of Hoffman*

---

[10] Plaintiffs' showing, for purposes of pre-enforcement standing, that their conduct is "arguably" covered by the recruitment provision is not inconsistent with their merits argument that the statute is too vague to be definitively construed. Otherwise, a plaintiff could never have standing for a pre-enforcement vagueness challenge.

*Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). And the Constitution is particularly inhospitable to vague laws that "threaten[] to inhibit the exercise of constitutionally protected rights," so "a more stringent vagueness test" applies to a law that "interferes with the right of free speech." *Id.* When a law "is a content-based regulation of speech," vagueness is "a matter of special concern … because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

As Defendants conceded before the district court, the word "recruit" is "susceptib[le] to a wide array of possible meanings." *See* Defs.' PI Opp'n, R.22, PageID #218. Dictionaries provide multiple interpretations. Some say that "recruit" means to "to seek or enlist new members, supporters, or employees." *Recruit*, Oxford English Dictionary, *supra*; *Recruit*, Merriam-Webster Dictionary, *supra* ("to fill up the number of with new members" or "to seek to enroll"). Alternatively, "recruit" can mean "[t]o induce or enlist (a person) to participate or provide assistance." *Recruit*, Oxford English Dictionary, *supra*; *see also Recruit*, Merriam-Webster Dictionary, *supra* ("to secure the services of").

Courts have likewise recognized that "recruit" can mean different things. Recruit can mean "to 'hire or otherwise obtain to perform services,' to 'secure the services of' another, to 'muster,' 'raise,' or 'enlist.'" *Commonwealth v. Dabney*, 90 N.E.3d 750, 764 (Mass. 2018). Recruiting can also involve "seek[ing] out a person to perform a specific task or service." *State v. Cartee*, 577 N.W.2d 649, 652 (Iowa 1998) (internal quotation marks omitted). It may involve "indirect" conduct, like "put[ting] out the word" about

an opportunity. *See Escobar v. Baker*, 814 F. Supp. 1491, 1503 (W.D. Wash. 1993). Or it may entail "persuad[ing] someone to join in or to help with some activity." Defs.' Br. 18 (quoting Post-Trial Jury Instrs., *United States v. Withers*, No. 16-CR-0005, ECF No. 126-2, at 12 (W.D. Wis. Apr. 28. 2017)). Other times, it might mean merely to "encourage." Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007).

That a word has multiple meanings does not alone render a statute vague. Here, however, it is unclear which if any of the usual meanings is intended because the word "recruit" is an awkward fit in the abortion context. Abortion is not an organization that a recruited individual can join, nor does it make sense to talk about "enrolling" a person in an abortion or "enlist[ing]" a person "to provide assistance" by obtaining an abortion. Because the usual meanings of "recruit" do not neatly apply in this context, the public is left to wonder how broadly the statute sweeps.

The "opaque" legislative history reinforces the recruitment provision's vagueness. *Wilson*, 559 U.S. at 298. When asked to "explain what [recruiting] would look like," House Tr., R.1-6, PageID #60, the law's sponsor gave two examples. First, he instructed legislators to "Google the story of recruiting children to take them across state lines to abort their babies." *Id.* at PageID #61. This was, of course, circular and did not define "recruiting" outside the context of "transporting," a separate offense under the bill. Second, he referred to a social media post by Behn in which she expressed her willingness "to take a young person out of state who wants to have an abortion."

*Id.* That post amounted to pure speech that was not targeted at any particular pregnant minor, contrary to Defendants' current interpretation.

Although "a scienter requirement may mitigate a law's vagueness," *Hoffman Estates*, 455 U.S. at 499, it does not help here, where "the contours" of that "requirement are themselves unclear." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 535 (6th Cir. 1998). The recruitment provision applies to a person who "intentionally recruits" a minor "for the purpose of" "[p]rocuring" an abortion that would be illegal in Tennessee. Tenn. Code Ann. § 39-15-201(a). But it remains unclear what a person must do in connection with procuring an abortion to violate the statute. Consider a social worker who counsels a pregnant minor to get a lawful abortion in another state. Even if there is no doubt that the social worker had the purpose of persuading the minor to terminate her pregnancy, it remains uncertain whether the conversation counts as recruitment. And any "mistake" about what recruitment means on the social worker's part "is no defense to criminal prosecution." *See State v. Casper*, 297 S.W.3d 676, 690 (Tenn. 2009).

