# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RACHEL WELTY et al.,
*Plaintiffs/Appellees and Cross-Appellants,*

v.

BRYANT DUNAWAY et al.,
*Defendants/ Appellants and Cross-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville
Case No. 3:24-cv-768

## BRIEF OF *AMICUS CURIAE*
## IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE
## IN SUPPORT OF PLAINTIFFS/APPELLEES

KYLEE SUNDERLIN, Counsel of Record
Sara L. Ainsworth
Elizabeth Ling
If/When/How: Lawyering
for Reproductive Justice
106 W. 32nd Street, Ste 112
New York, NY 10001
(602) 887-6235 (phone)
(929) 416-0755 (fax)
kylee.sunderlin@ifwhenhow.org

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Amicus Curiae If/When/How: Lawyering for Reproductive Justice is neither a subsidiary nor an affiliate of any publicly owned corporation. There is no publicly owned corporation, not a party to this appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES.................................................................................iii

INTEREST OF AMICUS CURIAE......................................................................1

SUMMARY OF ARGUMENT.............................................................................2

ARGUMENT.......................................................................................................3

    I.    Abortion law is rapidly changing and increasingly complicated, so people of all ages, in Tennessee and throughout the country, are seeking legal advice to understand their rights. ....................................................................3

    II.    Allowing Tennessee to enforce the recruiting provision of its ban on abortion support would chill lawyers from providing vital legal services to young Tennesseans. ........................................................................................8

    III.   Criminalizing the provision of legal advice fundamentally erodes bedrock principles of the legal profession and undermines the rule of law. .............12

        A. Attorney-client privilege is one of the oldest and most important evidentiary privileges in U.S. law. ..............................................................13

        B. Denying young people access to comprehensive, accurate legal advice thwarts increased observance of the law. ................................................15

CONCLUSION ...................................................................................................19

CERTIFICATE OF COMPLIANCE....................................................................19

CERTIFICATE OF SERVICE.............................................................................20

# TABLE OF AUTHORITIES

## Cases

*Access Indep. Health Serv. Inc. v. Wrigley,*
  No. 20240291, 2025 ND 199 (N.D. Nov. 25, 2025)......................................................5

*Berd v. Lovelace,*
  21 Eng. Rep. 33 (Ch. 1577) ...........................................................................................13

*Comprehensive Health of Planned Parenthood Great Plains et al. v. Missouri,*
  No. 2416-CV31931 (Jackson Cnty. Cir. Ct. July 3, 2025)............................................6

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ........................................................................................................2

*Fisher v. United States,*
  425 U.S. 391 (1976) ......................................................................................................14

*Hunt v. Blackburn,*
  128 U.S. 464 (1888) ......................................................................................................14

*In re FirstEnergy Corp.,*
  154 F.4th 431(6th Cir. 2025) ........................................................................................14

*In re Primus,*
  436 U.S. 412 (1978) ......................................................................................................10

*Matsumoto v. Labrador,*
  122 F.4th 787 (9th Cir. 2024) ...................................................................... 1, 8, 9, 10, 13

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health,* 732 F. Supp. 3d 971 (D. Ind. 2024) .................................................................10

*Planned Parenthood v. State,*
  554 P.3d 153 (Mont. 2024) .............................................................................................8

*State v. Johnson,*

    No. S-24-0326 (Wyo. Jan. 6, 2026) ..................................................................5

*Stout v. Leadec Indus. Servs.*,
    2022 U.S. Dist. LEXIS 119700 (W.D. Ky. 2022) ...................................14

*Trammel v. United States*,
    445 U.S. 40 (1980)..........................................................................................15

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ............................................................................... 15, 16

*Welty v. Dunaway*,
    791 F. Supp. 3d 818 (M.D. Tenn. 2025) ...................................................10

*Yellowhammer Fund v. Marshall*,
    776 F. Supp. 3d 1071 (M.D. Ala. 2025)..........................................7, 9, 10

**Statutes**

Ala. Code § 26-23H-4 ...............................................................................................5

Ark. Code Ann. § 5-61-301 to -304 ......................................................................5

Fla. Stat. § 390.0111 .................................................................................................5

Ga. Code Ann. § 16-12-141 ....................................................................................6

Ga. Code Ann. §§ 15-11-682, 684 ........................................................................6

GA. H.B. 481, 2019 Leg., Reg. Sess. (Ga. 2019) .................................................5

IA. Code § 146E.2 ....................................................................................................5

Ida. Code § 18-622(1)(a) ........................................................................................5

Ida. Code §§ 18-8804, 18-8807.............................................................................5

Ind., S.B. 1, 122nd Leg., 1st Spec. Sess. (Ind. 2022) .........................................5

Ky. Rev. Stat. § 311.772...........................................................................................5

La. Stat. Ann. §§ 40.87.7, 14.87.8, 40:1061 ...................................................................5

Miss. Code Ann. § 41-41-45 ...............................................................................................5

Mo. Rev. Stat. § 188.027 ......................................................................................................6

Mo. Rev. Stat. § 188.028 ......................................................................................................6

