# United States Court of Appeals

## for the

# Sixth Circuit

---

Case Nos. 25-5738 and 25-5739

RACHEL WELTY; AFTYN BEHN,

*Plaintiffs-Appellees Cross-Appellants,*

v.

BRYANT C. DUNAWAY; JASON LAWSON; JENNINGS HUTSON JONES;
ROBERT J. CARTER; RAY WHITLEY; ROBERT J. NASH; GLENN R.
FUNK; STACEY EDMONSON; BRENT COOPER; RAY CROUCH;
HANS SCHWENDIMANN,

*Defendants-Appellants Cross-Appellees.*

---

ON APPEAL FROM AN ORDER ENTERED IN THE
MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE
THE HONORABLE JULIA SMITH GIBBONS, JUDGE PRESIDING.

## BRIEF FOR *AMICUS CURIAE* NATIONAL CENTER FOR YOUTH LAW IN SUPPORT OF PLAINTIFFS-APPELLEES CROSS-APPELLANTS AND AFFIRMANCE

JEAN STROUT
NINA MONFREDO
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway Avenue
Oakland, California 94612
(510) 835-8098

COURTNEY DANKWORTH
JAMES STRAMM
ANYA ALLEN
ALEXANDRA MCDEVITT
MARGARET JEWETT
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and 6th Circuit Rule 26.1, Amicus National Center for Youth Law states that it is a non-profit organization without parent corporations and does not issue stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... i

TABLE OF CONTENTS .................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

INTERESTS OF AMICI CURIAE ........................................................................1

INTRODUCTION .............................................................................................2

ARGUMENT ....................................................................................................4

    A.    Section 39-15-201(a)'s Recruitment Provision Harms Youth by Delaying or Denying Access to Information About Time-Sensitive Healthcare. ..............................................................................................4

        1.    The Recruitment Provision Denies Young People Timely Access to Information About Healthcare, Which Leads to Delays in Care. ........................................................................6

        2.    Marginalized Youth—Including Youth of Color, Low-Income Youth, Rural Youth, and Foster Youth—Face Disproportionate Harms. ..........................................................10

        3.    The Parental Consent Exception Does Not Mitigate Harm to Youth—It Exacerbates It. ..................................................12

    B.    The Recruitment Provision in Section 39-15-201(a) Unconstitutionally Restricts the First Amendment Rights of Young People. ............................................................................................16

        1.    Section 39-15-201(a) Is an Unconstitutional Viewpoint Restriction on Protected Speech. ......................................19

        2.    Tennessee Cannot Meet Strict Scrutiny Required to Justify Curtailment of Young Peoples' First Amendment Rights. .................22

        3.    Young People Have Rights Independent of Their Parents or Guardians. ...........................................................26

CONCLUSION .................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*,
    503 F.3d 256 (3d Cir. 2007) ..............................................................27

*Application of Gault*, 387 U.S. 1 (1967)..............................................................26

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)..............................................................21

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982)..............................................................17, 24

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011)..............................................................*passim*

*Cardwell v. Bechtol*,
    724 S.W.2d 739 (Tenn. 1987) ..............................................................16

*Carey v. Population Servs., Int'l*,
    431 U.S. 678 (1977)..............................................................26

*Doe v. Irwin*,
    615 F.2d 1162 (6th Cir. 1980) ..............................................................27

*Edwards v. Aguillard*,
    482 U.S. 578 (1987)..............................................................23

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975)..............................................................3, 17, 20, 21

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025)..............................................................20

*Ginsberg v. State of N. Y.*,
    390 U.S. 629 (1968)..............................................................20

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025)..............................................................23, 24

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)..............................................................26

*Miller v. California,*
413 U.S. 15 (1973).................................................................20

*NetChoice, LLC v. Yost,*
778 F. Supp. 3d 923 (S.D. Ohio 2025).................................18, 22, 25

*Parham v. J.R.,*
442 U.S. 584 (1979).............................................................26

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925).............................................................26

*Prince v. Massachusetts,*
321 U.S. 158 (1944).........................................................26, 27

*Sorrel v. IMS Health Inc.,*
564 U.S. 552 (2011).............................................................20

*Stanley v. Georgia,*
394 U.S. 557 (1969).............................................................17

*Tinker v. Des Moines School Dist.,*
393 U.S. 503 (1969).............................................................26

*Wisconsin v. Yoder,*
406 U.S. 205 (1972).............................................................23

**Statutes**

Tenn. Code Ann. § 33-8-202 ...................................................15

Tenn. Code Ann. § 39-15-201 ..........................................*passim*

Tenn. Code Ann. § 39-15-213 ................................................2, 6

Tenn. Code Ann. § 63-6-220 ...................................................15

Tenn. Code Ann. § 63-6-223 ...............................................15, 21

Tenn. Code Ann. § 63-6-229 ...................................................16

Tenn. Code Ann. § 68-10-104 ..............................................15, 21

Tenn. Code Ann. § 68-34-104 .................................................21

Tenn. Code Ann. § 68-34-107 ...............................................................15

**Rules**

Fed. R. App. P (1)(a)(2) ........................................................................1

**Other Authorities**

Abigail Liberty et al., *Combatting Misinformation: Adolescents'*
*Reported Need and Desire for School-Based Education About*
*Crisis Pregnancy Centers*, 96 J. SCHOOL HEALTH (2026)...................7

*Ensuring Minors' Access to Confidential Abortion Services*, AM. PUB.
HEALTH ASS'N (Nov. 1, 2011), https://www.apha.org/policy-and-
advocacy/public-health-policy-briefs/policy-
database/2014/07/03/11/14/ensuring-minors-access-to-
confidential-abortion-services (last visited January 29, 2026)....................12, 14

Amy G. Bryant et al., *Crisis pregnancy center websites: Information,*
*misinformation and disinformation*, 90 CONTRACEPTION 601
(2014) ...................................................................................................7, 25