Defendants' constantly evolving efforts to define the term offer little clarity. Defendants primarily argue on appeal that "recruiting" means "the intentional targeting of an unemancipated minor to induce or persuade them to obtain an elective abortion without the consent of their parent or guardian" and does not include "generalized advocacy or sharing of abortion-related information." Defs. Br. 17-18, 20. Elsewhere in their brief, they assert that the recruitment provision "applies to recruiting incident

to extortion, coercion, or the concealment of other criminal conduct." *Id.* at 43. But Defendants' interpretation of the law has varied over the course of this litigation. For instance, in their appeal of the district court's preliminary injunction, Defendants endorsed a broader definition of the word "recruit" that included "persuad[ing]" persons "to engage in a particular activity." Defs.' PI Appeal Br. 52-53 (quoting *Matsumoto*, 122 F.4th at 808). In the district court, Defendants similarly suggested that recruitment encompasses mere persuasive speech. *See* Defs.' PI Opp'n, R.22, PageID #218-219 (recruitment involves "*successful* persuasion to join a group or engage in an endeavor"). There does not appear to be any definition of "recruit" that encompasses each of these proposed meanings, nor is there anything to stop Defendants from changing their interpretation again. Defendants' constantly shifting definitions of "recruit" raise more questions than they answer.

Defendants' examples of "recruitment" further muddy the waters. Defendants suggest that "recruiting" could include "coercion," citing "a college freshman who blackmails his high-school girlfriend into getting an abortion by threatening to share intimate photos of her" and "an adult who forces a 14-year-old girl he impregnated to get an abortion through threats of physical harm." Defs.' Br. 43. But "recruitment" and "coercion" are different concepts. *See Dabney*, 90 N.E.3d at 764 ("the plain and ordinary meaning[s]" of "entice" and "recruit" do not imply "force or coercion"). Recruitment suggests persuading a person to do something, whereas coercion means forcing them

to do so. Defendants' efforts to explain recruitment have yielded only "hopeless indeterminacy." *Johnson*, 576 U.S. at 598.

## IV. The district court appropriately enjoined Defendants from enforcing the recruitment provision against nonparties.

The district court properly tailored its permanent injunction to grant relief on Plaintiffs' overbreadth claim. The "whole point" of "an overbreadth challenge[] is to permit the claimant to strike the law in its entirety based on its application to other individuals not before the court." *Connection Distrib.*, 557 F.3d at 335. In arguing otherwise, Defendants misrepresent both the scope of the injunction and the relevant case law.

**1.** Defendants claim that the district court enjoined "*all* enforcement of the recruiting provision, against anyone statewide" Defs.' Br. 15 (internal quotation marks omitted). That is simply false. Defendants are 11 of Tennessee's 32 district attorneys general. Under Tennessee law, district attorneys general have jurisdiction only "within" "the judicial districts to which they are assigned," Tenn. Code Ann. § 16-2-508, and may prosecute only crimes occurring there, *see State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006). All Defendants serve state judicial districts within the federal Middle District of Tennessee. Because the district court's injunction applies only to those 11 district attorneys general, it has no effect on the ability of Tennessee's other 21 district attorneys general to enforce the recruitment provision.

Defendants' various policy objections to statewide injunctions are thus misdirected. For instance, Defendants claim that statewide injunctions incentivize forum shopping "within the State" by allowing a plaintiff to sue in one of Tennessee's federal judicial districts to obtain a remedy applicable across all three federal districts. Defs.' Br. 65. But the district court's injunction applies within only one forum—the Middle District of Tennessee. The injunction thus does nothing to prevent the Eastern and Western Districts from "weigh[ing] in" on the recruitment provision. *See id.* And unlike a statewide injunction that bars enforcement of a law against "all seven million residents of the Volunteer State," *id.* at 65-66 (internal quotation marks omitted), the injunction here would theoretically permit prosecution of all seven million Tennesseans under the recruitment provision, so long as they committed one element of the offense within the jurisdiction of one of the 21 district attorneys general not subject to the injunction. *See* Tenn. Code Ann. § 39-11-103(d).

Whatever the merits of Defendants' arguments against statewide injunctions, they do not apply to this injunction.