N. D., S.B. 2150, 68th Leg. Sess., Reg. Sess. (N.D. 2023) ............................................5

N.C. Gen. Stat. § 90-21.82 ..................................................................................................6

N.C. Gen. Stat. § 90- 21.81B(2) .........................................................................................5

N.C. Gen. Stat. §§ 90-21.7, 21.8 .......................................................................................6

Neb. L.B. 574, 108th Leg., 1st Reg. Sess. (Neb. 2023) ...............................................5

Okla. Stat. tit. 21, § 861 .......................................................................................................5

Okla. Stat. tit. 63, § 1-745.31 .............................................................................................5

S. D., S.D. Codified Laws § 22-17-5.1 ............................................................................5

S.C. S. 474, 125th Gen. Assemb., Spec. Sess. (S.C. 2023) .........................................5

Tenn. Code § 39-15-201 ......................................................................... 3, 8, 9, 12, 18

Tex. Health & Safety Code §§ 170A.001-7 ....................................................................5

Tex. Health & Safety Code §§ 171.204- 12 ...................................................................5

UT. Code Ann. § 76-7-302.5; id. § 76-7-302 .................................................................5

W. Va. Code §16-2R-3 ..........................................................................................................5

**Rules**

Tenn. Sup. Ct. R. 8, RPC Preamble.................................................................................17

**Other Authorities**

American Bar Association Resolution 05A111 (adopted 2005)......................................14

American Public Health Association, *Ensuring Minors'*
    *Access to Confidential Abortion Services* (Nov. 1, 2011) ......................................12

Andrea J. Hoopes et al., *Elevating the Needs of Minor*
    *Adolescents in a Landscape of Reduced Abortion Access in the*
    *United States*, 71 J. ADOLESCENT HEALTH 530 (2022) ................................. 7, 8

Audrey Kearney et al., *KFF Health Tracking Poll May 2023:*
    *Health Care in the 2024 Election and in the Courts*,
    KFF.org, (May 26, 2023) ........................................................................4

Comm'n on the Future of Legal Services,
    *Report on the Future of Legal Services in the United States* 33 (2016)...................17

Jessica K. Steinberg, *Demand-Side Reform in the Poor*
    *People's Court*, 47 CONN. L. REV. 741 (2015) .............................................17

Jessica Winter, *The Dobbs Decision Has Unleashed Legal*
    *Chaos for Doctors and Patients*, THE NEW YORKER (July 2, 2022) ...................4

Kate Coleman-Minahan, et al., *Young Women's Experience*
    *Obtaining Judicial Bypass for Abortion in Texas*,
    64 J. ADOLESCENT HEALTH 20 (2019)...................................................11

Kebé et al., If/When/How: Lawyering for Reproductive
    Justice, *A Repro Legal Helpline Report: State Violence*
    *and the Far-Reaching Impact of Dobbs* (June 2024) ......................................... 7, 9

Kelly Baden, *Three Years Post-Roe: The Escalating Campaign*
    *to Make Abortion Inaccessible Nationwide*,
    GUTTMACHER INSTITUTE (June 2025) ....................................................4

Lauren J. Ralph et al., *The Role of Parents and Partners in*
    *Minors' Decisions to Have an Abortion and Anticipated Coping*

*After Abortion,* 54 J. Adolescent Health 428 (2014) ...........................................................11

Legal Services Corp, *The Justice Gap: The Unmet Civil*
    *Legal Needs of Low-Income Americans* (April 2022)............................................17

Linda Klein, A.B.A. Coal. For Justice, *Report on the Survey*
    *of Justice on the Impact of the Economic Downturn on*
    *Representation in the Courts* (July 12, 2010) ....................................................17

Megan Tilton, *The Ins and Outs of Attorney-Client Privilege,*
    Am. Bar. Asso. (June 12, 2024).........................................................................15

Michal Raucher and Anne Whitesell, *Spotlight Analysis:*
    *Americans' Response to Abortion's Uncertain Legal Landscape,*
    Public Religion Research Institute (Sept. 3, 2025) ...........................................4

Nicole Huberfeld, *Confusion, Chaos, and Conflict in U.S.*
    *Law and Health Care after Dobbs,* 55 ICLEA 1 (2024) ...................................4

Stanley K. Henshaw & Kathryn Kost, *Parental Involvement*
    *in Minors' Abortion Decisions,* 24 FAM. PLAN.
    PERSPS. 196 (1992) ...........................................................................................11

Vanessa Romo, *A year after Dobbs and the end of Roe v. Wade,*
    *there's chaos and confusion*, NPR (June 24, 2023) ..............................................4

## Treatises

Paul R. Rice et al., *Attorney-Client Privilege in the*
    *United States* §§ 1:3, 1.12 n.2 (2021) ..........................................................13-14

**INTEREST OF AMICUS CURIAE**

In *Matsumoto v. Labrador*, the Ninth Circuit Court of Appeals affirmed a district court's order preliminarily enjoining enforcement of the recruiting provision of Idaho's ban on abortion support. 122 F.4th 787 (9th Cir. 2024). The Ninth Circuit upheld the injunction because the challengers were likely to succeed on their claim that the recruiting provision is unconstitutionally overbroad — meaning, a substantial number of its applications, when compared to its "plainly legitimate" reach, burden speech protected by the First Amendment. *Id.* at 795. Cataloguing the wide range of protected speech that Idaho's recruiting provision chilled, the Ninth Circuit explicitly recognized Amicus If/When/How and the legal services it provides on its nationwide helpline, the Repro Legal Helpline. *Id.* at 810.