Andrea Swartzendruber et al., *Crisis Pregnancy Centers in the United*
*States: Lack of Adherence to Medical and Ethical Practice*
*Standards; A Joint Position Statement of the Society for Adolescent*
*Health and Medicine and the North American Society for Pediatric*
*and Adolescent Gynecology*, 32 J. PEDIATRIC AND ADOLESCENT
GYNECOLOGY (2019) .................................................................7, 25

Ashton Cain et al., *A Snapshot of Broadband Access in Rural*
*Communities*, 2M RESEARCH (Dec. 2022),
https://acf.gov/sites/default/files/documents/opre/broadband_speci
al_topic_brief_jan2023.pdf...............................................................11

Bureau of Transportation Logistics, *The Household Cost of*
*Transportation: Is it Affordable?*, DEP'T OF TRANSP. (Sept. 19,
2023), https://www.bts.gov/data-spotlight/household-cost-
transportation-it-affordable? ............................................................11

Doris W. Chiu et al., *Characteristics and Circumstances of Adolescents Obtaining Abortions in the United States*, 21 INT. J. ENVIRON. RES. PUB. HEALTH 477 (April 2024), https://doi.org/10.3390/ijerph21040477 ............................................................11

Elise D. Berlan et al., Am. Acad. Pediatrics, Policy Statement, *The Adolescent's Right to Confidential Care When Considering Abortion*, 150 PEDIATRICS 1 (2022) .................................................14

Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, OBSTETRICS & GYNECOLOGY (Feb. 2012) .........................................9

Glenn L. Pierce & Paul F. Cleary, *The persistent educational digital divide and its impact on societal inequality*, 19 PLoS ONE 1 (2024), https://doi.org/10.1371/journal.pone.0286795.......................................11

Gopal K. Singh, *Trends and Social Inequalities in Maternal Mortality in the United States*, 1969-2018, 10 INT'L J. MATERNAL & CHILD HEALTH & AIDS 29 (2021) .................................................10

Human Rights Watch & ACLU of Illinois, *The Only People It Really Affects Are the* People *It Hurts: The Human Rights Consequences of Parental Notice of Abortion in Illinois*, (March 11, 2021), https://www.hrw.org/sites/default/files/media_2021/03/us0321_web.pdf (last visited January 29, 2026)...........................................12, 14

J. Shoshanna Ehrlich, *Grounded in the Reality of Their Lives: Listening to Teens Who Make the Abortion Decision Without Involving Their Parents*, 18 BERKELEY WOMEN'S L.J. 61 (2003)...............13, 15

Jocelyn A. Lehrer et al., *Forgone Health Care Among U.S. Adolescents: Associations between Risk Characteristics and Confidentiality Concern*, 40 J. ADOLESCENT HEALTH 218 (2007) .....................14

Katie M. Combs et al., *Pregnancy and Childbearing Among Young Adults Who Experienced Foster Care*, 23 CHILD MALTREATMENT 166 (May 2018)...........................................................11

Latoya Hill et al., *Racial Disparities in Maternal & Infant Health: Current Status and Key Issues*, KFF (Dec. 2025), https://www.kff.org/racial-equity-and-health-policy/racial-disparities-in-maternal-and-infant-health-current-status-and-key-issues/ ............................................................................................10

Lauren J. Ralph et al., *Reasons for and logistical burdens of judicial bypass for abortion in Illinois,* 68 J. ADOLESCENT HEALTH 71 (2021). ..............................................................................................8

Laurie Cawthorn et al., *Pregnant and Parenting Youth in Foster Care in Washington State: Comparison to Other Teens and Young Women who Gave Birth*, WASH. STATE DEP'T OF SOC. AND HEALTH SERVICES 1 (2014) ........................................................................10

Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barrier to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. ADOLESCENT HEALTH 1 (2018)....................................14

Liza Fuentes, *Policy Analysis: Inequity in US Abortion Rights and Access: The End of Roe Is Deepening Existing Divides*, GUTTMACHER INSTITUTE (Jan. 2023), http://www.guttmacher.org/2023/01/inequity-us-abortion-rights-and-accessend-roe-deepening-existing-divides (last visited January 20, 2025) ......................................................................................9

Mark E. Courtney, et al., *Findings from the California Youth Transitions to Adulthood Study (CalYOUTH): Conditions of Foster Youth at Age 17*, CHAPIN HALL U. CHICAGO, 44 (2014), https://www.chapinhall.org/wp-content/uploads/CY_YT_RE1214-1.pdf (last visited January 20, 2026)................................................10

N. Op. Att'y Gen. No. 03-087 (2003).................................................16

Ortar Wassal et al., *Experiences of delay-causing obstacles and mental health at the time of abortion seeking*, 6 CONTRACEPTION: X 1 (2024) ...........................................................................8, 9

*Recommendations for Pregnancy Counseling and Abortion Referrals*,
AM. PUB. HEALTH ASS'N (Oct. 23, 2020),
https://www.apha.org/policy-and-advocacy/public-health-policy-
briefs/policy-database/2021/01/12/recommendations-for-
pregnancy-counseling-and-abortion-referrals (last visited January
29, 2026) ................................................................................................7

Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in
Minors' Abortion Decisions*, 24 FAM. PLAN. PERSPS. 196 (1992) ....................13

## INTERESTS OF AMICI CURIAE[1]

The National Center for Youth Law ("NCYL") is a private, non-profit law firm that uses the law to help children and youth achieve their potential by transforming the public agencies that serve them. NCYL's priorities include ensuring that children and youth have the resources, support, and opportunities they need to live safely with their families in their communities and that public agencies promote their safety and well-being. NCYL represents youth in cases that have broad impact and has extensive experience using litigation to enforce the rights of young people, including their rights to autonomy, privacy, and information, and to facilitate their connections to their families and communities. For more than 50 years, NCYL has fought to ensure that youths' rights, dignity, and autonomy are respected in health, immigration, education, court, and child welfare systems across the United States. NCYL's extensive experience representing young people and their interests makes it uniquely situated to discuss the impacts of laws that deny or delay youth access to time-sensitive healthcare information, particularly youth from marginalized communities, including youth of color, low-income youth, youth living in rural areas, and youth in the foster system.