**2.** Although it is narrower than Defendants suggest, the district court's injunction does benefit speakers beyond the named Plaintiffs. But that is necessary to remedy the law's overbreadth. Although relief must generally be party-specific, *see Trump v. CASA, Inc.*, 606 U.S. 831, 850 (2025), the Supreme Court and this Court have held that this usual rule does not apply to the "overbreadth doctrine," which "changes the customary rules of constitutional litigation," *Connection Distrib.*, 557 F.3d at 335.

Because "the First Amendment needs breathing space" for free speech to flourish, the Supreme Court "has altered its traditional rules of standing to permit—in the First Amendment area—attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973) (internal quotation marks omitted). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. Because the constitutional violation in such a case is the very existence of a statute that chills speech, an overbroad law "may be struck down in its entirety." *Moody*, 603 U.S. at 723; *see also Hicks*, 539 U.S. at 119 (overbreadth "invalidates *all* enforcement"); *Hansen*, 599 U.S. at 770 (overbreadth "destroys some good along with the bad"); *Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (in a First Amendment case, "the distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court.").[11]

---

[11] Defendants dismiss this language from the Supreme Court's decisions as concerning "vertical stare decisis." Defs.' Br. 58. But Defendants' account would all but eliminate the distinction between as-applied and facial challenges in district court. A plaintiff who meets the more demanding standard for facial invalidity would receive nothing in return, unless the defendant appeals. Even then, the decisions of federal circuit courts are not binding on state courts, *see Johnson v. Williams*, 568 U.S. 289, 305 (2013), so the

The two essential features of the overbreadth doctrine are thus that "[i]t relaxes the general prohibition against vicarious litigation by allowing claimants to assert the rights of third parties," and that "it permits a court to strike a law in its entirety even though it legitimately may be enforced in some other settings." *Connection Distrib.*, 557 F.3d at 335-36 (describing a First Amendment facial challenge as a way "to invalidate the law in each of its applications, to take the law off the books completely"). Restricting overbreadth remedies to the parties before the district court would be inconsistent with both of those principles. An as-applied remedy would not strike the law in its entirety. And worse yet, it would not even benefit the third parties whose speech rights formed the basis of the plaintiff's "vicarious" claims. *Id.* at 335. It would make no sense to provide a remedy only to a plaintiff whose rights were not violated, while giving no relief to the "others not before the court" who are forced by the law "to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. Providing relief in an overbreadth case requires a remedy that reaches the third parties on whose behalf the case is litigated.

**3.** Even aside from overbreadth doctrine, an injunction against a state official limited to the territory of one federal district court fits "within the broad boundaries of traditional equitable relief." *CASA*, 606 U.S. at 846 (internal quotation marks omitted).

---

vertical stare decisis effect of a holding from this Court that the recruitment provision is facially unconstitutional would not necessarily prevent state-court prosecutions.

And it is distinguishable in two significant respects from the universal injunction against the federal government that the Supreme Court vacated in *CASA*.

First, the injunction here was issued pursuant to different statutory authority, and thus implicates a different historical tradition, than injunctions against the federal government. Because *CASA* concerned the equitable authority of the courts under the Judiciary Act of 1789, the Supreme Court looked to equitable practice at the time of the Founding. 606 U.S. at 841. But the power of federal courts to enjoin the unconstitutional acts of state officials derives from different statutory authorities: Section 1983, which was enacted in 1871 and provides Plaintiffs' cause of action, and the Jurisdiction and Removal Act of 1875, 18 Stat. 470, which provides district courts with federal-question jurisdiction over cases in equity. As the district court noted, the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908), which recognized the power of federal courts to enjoin unlawful actions by state officials, is likewise significant. *See* Mem. Op., R.81, PageID #30. The scope of equitable remedies available under these sources of judicial power depend not on equity practice at the Founding, but rather in the late 19th and early 20th centuries. And as the Supreme Court recognized in *CASA*, nonparty relief had become much more prevalent by then. *See* 606 U.S. at 850 (discussing nonparty relief awarded in taxpayer suits during the mid-19th century), *id.* at 845 n.7 (listing possible examples of universal injunctions in the

early 20th century). History thus indicates that Congress has authorized a wider range of equitable remedies against state officials than against federal ones.[12]