If/When/How is a national legal nonprofit organization that defends and furthers reproductive justice through direct legal services, impact litigation, policy advocacy, a legal defense fund, and community support. Its Repro Legal Helpline is the only service of its kind in the United States. Helpline attorneys provide free and confidential legal services to individuals, no matter their age, on a wide range of legal issues impacting their reproductive lives, in all fifty states and D.C., including Tennessee. If/When/How writes because the ability of our Helpline, and all lawyers, to provide confidential legal advice to young people in Tennessee will be chilled if that advice can be criminalized as recruiting. We also write because attorneys' ability to counsel their clients is not only necessary for people to understand and enforce their

1

legal rights but is essential to the rule of the law and the functioning of our

constitutional system.[1]

## SUMMARY OF ARGUMENT

It sounds simple: abortion law is returned to the states. *See Dobbs v. Jackson*

*Women's Health Org.,* 597 U.S. 215, 232 (2022). For pregnant people who want to

understand their rights, reality is much more complicated. Their state may have a total

abortion ban or one that bans abortion after a certain point in pregnancy. That ban

may be fully or partially enjoined. Their home state's abortion ban may have

exceptions, but whether the exception applies to their personal situation is unclear.

They may have heard they have the constitutional right to travel to another state

where abortion care is permitted, but conflicting news stories and threats from state

attorneys general could make them fear prosecution regardless. They may have

immigration-related questions that arise as they consider whether or where they can

travel for permitted abortion care. They may be a 17-year-old whose parent supports

their decision to have an abortion but cannot get a document notarized because they

do not have proper identification, so they want to understand their legal options.

These are the kinds of questions the Repro Legal Helpline's lawyers answer

every day, from callers in every state, including Tennessee. For callers under age 18,

---

[1] All parties have consented to the filing of this brief, as required by Fed. R. Civ. P. 29(a)(2). No party's counsel authored this brief in whole or in part, or contributed money intended to fund preparation or submission of the brief, and no person, other than If/When/How, contributed money intended to fund preparation or submission of this brief. *See* Fed. R. Civ. P. 29(a)(4)(E).

there are often added layers of legal complexity, and that is as true in Tennessee as it is in every state that has prohibited the provision of nearly all abortions. Restricting young Tennesseans from access to legal advice serves no public purpose. It compounds the barriers they face; it undermines the rule of law by eliminating advice about how to comply with it; and it threatens one of the oldest privileges in American law — that between a client and their attorney.

By imposing criminal penalties and civil liability on any attorney who could be considered to have recruited a person to have an abortion without their parent's written, notarized permission, Tennessee chills lawyers from providing accurate, comprehensive legal advice to their clients — a fundamental duty owed to every client and required by ethics rules governing the legal profession. As lawyers serving young people in Tennessee, Amicus urges this Court to affirm the district court's order enjoining the recruiting provision of Tennessee Code § 39-15-201 because it chills our exercise of First Amendment rights and would eviscerate bedrock principles of the legal profession.

## ARGUMENT

I. **Abortion law is rapidly changing and increasingly complicated, so people of all ages, in Tennessee and throughout the country, are seeking legal advice to understand their rights.**

People of all ages, in Tennessee and throughout the United States, are understandably confused about abortion law and how it could impact their lives.[2] It has been fewer than four years since the Supreme Court's decision in *Dobbs* greenlighted the states to decide whether, when, and how people could access abortion care. The resulting landscape is one of fragmented, complex, and ever-changing abortion laws across the country, frequently described by legal and media professionals as "chaos."[3]

As lawyers with the professional duty to stay abreast of abortion laws throughout the U.S. so that we may competently advise and counsel people about those laws, we wade through this churn every day. We use our legal training to make sense of this chaos for the people who are trying, within the time limits of a

---

[2] A research poll conducted approximately a year after *Dobbs* indicated that nearly half of women living in states that had enacted abortion bans were unsure about the legal status of abortion in their state. Audrey Kearney et al., *KFF Health Tracking Poll May 2023: Health Care in the 2024 Election and in the Courts*, KFF.org, (May 26, 2023), https://www.kff.org/womens-health-policy/kff-tracking-poll-may-2023/. Another research poll published just last fall found that, if anything, that uncertainty had increased; approximately 60 percent of respondents living in states with abortion bans were unsure if a miscarriage experienced between 5-7 weeks gestation (not an abortion) could be legally managed with medications. Michal Raucher and Anne Whitesell, *Spotlight Analysis: Americans' Response to Abortion's Uncertain Legal Landscape*, Public Religion Research Institute (Sept. 3, 2025), https://prri.org/spotlight/americans-responses-to-abortions-uncertain-legal-landscape/.