---

[1]  NCYL files this brief with the consent of all parties. *See* Fed. R. App. P (1)(a)(2). No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person beyond NCYL and its counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

This case concerns a statute that will significantly and tangibly harm Tennessee youth and infringe on their constitutional rights. Tennessee has already enacted a near total ban on abortion. Tenn. Code Ann. § 39-15-213. Yet Tennessee seeks to go further by preventing its youth from merely accessing information about abortion and its legality in other states. Tenn. Code Ann. § 39-15-201(a)—which Tennessee misleadingly refers to as its "abortion trafficking" law—criminalizes "intentionally recruit[ing] . . . a pregnant unemancipated minor" in Tennessee "for the purpose of" obtaining an abortion that would be illegal in Tennessee. The law's prohibition applies regardless of where the procedure occurs, even if that procedure would be legal in another state. *Id.* As the lower court rightly held, the broad recruitment provision impermissibly encroaches on constitutionally protected speech. *See* Mem. Opp. & Order R.81, PageID#1102. It will prevent youth from receiving vital health information, harming them and violating their constitutional rights.

By denying young people information about legal abortion, the recruitment provision will harm youth in Tennessee by delaying or preventing time-sensitive medical care, resulting in physical, emotional, and financial injury. Under the broad recruitment provision, even a trusted healthcare provider may not be able to explain the pros and cons of abortion care or explain the legality of the procedure

in states beyond Tennessee in response to a question from a young patient. While young people might seek out the information in other ways, some will undoubtedly be delayed or denied access to medical care in the process. Delay of this medical care will put at risk the physical, emotional, and financial well-being of the youth who are forced to continue to carry unwanted pregnancies.

The recruitment provision also violates young people's constitutional rights by prohibiting them from accessing vital information about medical care that is legally available in the United States. As the Supreme Court has explained, Tennessee lacks "the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011) (emphasis omitted). That is because, under longstanding Supreme Court precedent, "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). "Such laws do not enforce *parental* authority over children's speech . . . they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. Because the recruitment provision does not prohibit obscene or otherwise legitimately proscribed speech but rather prevents the free flow of protected healthcare

information, the law "must be unconstitutional." *See id.* The Court should

vindicate the rights of Tennessee's youth and affirm.

## ARGUMENT

### A.  Section 39-15-201(a)'s Recruitment Provision Harms Youth by Delaying or Denying Access to Information About Time-Sensitive Healthcare.

Restricting youths' access to information about safe and legal reproductive

healthcare will cause physical, emotional, and financial harm to Tennessee youth.

By chilling constitutionally protected speech, Section 39-15-201(a) restricts young

people's access to information about their reproductive healthcare options, which

unnecessarily delays the delivery of important, legal reproductive healthcare.  In

addition to depriving young people of information, this law puts the physical,

psychological, and financial well-being of young people in Tennessee at risk.

These harms are real, not merely "dreamed-up hypotheticals," as Appellants

suggest.  *See* Appellants Br. 3.

Section 39-15-201(a) makes it a criminal offense to "recruit[] . . . a pregnant

unemancipated minor" for the "purpose of" obtaining an abortion, even in states

where abortion care is legal.  Tenn. Code Ann. § 39-15-201(a).  "Recruit" is not

defined in the statute, leaving individuals to guess whether the speech could be

considered a criminal offense.  *Id.*; *see* Appellees Br. 52–53 (noting that the term

recruit could include "'indirect' conduct, like 'put[ting] out the word' about an

opportunity"; "persuad[ing] someone to join in or help with some activity," or "merely . . . encourag[ing]").  The statute criminalizes recruitment regardless of whether the youth obtains an abortion.  It thus restricts youth in Tennessee from even engaging in conversations that could be deemed "recruitment" for an out-of-state abortion—including conversations that also explore non-abortion options and ultimately do not result in an abortion.  The ambiguity and potential breadth of the provision, combined with the criminal penalties, incentivize individuals like Appellees to read the statute conservatively to avoid liability, making it less likely that Tennessee youth will be provided with information that includes safe and legal abortion options.[2]

Because the statute will undoubtedly chill speech by individuals like Appellees about reproductive healthcare options that include legal out-of-state abortion, it also impermissibly limits Tennessee youths' access to such information.  For instance, under this law, pregnant young Tennesseans consulting with Appellee Rachel Welty regarding access to legal abortion care would not be able to hear all of their options, including out-of-state travel, because the statute

---

[2]  Appellants cannot save the constitutionality of this overbroad provision by asserting that the words "intent," "recruit," and "purpose" narrow the statute to a constitutionally permissible scope.  *See* Appellants Br. 25–27.  Tennessee provides no meaningful limiting principle on these capacious terms, and Appellees will be left wondering how to avoid criminal liability under the provision.

forbids her to provide that information.  *See* Appellees Br. 16.  Nor could pregnant

youths who lack written, notarized parental consent receive information about all

of their safe, legal healthcare options—including legal abortion—when consulting

with their grandmothers or aunts.  Nor could young people experiencing severe

mental health conditions exacerbated by pregnancy discuss legal abortion with

their psychiatrist as a potential means of mitigating those conditions.[3]  The State

could view these consultations as "recruiting" young people to obtain abortions

and prosecute them in criminal court, regardless of whether an abortion occurs.

> 1.    The Recruitment Provision Denies Young People Timely
>        Access to Information About Healthcare, Which Leads to
>        Delays in Care.