In addition, a district-specific injunction more readily fits within our Nation's tradition of equitable remedies than does a nationwide injunction. As the Supreme Court acknowledged in *CASA*, courts of equity have issued some forms of nonparty relief since long before the Founding. *See id.* at 847-50. Those historical analogues, although insufficient to justify nationwide injunctions, support the more limited nonparty relief at issue here. The district court's narrow injunction is akin to traditional equitable remedies that provided nonparty relief within discrete communities. *See id.* at 848. This injunction also finds support in 19th-century precedent "allowing a successful plaintiff to obtain an injunction protecting all similarly situated persons" in challenges to municipal taxes and ordinances. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 427 & nn. 43-45 (2017). Given that equity is "flexible," *CASA*, 606 U.S. at 846, and given the tradition of awarding nonparty relief in overbreadth cases, the district court's injunction does not exceed the equitable powers of the federal courts.

---

[12] Defendants argue that Article III prohibits nonparty relief. Defs.' Br. 55-59. But *CASA* expressly declined to resolve that question. *See* 606 U.S. at 841 n.4. This Court has done the same. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023) (noting that nonparty relief may be consistent with Article III "in some instances"). And the availability of nonparty relief in class actions and in Administrative Procedure Act cases indicates that Article III does not tie Congress's hands in authorizing such remedies. *See CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring).

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment should be affirmed.

Dated:  January 28, 2026

Respectfully Submitted,

*/s/ William Powell*

Daniel A. Horwitz
Sarah L. Martin
Laura E. Cantwell
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
(615) 739-2888
daniel@horwitz.law

William Powell
*Counsel of Record*
Rupa Bhattacharyya
Elizabeth R. Cruikshank
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Avenue NW
Washington, DC 20001
(202) 661-6629
whp25@georgetown.edu

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 28.1(e)(2) because it contains 15,173 words, excluding those portions of the brief exempted by Federal Rule 32(f) and Sixth Circuit Rule 32(b). I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in 14-point Garamond font, a proportionally spaced typeface, using Microsoft Word.

*/s/ William Powell*
William Powell

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January 2025, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ William Powell*
William Powell

# ADDENDUM

## Plaintiffs/Appellees/Cross-Appellants' Designations of Court Documents

Pursuant to Sixth Circuit Rules 28(b) and 30(g), Plaintiffs-Appellees hereby designate the following relevant district court documents in the electronic record.

| Record Entry No. | Description of Document | Page ID # |
|:---:|:---:|:---:|
| Middle District of Tennessee, No. 3:24-cv-768 | | |
| 1 | Complaint | 1-15 |
| 1-1 | Complaint Exhibit 1, Public Ch. 1032 | 16-18 |
| 1-2 | Complaint Exhibit 2, Welty Informational Materials | 19-21 |
| 1-3 | Complaint Exhibit 3, NPR Article | 22-24 |
| 1-4 | Complaint Exhibit 4, Horwitz Letter to District Attorneys General | 25-35 |
| 1-5 | Complaint Exhibit 5, Rep. Behn X post with Infographics | 36-40 |
| 1-6 | Complaint Exhibit 6, Transcript of Hearing on H.B. 1895 | 41-78 |

| 1-7 | Complaint Exhibit 7, Declaration of Rachel Welty | 79-80 |
|---|---|---|
| 1-8 | Complaint Exhibit 8, Declaration of Aftyn Behn | 81-82 |
| 22 | Defendants' Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 208-234 |
| 29-1 | Exhibit 1 to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, Fiscal Note to HB 1895–SB 1971 | 328-330 |
| 35 | Transcript of Preliminary Injunction Hearing | 351-478 |
| 40 | Memorandum Opinion | 538-586 |
| 41 | Order Granting Plaintiffs' Motion for Preliminary Injunction and Denying Defendants' Motion to Dismiss in Part | 587-588 |
| 55 | Plaintiffs' Statement of Undisputed Material Facts | 644-675 |
| 69 | Defendants' Consolidated Memorandum of Law in Support of Their Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment | 812-855 |

| 70 | Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts | 856-885 |
|----|------------------------------------------------|-----------|
| 75 | Defendants' Reply in Support of Their Motion for Summary Judgment | 932-938 |
| 81 | Memorandum Opinion and Order | 1101-1132 |
| 84 | Judgment | 1138-1139 |
| 86 | Notice of Appeal | 1146-1148 |
| 87 | Notice of Cross-Appeal | 1149-1150 |