[3] *See* Vanessa Romo, *A year after Dobbs and the end of Roe v. Wade, there's chaos and confusion*, NPR (June 24, 2023, 6:00 AM) https://www.npr.org/2023/06/24/1183639093/abortion-ban-dobbs-roe-v-wade-anniversary-confusion; Kelly Baden, *Three Years Post-Roe: The Escalating Campaign to Make Abortion Inaccessible Nationwide*, GUTTMACHER INSTITUTE (June 2025) https://www.guttmacher.org/article/2025/06/three-years-post-roe-escalating-campaign-make-abortion-inaccessible-nationwide; Jessica Winter, *The Dobbs Decision Has Unleashed Legal Chaos for Doctors and Patients*, THE NEW YORKER (July 2, 2022) https://www.newyorker.com/news/news-desk/the-dobbs-decision-has-unleashed-legal-chaos-for-doctors-and-patients?_sp=38ec7578-e717-4e26-98e7-7828b7509663.1770061336538; Nicole Huberfeld, *Confusion, Chaos, and Conflict in U.S. Law and Health Care after Dobbs*, 55 ICLEA 1 (2024).

pregnancy, to self-determine their lives and access the care they need. Today, thirteen states in the U.S. are enforcing total bans on abortion;[4] others are enforcing bans after a certain point in pregnancy;[5] four states passed laws — like the one at issue in this case — that purport to allow civil lawsuits against certain people who help someone have an abortion.[6] Between the filing of the parties' briefs in this case, one state (North Dakota) saw its abortion ban upheld by its highest court, and another (Wyoming) saw its abortion ban struck down. *See Access Indep. Health Serv. Inc. v. Wrigley,* No. 20240291, 2025 ND 199 (N.D. Nov. 25, 2025); *State v. Johnson,* No. S-24-0326 (Wyo. Jan. 6, 2026).

This uncertainty is significant for a state like Tennessee. Its eight bordering states include four total abortion bans (Alabama, Arkansas, Kentucky, Mississippi), one 6-week ban (Georgia), one 12-week ban (North Carolina), and two states with abortion access (Missouri and Virginia), one of which is in active litigation because of

---

[4] *See* Alabama, Ala. Code § 26-23H-4; Arkansas, Ark. Code Ann. § 5-61-30-304; Idaho, Idaho Code § 18-622(1)(a); Indiana, S.B. 1, 122nd Leg., 1st Spec. Sess. (Ind. 2022); Kentucky, Ky. Rev. Stat. § 311.772; Louisiana, La. Stat. Ann. §§ 40.87.7, 14.87.8, 40:1061; Mississippi, Miss. Code Ann. § 41-41-45; North Dakota, S.B. 2150, 68th Leg. Sess., Reg. Sess. (N.D. 2023); Oklahoma, Okla. Stat. tit. 21, § 861; South Dakota, S.D. Codified Laws § 22-17-5.1; Tennessee, Tenn. Code Ann. § 39-15-213; Texas, Tex. Health & Safety Code §§ 170A.001-7; West Virginia, W. Va. Code §16-2R-3.

[5] *See* Florida, 6-week ban, Fla. Stat. § 390.0111; Georgia, 6-week ban, Ga. H.B. 481, 2019 Leg., Reg. Sess. (Ga. 2019); Iowa, 6-week ban, Iowa Code § 146E.2; Nebraska, 12-week ban, L.B. 574, 108th Leg., 1st Reg. Sess. (Neb. 2023); North Carolina, 12-week ban, N.C. Gen. Stat. § 90- 21.81B(2); South Carolina, 6-week ban, S. 474, 125th Gen. Assemb., Spec. Sess. (S.C. 2023); and Utah, 18-week ban, Utah Code Ann. § 76-7-302.5; id. § 76-7-302.

[6] *See* Texas, Tex. Health & Safety Code §§ 171.204-12; Oklahoma, Okla. Stat. tit 63, § 1-745.31) (held unconstitutional in Okla. Call v. State, 2023 OK 60; Idaho, Idaho Code §§ 18-8804, 18-8807, and Tennessee, Tenn. Code Ann. § 39-15-201(e)(1).

a 2024 state constitutional amendment. *See Comprehensive Health of Planned Parenthood Great Plains et al. v. Missouri,* No. 2416-CV31931 (Jackson Cnty. Cir. Ct. July 3, 2025). And of those four states where abortion may still be available, three have state-mandated requirements like ultrasounds and waiting periods that further limit access. *See* Ga. Code Ann. § 16-12-141; Mo. Rev. Stat. § 188.027; N.C. Gen. Stat. § 90-21.82. Young Tennesseans must also consider whether a state has a forced parental involvement law, like three of the states it borders. *See* Ga. Code Ann. §§ 15-11-682, 684; Mo. Rev. Stat. § 188.028; N.C. Gen. Stat. §§ 90-21.7, 21.8.