While youth may be able to access information about legal abortion through

other means, the recruitment provision is likely to lead to delays that increase the

risk of adverse health consequences.  For instance, young Tennesseans unable to

access this information through a conversation with their trusted healthcare

provider, social worker, attorney, or adult would be left to wade through the

morass of information available on the internet, much of it unreliable, rather than

---

[3]  Tennessee's abortion ban includes a Medical Condition Exception if a physician determines "using reasonable medical judgment, based upon the facts known to the physician at the time," that abortion is necessary "to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman." Tenn. Code Ann. § 39-15-213(c)(1)(A).  But this narrow exception does not cover mental health conditions.

talk to someone who understands their specific needs.[4]  Rather than being given all

relevant information at a single appointment, young people would need to research

out-of-state abortion care independently, including arranging travel and other

accommodations.  Young people left alone to understand the full range of their

healthcare options are likely to receive dubious and delayed information.[5]

---

[4]  While subsection (f)(1) provides an exception for "the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor," this exception is vague, with terms like "consultation" not defined in the statute.  Tenn. Code Ann. § 39-15-201(f)(1).  It is unclear whether a discussion of healthcare options including a legal abortion would be covered by this exception.  Moreover, the conduct of non-healthcare providers like Appellees falls outside this narrow exception.

[5]  For instance, a youth may encounter crisis pregnancy center websites, which often include misleading or inaccurate information regarding the risks of abortion.  Amy G. Bryant et al., *Crisis pregnancy center websites: Information, misinformation and disinformation*, 90 CONTRACEPTION 601 (2014) (survey of crisis pregnancy center websites referenced in state resource directories found that 80% of these websites contained false or misleading information); Andrea Swartzendruber et al., *Crisis Pregnancy Centers in the United States: Lack of Adherence to Medical and Ethical Practice Standards; A Joint Position Statement of the Society for Adolescent Health and Medicine and the North American Society for Pediatric and Adolescent Gynecology*, 32 J. PEDIATRIC AND ADOLESCENT GYNECOLOGY, 563 (2019) (statement by medical societies focused on adolescent health that pregnancy crisis centers provide "biased, limited, and inaccurate health information"); Abigail Liberty et al., *Combatting Misinformation: Adolescents' Reported Need and Desire for School-Based Education About Crisis Pregnancy Centers*, 96 J. SCHOOL HEALTH (2026); *see also Recommendations for Pregnancy Counseling and Abortion Referrals*, AM. PUB. HEALTH ASS'N (Oct. 23, 2020), https://www.apha.org/policy-and-advocacy/public-health-policy-briefs/policy-database/2021/01/12/recommendations-for-pregnancy-counseling-and-abortion-referrals (last visited January 29, 2026) ("Denying pregnant people complete information about pregnancy options and services reduces their ability to access care in a timely manner.").  It is unconstitutional viewpoint discrimination that

These delays will have real, negative impacts.  As a young person in the foster system shared with NCYL, a lack of access to accurate information is harmful in itself:  "I didn't have any conversation prior to my [pregnancy and abortion], I feel I didn't learn what I should have.  I was two and a half months [pregnant] with no expectations of what was actually happening to me . . . .  I was not prepared, and it traumatized me heavily."  Additionally, delays in accessing needed and legal abortion care will force Tennessee youth to face the increased risk of continuing an unwanted pregnancy and seeking an abortion later in the pregnancy.  While all abortion care is extremely safe, later procedures become more expensive, complex, and higher risk.[6]  Youth facing a delay in receiving abortion care may not be able to access their preferred method of abortion or may require a two-day procedure, which imposes additional medical, financial, and logistical risks.  Pregnant young Tennesseans would also be harmed by the indignity and trauma of being forced to stay pregnant for a prolonged period of time.[7]  Young people are particularly likely to suffer these harms, as they are less

---

youth are able to access misinformation regarding *non-abortion* options without parental consent, but cannot hear information about options including legal abortion.  *See infra* Section B.1.

[6]  Lauren J. Ralph et al., *Reasons for and logistical burdens of judicial bypass for abortion in Illinois*, 68 J. ADOLESCENT HEALTH 71, 75 (2021).

[7]  *See, e.g.*, Ortar Wassal et al., *Experiences of delay-causing obstacles and mental health at the time of abortion seeking*, 6 CONTRACEPTION: X 1, 5 (2024) ("[E]xperiences of delay-causing obstacles corresponded with significantly

likely to recognize pregnancy early, and thus are often further along in pregnancy when they first seek abortion care.[8]

By restricting the information available to youth, the recruitment provision prevents young people from making the reproductive healthcare decision that is best for them. For some young people, that may mean choosing to keep their pregnancy. For others, the best choice may be to obtain a legal abortion. A legal abortion may be the right choice for a young person for a number of reasons. For instance, they may seek to avoid the higher risks of death and serious health complications that come with childbirth,[9] or to avoid the emotional and psychological harm that comes with carrying an unwanted pregnancy.[10] By infringing on youths' ability to access the full range of information about options including abortion, the recruitment provision limits their ability to make informed reproductive decisions.

---

higher levels of stress, anxiety, and depression symptoms and greater risk of moderate to severe anxiety disorder and major depressive disorder.").

[8] *See, e.g.*, Liza Fuentes, *Policy Analysis: Inequity in US Abortion Rights and Access: The End of Roe Is Deepening Existing Divides*, GUTTMACHER INSTITUTE (Jan. 2023), http://www.guttmacher.org/2023/01/inequity-us-abortion-rights-and-accessend-roe-deepening-existing-divides (last visited January 20, 2025).

[9] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, OBSTETRICS & GYNECOLOGY, 215 (Feb. 2012) ("The risk of death associated with childbirth is approximately 14 times higher than that with abortion" and "morbidity associated with childbirth exceeds that with abortion.").

[10] *See, e.g.*, Wassal, *supra* note 7, at 5.

2.	Marginalized Youth—Including Youth of Color, Low-Income Youth, Rural Youth, and Foster Youth—Face Disproportionate Harms.