Given this variability, lawyers around the country are working to ensure that people can understand their legal rights amid the new restrictions on abortion access.[7] For our part, since 2020, the Repro Legal Helpline has provided free, confidential

---

[7] A non-exhaustive list of efforts across the legal profession to meet legal needs post-*Dobbs* includes: Amicus If/When/How, https://reprolegalhelpline.org/ (providing legal advice, information, and civil and criminal defense representation to people directly impacted by abortion restrictions); Abortion Defense Network, https://abortiondefensenetwork.org/ (providing attorneys to people who provide or support abortion care); ACLU Criminal Defense Initiative, https://www.aclu.org/campaigns-initiatives/abortion-criminal-defense-initiative (defending health care providers and abortion supporters in criminal prosecutions); Sissy Farenthold Fund and the Rapaport Center for Human Rights and Justice, https://law.utexas.edu/rj-defense/legal-information/, (offering lawyer trainings on Texas law "to dispel misinformation and disinformation," and tracking Texas prosecutions related to abortion); Center for Reproductive Rights, https://reproductiverights.org/maps/abortion-laws-by-state/ (mapping abortion laws in every state), Southern California Alliance for Reproductive Justice, https://law.ucla.edu/academics/centers/center-reproductive-health-law-and-policy/southern-california-legal-alliance-reproductive-justice (organizing the legal profession in Southern California to "provide pro bono representation regarding abortion and other reproductive rights issues"); Lawyers for Good Government, Reproductive Health Legal Assistance Project, https://www.lawyersforgoodgovernment.org/repro-health-lap (a network of lawyers to help health care providers navigate the changing legal landscape).

legal services to thousands of people in all 50 states and D.C.[8]  These legal services range from representing clients in a range of administrative proceedings and civil legal matters to advising clients of their constitutional rights. We provide these services because we believe that all people have the right to self-determine their lives, and that people should have access to the full range of reproductive health care without barriers or stigma.[9]

While people's reasons for contacting the Helpline vary, a consistent theme is confusion about the differences between state abortion laws, federal laws, and their federal constitutional rights. This is unsurprising in light of the frequent shifts in the legal status of abortion access in the states, both real and threatened.[10] Also unsurprising is that confusion about the law is particularly acute for people under age 18, as they face the most complex array of barriers to accessing abortion care.[11] Young Tennesseans, like young people everywhere, have fewer resources than older populations, as well as a less sophisticated understanding of the law and how it may

---

[8] *See* Kebé et al., If/When/How: Lawyering for Reproductive Justice, *A Repro Legal Helpline Report: State Violence and the Far-Reaching Impact of Dobbs* (June 2024), https://ifwhenhow.org/wp-content/uploads/2024/06/Repro-Legal-Helpline-Report-June-24.pdf (hereinafter "Helpline Report").

[9] *Id.* at 3-4.

[10] *See, e.g., Yellowhammer Fund v. Marshall,* 776 F. Supp. 3d 1071 (M.D. Ala. 2025)(holding that the Attorney General's threats to criminally prosecute people who help pregnant Alabamians leave the state to access legal abortion care violated the Fund's constitutional rights to free speech and expressive conduct, as well as Alabamians' constitutional right to interstate travel.)

[11] *See* Andrea J. Hoopes et al., *Elevating the Needs of Minor Adolescents in a Landscape of Reduced Abortion Access in the United States,* 71 J. ADOLESCENT HEALTH 530 (2022).

impact them.[12] They also have less experience navigating health care decisions than older adults.[13]

Since the Tennessee Legislature enacted Tenn. Code. Ann. § 39-15-201, prohibiting the so-called "abortion trafficking of a minor," in 2024,[14] the Helpline has provided legal advice to more than 180 people in Tennessee, including people under age 18. To this day, people under age 18 constitute nearly half of our legal inquiries nationwide, and Tennessee ranks in the top eight states from which potential clients contact the Helpline.[15]

## II. Allowing Tennessee to enforce the recruiting provision of its ban on abortion support would chill lawyers from providing vital legal services to young Tennesseans.

As lawyers serving people of all ages, the Helpline recognizes that young people uniquely benefit from "tailored education and resources when seeking abortion."[16]

---

[12] *Id. See also Planned Parenthood v. State*, 554 P.3d 153, 172 (Mont. 2024) (striking down a law requiring either parental consent or a judicial waiver for a young person to obtain abortion care, because the law violated fundamental rights guaranteed by the Montana Constitution, and explaining: "the legal system is intimidating, confusing, and difficult to access, even for those who have legal representation and do not have time-sensitive legal problems. These complications are made worse for those with time-sensitive medical conditions who begin the process without counsel. . . . Minors with the least financial resources and the greatest access impediments, face greater challenges in seeking a timely judicial waiver. These financial and logistical barriers may be even more pronounced for indigenous and marginalized people.").

[13] Hoopes et al., *supra* note 11.

[14] As the Ninth Circuit pointed out in *Matsumoto*, "[c]alling the statute 'abortion trafficking' does not make it so." *Matsumoto,* 122 F.4th at 805.

[15] Helpline Report at 6.

[16] Hoopes et al., *supra* note 11 at 530-31.