The harms described above fall disproportionately on already-marginalized groups.  Because youth who are members of marginalized groups experience worse pregnancy and birth outcomes than their peers, delaying access to timely and accurate information about abortion care is particularly risky for them.  Black patients are three times more likely than white patients to experience a pregnancy-related death.[11]  People living in low-income areas experience double the maternal mortality rate of those in more affluent areas, and people in rural areas are much more likely to die from childbirth than those living in cities.[12]  Youth in the foster system experience adverse birth outcomes at much higher rates than other youth.[13]

[11]	Latoya Hill et al., *Racial Disparities in Maternal & Infant Health: Current Status and Key Issues*, KFF (Dec. 2025), https://www.kff.org/racial-equity-and-health-policy/racial-disparities-in-maternal-and-infant-health-current-status-and-key-issues/.

[12]	Gopal K. Singh, *Trends and Social Inequalities in Maternal Mortality in the United States*, 1969–2018, 10 INT'L J. MATERNAL & CHILD HEALTH & AIDS 29, 33, 38 (2021).

[13]	Laurie Cawthorn et al., *Pregnant and Parenting Youth in Foster Care in Washington State: Comparison to Other Teens and Young Women who Gave Birth*, WASH. STATE DEP'T OF SOC. AND HEALTH SERVICES 1, 7–8 (2014) (noting worse birth outcome, including premature birth, low birth weight, and infant mortality for youth in foster care compared to other youths).  *See also* Mark E. Courtney, et al., *Findings from the California Youth Transitions to Adulthood Study (CalYOUTH): Conditions of Foster Youth at Age 17*, CHAPIN HALL U. CHICAGO, 44 (2014), https://www.chapinhall.org/wp-content/uploads/CY_YT_RE1214-1.pdf (last visited January 20, 2026); *see generally* Katie M. Combs, et al., *Pregnancy and Childbearing Among Young*

Tennessee's statute compounds these existing health disparities by creating additional barriers to accessing information and care. Low-income youth face a "digital divide"—a significant gap in technology access between youth from low-income and higher-income families—that limits their ability to research their legal options online.[14] Rural youth similarly lack reliable broadband access, making it harder for them to find information about their healthcare options.[15] Youth in the foster system and youth whose parents are incarcerated will particularly be harmed by the inability to access accurate healthcare information from trusted adults because they may not have access to a parent who can provide consent. And even when youth from disadvantaged populations obtain information about legal abortion care, they face further barriers accessing it due to limited financial resources and transportation.[16] By criminalizing the ability of trusted adults to

---

*Adults Who Experienced Foster Care*, 23 CHILD MALTREATMENT 166 (May 2018).

[14] *See* Glenn L. Pierce & Paul F. Cleary, *The persistent educational digital divide and its impact on societal inequality*, 19 PLoS ONE 1, 8 (2024), https://doi.org/10.1371/journal.pone.0286795.

[15] *See* Ashton Cain et al., *A Snapshot of Broadband Access in Rural Communities*, 2M RESEARCH, 2 (Dec. 2022), https://acf.gov/sites/default/files/documents/opre/broadband_special_topic_brief_jan2023.pdf (finding that "[r]ural counties in the United States . . . experience limited access to broadband internet.").

[16] Doris W. Chiu et al., *Characteristics and Circumstances of Adolescents Obtaining Abortions in the United States*, 21 INT. J. ENVIRON. RES. PUB. HEALTH 477 (April 2024), https://doi.org/10.3390/ijerph21040477; Bureau of Transportation Logistics, *The Household Cost of Transportation: Is it Affordable?*, DEP'T OF TRANSP. (Sept. 19, 2023), https://www.bts.gov/data-

provide information and support, Tennessee's statute cuts off the very assistance

that these vulnerable youth need the most.

      3.     The Parental Consent Exception Does Not Mitigate Harm to Youth—It Exacerbates It.

Tennessee's statute includes an exception permitting adults who have

"obtained the written, notarized consent of the unemancipated minor's parent or

legal guardian" to provide information about abortion without criminal liability.

Tenn. Code Ann. § 39-15-201(c)(2). Appellants frame this as a safeguard that

protects parental rights while allowing youth to access information and care with

parental approval. *See* Defs.' Resp. Opp., R.22, PageID#209–210; Appellants Br.

7–8. But this exception does not mitigate the statute's harm to young people—

instead, mandating parental approval puts youth at risk of coercion, rejection, and

even homelessness.[17] The notarization requirement imposes further burdens on

---

spotlight/household-cost-transportation-it-affordable? (noting that "[t]ransportation cost burden falls the hardest on lowest income families").

[17] *See* Human Rights Watch & ACLU of Illinois, *The Only People It Really Affects Are the* People *It Hurts: The Human Rights Consequences of Parental Notice of Abortion in Illinois*, 43–44 (March 11, 2021), https://www.hrw.org/sites/default/files/media_2021/03/us0321_web.pdf (last visited January 29, 2026); *Ensuring Minors' Access to Confidential Abortion Services*, AM. PUB. HEALTH ASS'N (Nov. 1, 2011), https://www.apha.org/policy-and-advocacy/public-health-policy-briefs/policy-database/2014/07/03/11/14/ensuring-minors-access-to-confidential-abortion-services (last visited January 29, 2026).

young people and their parents—particularly those with parents who are out-of-state, incarcerated, or otherwise unavailable.

Most young people voluntarily involve a parent in their abortion decision, regardless of any legal requirement.[18] But youth who do not involve their parents have legitimate, safety-based reasons rooted in the history and context of their specific family relationships.[19] Young people are good predictors of how their parents will react, and research demonstrates that involving an unsupportive parent is more detrimental to a young person than accessing abortion care without parental involvement.[20]

The pregnant youth who need information and support from trusted adults like Appellee Welty are not hypothetical. The record establishes that pregnant youth lacking parental consent continue to contact Ms. Welty to learn about their options for legal abortion care. Pls.' Summ. J. Mot., R.56, PageID#689. These are the youth for whom the parental consent exception offers no protection—only additional barriers and risks.