Accordingly, Helpline attorneys ensure that young clients fully comprehend their legal rights and potential risk so they can make the best decision for themselves. This often includes a thorough review of whether and how their state laws restrict abortion access, as well as how their efforts to access care may implicate other civil or criminal laws. Never would this involve a Helpline attorney trying to convince anyone, of any age, that they should either terminate or continue a pregnancy. But the ordinary meaning of the word "recruitment," absent any limiting definition in the statute, could put attorneys at risk of criminalization under Tennessee Code. Ann. § 39-15-201 for providing legal advice to a Tennessean under age 18. *See Matsumoto,* 122 F.4th at 809 (explaining that the plain meaning of recruiting, in Idaho's nearly identical statute, could include the provision of "information . . . regarding the provider, time, place, or cost of any available abortion").

Defendants' claim that it does not view Plaintiffs' activities, including legal advice, as recruitment, is no guarantee against the threat of prosecution. Nor do Defendants' assurances address, let alone resolve, the potential perils of the law's civil enforcement mechanism. *See* Tenn. Code. Ann. § 39-15-201 (e). The daylight between the positions of the Defendants and one of their supporting Amici[17] demonstrates

---

[17] Amicus Thomas More Law Center argues that Plaintiffs' speech is not protected by the First Amendment because it is speech integral to criminal conduct. Thomas More Amicus Br. 8. This kind of circular analysis has been put forth by others — notably, by the Alabama Attorney General, stating publicly after *Dobbs* that his office would attempt to prosecute people for conspiracy for helping someone in Alabama travel to another state for lawfully provided abortion care. *Yellowhammer Fund*, 776 F. Supp. at 1085 (declaring that Alabama's threatened use of its criminal law to prosecute people for helping others leave Alabama to obtain abortions in states where abortion is

that both the district court in this case and the Ninth Circuit in *Matsumoto* are correct: the vague and undefined term "recruiting" could potentially be used to criminalize a wide range of First Amendment protected speech, including legal advice. *See Matsumoto*, 122 F.4th at 812 (stating that "[o]ne facet of recruiting encompasses legal advice about the minor's rights."); *Welty v. Dunaway*, 791 F. Supp. 3d 818, 839 (M.D. Tenn. 2025) (citing *Matsumoto*); *see also In re Primus*, 436 U.S. 412, 432 (1978) (the First Amendment protects speech "advocating lawful means of vindicating legal rights," including "advising another that his legal rights have been infringed.") (alterations omitted) (quoting *NAACP v. Button,* 371 U.S. 415, 437, 434 (1963)).

The way Defendants' supporting Amicus interpret recruitment could include counseling the high school senior who has lived with her grandparents for years, without any formal documentation of the arrangement, and has no way of contacting her parents to get their permission to either speak with a lawyer or have an abortion. Recruitment could include advising the 17-year-old recently moved to Tennessee for

---

legal violates the First Amendment and the constitutional right to travel). The district court in *Yellowhammer* rejected that reasoning, explaining that "nonspeech conduct — obtaining an abortion in a State where abortion is legal — is not unlawful, so any speech connected to obtaining such care is not integral to, nor in furtherance of, criminal conduct and is therefore not an exception to First Amendment protection." *Id.* at 108. The *Yellowhammer* court's reasoning applies with equal force here. *See also Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 732 F. Supp. 3d 971, 978 (D. Ind. 2024), *appeal pending* (7th Cir.) (enjoining enforcement against plaintiffs of Indiana law that makes it a crime to "aid and assist" unemancipated minors to obtain abortion care without parental consent, and holding that providing truthful information about legal out-of-state options to minors is "*not* inducing criminal activity" but is speech protected by the First Amendment.).

college whose supportive parents suggested she contact the Helpline to determine her options. And it could include advising the teenager who was sexually assaulted by her only parent and wants to know whether Tennessee has an abortion ban exception for someone in her situation. Regardless of what decision a young client ultimately makes, or whether a trusted, supportive adult is involved in their decision-making, Helpline attorneys could be at risk for merely explaining the law to these clients. But attorneys are not the only people who would be endangered by the law. Young Tennesseans would also suffer.

The Helpline sees firsthand the ways that state-mandated parental involvement in abortion harms young people. Although most young people involve a parent in their abortion decision-making, those who cannot or do not want to involve a parent do so for their safety and well-being, to protect themselves from judgment and physical harm, to protect their family from the stress of their pregnancy and abortion, and to preserve their parental relationships.[18] Disregarding these reasons, and ignoring research showing that young people are good predictors of the outcome of involving a parent, puts young Tennesseans at risk.[19] Forced parental involvement may result in

---

[18] *See, e.g.,* Kate Coleman-Minahan et al., *Young Women's Experience Obtaining Judicial Bypass for Abortion in Texas,* 64 J. ADOLESCENT HEALTH 20, 21–22 (2019).