---

[18] *See* Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 FAM. PLAN. PERSPS. 196, 199 (1992).

[19] J. Shoshanna Ehrlich, *Grounded in the Reality of Their Lives: Listening to Teens Who Make the Abortion Decision Without Involving Their Parents*, 18 BERKELEY WOMEN'S L.J. 61, 166 (2003).

[20] *See id.*

Forcing young people to obtain written, notarized parental consent—not to receive an abortion, which they cannot do in Tennessee, but simply to receive information about obtaining legal abortion care out of state—exposes them to serious harm. Young people are best positioned to decide whether involving their parents is safe and whether they need to seek information and support from other trusted adults. Ignoring this reality, the parental consent exception puts young people at risk by forcing them to choose between obtaining critical healthcare information and avoiding the harms that come with forced parental disclosure. Young people who are forced to involve their parents in abortion decisions may experience parental coercion (either to have an abortion or to continue an unwanted pregnancy), family conflict, rejection, homelessness, or even violence between parents or against the youth.[21] The requirement also destroys confidentiality, a critical component of reproductive healthcare access for youth.[22]

---

[21] *See* Human Rights Watch & ACLU of Illinois, *supra* note 17; AM. PUB. HEALTH ASS'N, *supra* note 17.

[22] *See* Elise D. Berlan et al., Am. Acad. Pediatrics, Policy Statement, *The Adolescent's Right to Confidential Care When Considering Abortion*, 150 PEDIATRICS 1, 5 (2022); Jocelyn A. Lehrer et al., *Forgone Health Care Among U.S. Adolescents: Associations between Risk Characteristics and Confidentiality Concern*, 40 J. ADOLESCENT HEALTH 218, 218 (2007); Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barrier to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. ADOLESCENT HEALTH 1, 5 (2018).

Mandated parental involvement in confidential healthcare decisions also undermines family relationships by distorting how and when communication occurs.  As explained above, most youth voluntarily involve their parents in discussions regarding pregnancy and abortion.  But for those who do not, studies show that the decision often reflects the youth's awareness of existing family dynamics—such as poor communication, emotional distance, or fear of severe adverse reactions—rather than a capricious desire to exclude parents from the process.[23]  Under such circumstances, Tennessee's law does not foster open communication; instead, it compels disclosure at the outset of care, before a young person may be ready or feel safe to involve a parent.  By conditioning access to information on parental involvement, this forced disclosure provision risks exacerbating already strained relationships and further eroding trust where it is most fragile.

Moreover, Tennessee law already recognizes that young people have the capacity to make important healthcare decisions without parental consent. Consistent with this recognition, Tennessee permits young people to access prenatal care, contraception, outpatient mental healthcare, STI testing and treatment, and substance use treatment without parental consent.  Tenn. Code Ann. §§ 33-8-202; 63-6-220; 63-6-223; 68-10-104; 68-34-107.  Further, youths in

---

[23]    Ehrlich, *supra* note 19.

Tennessee who are parents themselves can consent to medical treatment of their minor child. Tenn. Code Ann. § 63-6-229. Tennessee courts have also articulated a mature minor exception to common law parental consent requirements. *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn. 1987). Tennessee's Attorney General has stated that "minors have the capacity to consent to medical treatment without their parents' approval if they are able to fully understand and appreciate the risks and probable consequences of their conduct." N. Op. Att'y Gen. No. 03-087 (2003). For youths to "fully understand and appreciate the risks and probable consequences" of a procedure—a necessary predicate to applying the mature minor standard—they must have access to all pertinent information. Yet when it comes to *receiving information about lawful reproductive healthcare*, Section 39-15-201(a) categorically cuts off access without parental approval, disregarding the ability of young people to determine whether it is safe or beneficial for them to involve their parents. This inconsistency reveals that the statute does not aim to protect youth or safeguard parental rights, but to restrict access to abortion-related information.

### B. The Recruitment Provision in Section 39-15-201(a) Unconstitutionally Restricts the First Amendment Rights of Young People.

The recruitment provision in Section 39-15-201(a) impedes young people's ability to receive information by requiring parental consent before a third party can

provide them with information about legal abortion care available outside of Tennessee. All people have the "right to receive information and ideas," a principle which is "fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This includes young people. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (stating young people's "right to receive ideas is a necessary predicate to the *recipient*'s meaningful exercise of his own rights of speech, press, and political freedom").

The First Amendment's protections are generally "no less applicable when the government seeks to control the flow of information to minors." *Erznoznik*, 422 U.S. at 214. For that reason, the government can bar public dissemination of First Amendment-protected speech "only in relatively narrow and well-defined circumstances." *Brown*, 564 U.S. at 794 (citing *Erznoznik*, 422 U.S. at 212–213) (holding law that restricted sale and rental of violent video games to young people without consent violated minors' First Amendment rights). While Tennessee "possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which [young people] may be exposed." *Id*. Further, "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. 205, 213–214 (ordinance prohibiting movie theaters from

showing movies with nudity to protect children was an overbroad content restriction).

Indeed, governments lack "the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted). "No doubt [Appellants] would concede this point if the question were whether to forbid children to read without the presence of an adult the *Odyssey . . .* or *The Divine Comedy . . .* or *War and Peace*" outside the confines of the classroom. *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 931, 954–56 (S.D. Ohio 2025) (citation omitted) (holding that Ohio's parental consent requirement for minors to access to certain online platforms violated the First Amendment because the State failed to show that the regulated speech caused harm to minors and the law was not narrowly tailored).

Under the First Amendment, young people have the right to receive ideas and independently seek information that differs from the ideas their parents prescribe to them. This includes a young person's right to hear protected speech about legal abortion. The First Amendment protects young people's ability to engage with competing ideas as they mature and make decisions that shape their lives.