[19] *See,* Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions,* 24 FAM. PLAN. PERSPS. 196, 207 (1992); *see also,* Lauren J. Ralph et al., *The Role of Parents and Partners in Minors' Decisions to Have an Abortion and Anticipated Coping After Abortion,* 54 J. Adolescent Health 428, 432 (2014) (anticipating poorer coping for minors who involve an unsupportive mother compared to those who do not tell their mother or told a supportive mother).

parents coercing the young person to have an abortion or keep an unwanted pregnancy; the young person being rejected by family and forced to leave home; and even physical conflict between the parents or against the young person.[20]

Allowing Tennessee to enforce the recruitment provision of Tenn. Code. Ann. § 39-15-201 would chill the provision of vital legal services for young people, thereby putting them at greater risk of harm. It would also fundamentally damage core tenets of the legal profession upon which not only Helpline attorneys, but *all* attorneys, and their clients rely.

## III. Criminalizing the provision of legal advice fundamentally erodes bedrock principles of the legal profession and undermines the rule of law.

When potential clients contact the Helpline — like all people seeking legal advice — they have an expectation of confidentiality. When a Helpline Counsel explains the scope of our services, as well as the necessity of forthright and thorough disclosures to receive fully informed legal advice, that expectation of attorney-client privilege is confirmed. Absent the crime-fraud exception, these bedrock principles of the legal profession remain steadfast regardless of how disfavored or stigmatizing the topic or the client. They apply no matter your age or where you live in the United States.

---

[20] *See, e.g.,* American Public Health Association, *Ensuring Minors' Access to Confidential Abortion Services* (Nov. 1, 2011), https://www.apha.org/policies-andadvocacy/public-health-policy-statements/policydatabase/2014/07/03/11/14/ensuring-minors-access-to-confidential-abortionservices (last visited Feb. 2, 2026).

The Ninth Circuit recognized that "an attorney advising a minor about the minor's rights to obtain a legal abortion outside of Idaho and promising absolute confidentiality (including from the minor's parents), coupled with arrangements to procure an abortion, could be prosecuted for attempting or aiding and abetting a violation of Section 18623." *Matsumoto,* 122 F.4th at 811. The same is true in Tennessee. By criminalizing, and therefore denying, confidential legal advice to young people within its borders, the state will gut one of the oldest and most important evidentiary privileges and undermine the rule of law.

**A. Attorney-client privilege is one of the oldest and most important evidentiary privileges in U.S. law.**

Attorney-client privilege is a public good that is fundamental to the facilitation of justice. It is one of the oldest and most important evidentiary privileges.[21] The concept can be traced back to the 16th Century, when England's Court of Chancery held that "the duty of the counsellor is to keep the secrets of his client," marking the birth of what came to be known as legal professional privilege. *Berd v. Lovelace,* 21 Eng. Rep. 33 (Ch. 1577).

During this country's founding era, courts applied the attorney-client privilege, which was then understood as a means to ensure a "client's freedom of action when dealing with his legal advisor." Paul R. Rice et al., *Attorney-Client Privilege in the United*

---

[21] Megan Tilton, *The Ins and Outs of Attorney-Client Privilege,* Am. Bar. Asso. (June 12, 2024), https://www.americanbar.org/groups/litigation/resources/newsletters/insurance-coverage/ins-outs-attorney-client-privilege/.

*States* §§ 1:3, 1.12 n.2 (2021) (collecting cases between 1782 and 1817). Since then, the

Supreme Court has consistently held that "[c]onfidential disclosures by a client to an

attorney made in order to obtain legal assistance are privileged." *Fisher v. United States,*

425 U.S. 391, 403 (1976). Today, attorney-client privilege continues to be a "bedrock"

principle of the legal profession. *See In re FirstEnergy Corp.*, 154 F.4th 431, 444 (6th Cir.

2025) (granting mandamus and vacating a discovery order requiring production of

attorney-client privileged communications); *Stout v. Leadec Indus. Servs.*, 2022 U.S. Dist.

LEXIS 119700, *6 (W.D. Ky. 2022) ("The attorney-client privilege is bedrock

principle of American jurisprudence") (quoting 8 J. Wigmore, Evidence § 2290

(McNaughton rev. 1961)).[22]

The attorney-client privilege protects clients by ensuring that clients may

provide frank and thorough information to their attorneys without fear or worry for

their self-interest. In return, the privilege ensures that lawyers are able to provide

sound, fully informed legal advice to their clients. In *Hunt v. Blackburn*, 128 U.S. 464,

470 (1888), the Supreme Court stated that the assistance of an attorney "can only be

safely and readily availed of when free from the consequences or the apprehension of

disclosure." And for decades, the attorney-client privilege has been hailed as

promoting "a public good transcending the normally predominant principle of

---

[22] *See also* American Bar Association Resolution 05A111 (adopted 2005) (the confidentiality of the attorney-client relationship is critical to "promote compliance with law through effective counseling. . . ensure effective advocacy for the client [and] access to justice" and to "promote the proper and efficient functioning of the American adversary system of justice.").

utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 50 (1980).

But to function properly, the privilege must be clear and equally applied. Both clients and their attorneys "must be able to predict with some degree of certainty whether particular discussions will be protected [because a]n uncertain privilege . . . is little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981). By excluding young Tennesseans from seeking legal advice about some of their rights, but not others, the recruiting provision eviscerates the attorney-client privilege. It creates an absurd guessing game. An attorney ostensibly could advise a minor client in Tennessee about their rights in school as a pregnant teenager, informed consent during pregnancy and birthing, legal considerations in adoption, and a whole host of other legal considerations. But the moment that same client asked about their constitutional right to travel for abortion care, the certainty that the client's private information will neither be disclosed nor used against the attorney or client would disappear.