1. Section 39-15-201(a) Is an Unconstitutional Viewpoint Restriction on Protected Speech.

Appellees' "public advocacy, information-sharing, and counseling" are protected under the First Amendment. Mem. Op. & Order, R.81, PageID#1109. The court below correctly found that Section 39-15-201(a) was an unconstitutional, content-based viewpoint restriction of protected speech because "[i]t favors speech that dissuades abortion over speech that encourages abortion." *Id.* at PageID#1123. Contrary to Appellants' argument, the "intended speech only seeks to recruit minors for purposes of obtaining a *legal* abortion. Thus, [Appellees'] speech cannot be integral to crime." *Id.* at PageID#1124. The court rightly concluded that "[t]he recruitment provision therefore regulates plaintiffs' speech because of its message—'that abortion is safe, common and normal' and available in certain states—and is presumptively unconstitutional." *Id.*

Appellants misleadingly analogize the speech proscribed by Tennessee's statute to unprotected obscenity. Appellants Br. 46–47. Comparing legal abortion to pornography, Appellants claim that young people in Tennessee have no First Amendment right to receive information about legal abortion, and thus receipt of this information can be contingent on parental consent. *Id.* This is plainly incorrect. Speech is obscene if:

(a) "the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest"; (b) "the work depicts or describes, in a patently

19

offensive way, sexual conduct specifically defined by the applicable state law"; and (c) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 472–73 (2025) (quoting *Miller v. California*, 413 U.S. 15, 24 (1973)).

Defendants' attempt to analogize legal abortion to obscenity is unhelpful and misguided. Obscenity is not "whatever a legislature finds shocking, but only depictions of 'sexual conduct.'" *Brown*, 564 U.S. at 792–93 (quoting *Miller*, 413 U.S. at 27). Information regarding terminating a pregnancy does not depict or describe sexual conduct and has no appeal to the prurient interest. It is nothing like the "girlie magazines" found to be obscene in *Ginsberg v. State of N. Y.*, 390 U.S. 629, 634–43 (1968); rather, it is vital healthcare information that "can save lives." *See Sorrel v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). Further, legal abortion information has, *at the very least*, material political and scientific value. Appellants and their supporting amici do not—and cannot—offer any explanation as to why information about legal abortion care is similar to obscene content or offer any legitimate proscription on this information. Tennessee cannot suppress this speech "solely to protect the young from ideas or images that [it] thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. Moreover, Tennessee already acknowledges that it is appropriate for youth to receive information about their own condition and medical options: Tennessee law allows young people to receive information

regarding pregnancy-related care, STI treatment, and contraception without the knowledge or consent of their parents or guardian. Tenn. Code Ann. §§ 63-6-223; 68-10-104; 68-34-104.

Speech about legal abortion should be evaluated under the strict scrutiny standard applied to content- and viewpoint-based restrictions on protected speech. As the Supreme Court explained in *Brown*, a State does not have a "free-floating power to restrict the ideas to which children may be exposed." 564 U.S. at 794. Section 39-15-201(a) falls outside the "narrow and well-defined circumstances" where the government may "bar public dissemination of protected materials." *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). It is therefore unconstitutional and "mistaken." *Id.*

Tennessee cannot restrict mere information about legal abortion care in other states. Young Tennesseans should have full access to ideas related to abortion regardless of viewpoint to inform their choices regarding their own healthcare and hone their capacity for civic engagement. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252–53 (2002) ("First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.").

2. Tennessee Cannot Meet Strict Scrutiny Required to Justify Curtailment of Young Peoples' First Amendment Rights.

Tennessee cannot limit young people's ability to hear information about legal abortion, just as it cannot limit the speakers' ability to communicate this information under the First Amendment. Laws requiring parental consent for young people to "access constitutionally protected, non-obscene content are subject to strict scrutiny." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 955 (S.D. Ohio 2025). To overcome strict scrutiny, Tennessee must demonstrate that Section 39-15-201(a) is justified by a compelling interest and is narrowly tailored to serve that interest. *Brown*, 564 U.S. at 799. Tennessee must specifically identify an "actual problem" that needs to be solved, and the "curtailment of free speech must be actually necessary to the solution." *Id.* (citations omitted). Tennessee would have to present a "direct causal link" from the identified problem to the curtailed speech. *Id.* This is a demanding standard that Tennessee cannot meet.

Tennessee lacks a compelling interest in restricting young people's access to information about abortion care. Appellants fail to identify any problem relating to young people that this restriction is intended to address. Nor is there any problem associated with youth receiving information about legal abortion. Instead, Appellants focus solely on the alleged rights of parents, ignoring the rights and interests of young people altogether. Appellants articulate the compelling interest

as "the States' long-recognized interest in fostering parents' rights . . . in medical care," asserting that young people "do not possess the right to make medical decisions for themselves."  Appellants Br. 47–48.  But this statute does not regulate medical decision-making; it regulates access to information.  In pursuing an interest in parental involvement in medical care, Tennessee may not infringe the First Amendment right of young people to receive speech concerning their full range of lawful healthcare options.

Tennessee's reliance on *Mahmoud v. Taylor*, 606 U.S. 522 (2025), is misplaced.  *See* Appellants Br. 47.  In *Mahmoud*, the Supreme Court found that the Montgomery County Board of Education's policy of using LGBTQ+ inclusive texts to instruct students in kindergarten through fifth grade in the public school system with no parental opt-out impermissibly burdened the parents' right to religious exercise.  606 U.S. at 523.  Analogizing the Board's policy to the "compulsory-education law" at issue in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court was particularly concerned that very young children in elementary public schools were vulnerable to "coercion."  *Id.* at 547, 554–55 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)); *see id.* at 551 ("High school students may understand that widespread approval of a practice does not necessarily mean that everyone should accept it, but very young children are most unlikely to appreciate that fine point.").  The Court also found that the LGBTQ+ inclusive texts were

presented in a manner designed to exert a "pressure to conform" on children. *Id.* at 554–55.