## B. Denying young people access to comprehensive, accurate legal advice thwarts increased observance of the law.

In addition to promoting honest communication between a client and their attorney, this privilege serves a critical public policy by "promot[ing] broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. The quality of legal advice, and thereby its effectiveness in encouraging lawful

behavior as well as trust in the legal system, turns on the certainty that confidential disclosures will remain privileged.

People seek legal advice for a variety of reasons. Sometimes they need specific information about how to effectuate their legal rights. Other times, they ask for legal advice precisely because they do not understand how laws could impact their decision-making, let alone how their particular circumstances apply to the law. Without legal advice, people of all ages risk making a decision that goes against their interests. Worse yet, they risk making a decision that falls outside what the law allows because they did not have accurate information about what the law requires. Ultimately, young Tennesseans would either be forced to eschew their legitimate questions about their legal rights, turn to inaccurate sources of legal information, or make those inquiries without the guarantee of attorney-client privilege.

A lawyer meets their clients' needs in myriad ways, including explaining complex laws, drafting legal documents, and zealously advocating for their interests. Simultaneously, lawyers must serve as officers of the court, and through adherence to the profession's strict ethical duties, ensure the legal system functions as intended. As the preamble to Tennessee's code of lawyer ethics explains:

> A lawyer is an expert in law pursuing a learned art in service to clients and in the spirit of public service . . . to promote justice and public good. Essential characteristics of the lawyer are knowledge of the law, skill in applying the applicable law to the factual context, thoroughness of preparation, practical and prudential wisdom, ethical conduct and integrity, and dedication to justice and the public good.

Tenn. Sup. Ct. R. 8, RPC Preamble.

Without legal advice, people would be forced to make sense of sophisticatedly written statutes and court decisions, navigate complex legal processes, and learn intricate rules of practice on their own.[23] Lack of representation often results in worse outcomes and an imbalance of justice.[24] And public perception of the law as unfair or inequitable — especially amongst those who lack resources and are most vulnerable, like young people — erodes confidence and trust in the justice system.[25] Access to legal advice is especially important in the constantly evolving post-*Dobbs* legal landscape. Denying young Tennesseans the ability to access accurate, comprehensive legal advice exacerbates confusion, threatens their ability to effectuate their legal rights, and undermines the rule of law.

---

[23] *See* Jessica K. Steinberg, *Demand-Side Reform in the Poor People's Court*, 47 CONN. L. REV. 741, 754-59 (2015); Comm'n on the Future of Legal Services, *Report on the Future of Legal Services in the United States* 33 (2016) https://www.americanbar.org/content/dam/aba/administrative/center-for-innovation/2016-fls-final-report.pdf.

[24] Linda Klein, A.B.A. Coal. For Justice, *Report on the Survey of Justice on the Impact of the Economic Downturn on Representation in the Courts* (July 12, 2010), https://legalaidresearch.org/wp-content/uploads/2020/02/aba-coalition-justice-survey-judges-2010.pdf ("The judges were asked how the lack of [legal] representation impacts the parties . . . 62% of all judges said that outcomes are worse.").

[25] Legal Services Corp, *The Justice Gap: The Unmet Civil Legal Needs of Low-Income Americans* 51 (April 2022), https://lsc-live.app.box.com/s/xl2v2uraiotbbzrhuwtjlgi0emp3myz1 (noting that only 28% of low-income Americans believe that people like them are treated fairly in the legal system and only 39% believe they can use the system to protect and enforce rights).

# CONCLUSION

The threat of criminalization and civil liability for counseling young Tennesseans with questions about their legal rights and abortion makes it impossible for lawyers to provide those clients with fully informed, meaningful legal advice. Without such advice, the people already facing the most significant barriers to understanding their rights are deprived of that guidance, and bedrock principles of the legal profession are at risk. As lawyers serving young people in Tennessee, Amicus urges this Court to affirm the district court's order enjoining the recruitment provision of Tennessee Code § 39-15-201.

Dated: February 4, 2026

Respectfully submitted,

 /s/ Kylee Sunderlin
Kylee Sunderlin
Sara L. Ainsworth
Elizabeth Ling
If/When/How: Lawyering for
Reproductive Justice
106 W. 32nd Street, Ste. 112
New York, NY 10001
(602) 887-6235
(929) 416-0755
kylee.sunderlin@ifwhenhow.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

With type-volume limitation, typeface requirements,
and type-style requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because it contains 4,908 words, excluding the parts of the brief exempted
by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Garamond
14-point type face throughout, and Garamond is proportionally spaced typeface that
includes serifs.

Dated: February 4, 2026

                                                    /s/ Kylee Sunderlin
                                                  Kylee Sunderlin
                                                  *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 4, 2026, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Sixth Circuit and served through CM/ECF upon all counsel of record in this case.

  /s/ Kylee Sunderlin
Kylee Sunderlin
*Counsel for Amicus Curiae*