The *Mahmoud* Court held only that parents' free exercise rights were violated where *the State*, not private actors, was disseminating information to very young children at school without allowing parents to opt out of such instruction. Here, the State is not compelling students to learn about abortion care, nor does this case involve very young children in elementary classrooms. Instead, it concerns young people's ability—outside the classroom and free from state pressure—to seek and receive accurate information about lawful and potentially lifesaving medical care. Tennessee's law prohibits the sharing of *all* information about legal abortion care, even when it is "presented in a neutral manner" totally free of "pressure to conform." *See id.* at 550. The *Mahmoud* Court's reasons for concerns about the potential for state coercion are entirely absent here, where there is no "compulsory environment of the classroom" but instead a "regime of voluntary inquiry." *Pico*, 457 U.S. at 869.

Appellants offer no argument as to how youth are harmed by receiving information about legal abortion care. Accordingly, there is not a compelling state interest that could justify the curtailment of a young person's right to access to this constitutionally protected speech. But even if Tennessee did have a compelling interest—which it does not—the curtailment of young people's right to hear

information about legal abortion is not narrowly tailored and necessary to serve that alleged interest. First, it is underinclusive because the law allows young people to hear information regarding legal abortion care if a parent gives consent. "As the Supreme Court observed in *Brown*, legislation preventing minors from buying violent video games was 'seriously underinclusive' because the 'Legislature is perfectly willing to leave this . . . material in the hands of children so long as one parent . . . says it's OK . . . . That is not how one addresses a serious social problem.'" *NetChoice*, 778 F. Supp. 3d at 956 (quoting *Brown*, 564 U.S. at 802). It is also underinclusive in that parents cannot restrict young people's ability to hear information—including misinformation—about abortion care from crisis pregnancy centers and other organizations that advocate *against* legal abortion.[24] Second, it is also overinclusive as "it [is an] enforced governmental speech restriction—subject to parental veto," creating an administrative barrier for parents who genuinely want their children to have access to information about legal abortion care. *Id*. "Punishing third parties for conveying protected speech to children *just in case* their parents disapprove" is not a "proper governmental means of aiding parental authority." *Brown*, at 802. Section 39-15-201(a) is an

---

[24] *See* Bryant, *supra* note 5. *See also* Swartzendruber, *supra* note 5.

impermissible restriction on young people's ability to receive information under the First Amendment.

### 3. Young People Have Rights Independent of Their Parents or Guardians.

It is undisputed that young people possess constitutional rights independent of their parents or guardians. As the Supreme Court has affirmed, "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." *Parham v. J.R.,* 442 U.S. 584, 627 (1979) (Brennan, J., concurring in part) (citations omitted); *see also Application of Gault*, 387 U.S. 1, 55 (1967) (recognizing that children are entitled to constitutional protections); *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506 (1969) (same). The Supreme Court has acknowledged the rights of young people even while recognizing "that the custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (recognizing a child's right to exercise their religion); *see id.* (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923) (recognizing a child's right to receive teaching in languages other than the nation's common tongue), and *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (child's right to receive an education is protected by the Due Process Clause)). It is also well established that young people's rights extend to making reproductive healthcare choices—such as accessing contraception—and that allowing youth to exercise these rights does not violate parents' constitutional rights. *See, e.g.*, *Carey*

*v. Population Servs., Int'l*, 431 U.S. 678, 679 (1977) ("The right to privacy in connection with decisions affecting procreation extends to minors as well as to adults . . . ."); *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980) (holding that parents' liberty interest in their children's upbringing was not infringed by voluntary state-funded clinic that provided contraception to youth without requiring parental consent or notification); *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 269 (3d Cir. 2007) ("[T]here is no constitutional right to parental notification of a minor child's exercise of reproductive privacy rights.").

Parents' rights are not absolute and cannot wholly subsume young people's separate rights. In particular, there are limits to parents' rights when their control of their children results in harm to the minor child. The Supreme Court has rejected the idea that parents' rights extend so far as to expose their child to "ill health or death." *Prince*, 321 U.S. at 166–67. Section 39-15-201(a) provides no mechanism for protecting youths' constitutional rights. It vests ultimate control in the parent and forecloses any independent assessment of the young person's interests or health—stripping the young person of any rights and exposing them to medical, psychological, and economic harm. *See supra* Section A. Appellants' focus on parents' rights alone disregards the population that will be harmed by this law: pregnant youth in Tennessee.

## **CONCLUSION**

For the reasons stated above, Section 39-15-201(a) will cause immeasurable harm to Tennessee's youth. These harms will fall disproportionately on already disadvantaged youth and are not mitigated, but rather are exacerbated, by the parental consent provision. Further, the recruitment provision unconstitutionally restricts youths' First Amendment right to hear critical medical information. Rather than protect young people, this statute causes them further harm and infringes upon their rights.

Respectfully submitted,

*/s/ Courtney Dankworth*

Courtney Dankworth
James Stramm
Anya Allen
Alexandra McDevitt
Margaret Jewett
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
(212) 909–6000
cmdankworth@debevoise.com
jstramm@debevoise.com
acallen@debevoise.com
apmcdevitt@debevoise.com
mvjewett@debevoise.com

Jean Strout
Nina Monfredo
National Center for Youth Law
1212 Broadway Avenue
Oakland, CA 94612
Telephone: (510) 835-8098
jstrout@youthlaw.org
nmonfredo@youthlaw.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that is brief complies with the type-volume limitation in Fed. R. App.

P. 29(a)(4) and 32(a)(7)(B) because it contains 6,443 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1). This brief

complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-

style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-

point Times New Roman font using Microsoft Word.

Dated:  Feb. 4, 2026                          */s/ Courtney Dankworth*
                                              Courtney Dankworth

                                              *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  Feb. 4, 2026

*/s/ Courtney Dankworth*
Courtney Dankworth

*Counsel for Amicus Curiae*