IN THE

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

**RACHEL WELTY; AFTYN BEHN**

*Plaintiffs-Appellees/Cross-Appellants*,

v.

**BRYANT C. DUNAWAY, JASON LAWSON; JENNINGS HUTSON JONES;
ROBERT J. CARTER; RAY WHITLEY; ROBERT J. NASH; GLENN R.
FUNK; STACEY EDMONSON; BRENT COOPER; RAY CROUCH; HANS
SCHWENDIMANN**

*Defendants-Appellants/Cross-Appellees*

_____

On Appeal from the U.S. District Court
for the Middle District of Tennessee at Nashville
No. 3:24-cv-768

_____

**BRIEF OF PHYSICIANS FOR HUMAN RIGHTS AS AMICUS CURIAE IN
SUPPORT OF PLAINTIFFS-APPELLEES / CROSS-APPELLANTS**

Gerson H. Smoger
Smoger and Associates
4228 Hallmark Dr.
Dallas, TX 75229
(510) 531-4529
smogerlaw@gmail.com

Payal K. Shah
Kimberly Saltz
Physicians for Human Rights
520 Eighth Avenue, Suite 2300
New York, New York 10018
(646) 564-3720
pshah@phr.org

Mary A. Parker
*Counsel of Record*
TN Bar #006016
Parker &Crofford
5115 Maryland Way
Brentwood, TN 37027
(615) 244-2445
mparker@parker-crofford.com

*Counsel for Amicus Curiae*
*Physicians for Human Rights*

CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Physicians for Human Rights certifies that it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns 10 percent or more of its stock.

Respectfully submitted on February 4, 2026.

/s/ Mary A. Parker

MARY A. PARKER
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT…………………………………i

TABLE OF CONTENTS………………………………………………………ii

TABLE OF AUTHORITIES…………………………………………………...iv

IDENTITY AND INTEREST OF AMICUS CURIAE………………………..1

SUMMARY OF ARGUMENT…………………………………………………3

ARGUMENT……………………………………………………………...5

I.  THE PROVISIONS OF THE TENNESSEE ABORTION
    ACTS THAT IMPLICATE PHYSICIANS' ABILITY
    TO CARE FOR THEIR PATIENTS……..………..……………………....5

II. THE ACT DANGEROUSLY RESTRICTS PHYSICIANS' ABILITY
    TO TREAT THEIR PATIENTS …………………………..……….........7

    A. Lack of Consideration for Appropriate and Routine
       Out-of-State Medical Treatment ………………………...…..………..7

    B. The Vagueness of the Act has a Chilling Effect on a Physician's
       Ability to Treat Patients……………………………………….…..…10

    C. Ambiguity in Tennessee's Medical Exceptions Are Made More
       Concerning By the Tennessee Act………………………….……..…14

III. WHAT TENNESSEE PHYSICIANS FACE UNDER THE
     ACT -- CONFLICTING REQUIREMENTS AND A DIFFICULT
     FUTURE ...……………………………………………..……...18

     A.  Dual Loyalty: Conflict Between Tennessee Law and a
         Physician's Ethical Obligations ………..………………...…….......19

     B.  Conflict Caused by Harsh Criminal and Civil Penalties…………...20

  C.  Conflict Caused by the Potential for Civil Malpractice
      Suits …………………………………………………...……..21

  D. Likely Long-Term Effect on the Practice of Obstetrics and
      Gynecology in Tennessee ……………………………...…....22


CONCLUSION……………………………………………………...**25**

CERTIFICATE OF COMPLIANCE……………………………….**27**

CERTIFICATE OF SERVICE…………………………………….....**28**

# TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)……..……..…..1, 22

*Moyle v. United States,* 144 S. Ct. 2015 (2024)……………………….....………17

*Roe v. Wade*, 410 U.S. 113 (1973)………………………....………………........1, 6

*Tr. of Oral Arg.* at 62, *Moyle v. United States*, No. 23-726 (S. Ct. Apr. 24, 2024)…………………………………………………………………....…….17

*Welty v. Dunaway*, No. 3:24-cv-00768, (M.D. Tenn. 2025) at 12-14 (memorandum opinion granting Plaintiffs' Motion for Preliminary Injunction in part and denying in part)..……………………...………………11

**Statutes**

Tenn Code Ann. § 39-15-201……………………………………………….*passim*

Tenn Code Ann. § 39-15-211……………………………………..….6, 7, 15, 16

**Other Authorities**

*2024 State Scorecard on Women's Health and Reproductive Care*, Commonwealth Fund (July 18, 2024) https://www.commonwealthfund.org/publications/ scorecard/2024/jul/2024-state-scorecard-womens-health- and-reproductive-care#:~:text=The%20highest%20rates%20of% 20maternal,obstetric%20providers%20offering%20obstetric%20care………..24

Afshin Azimirad, *Pregnancy in Adolescence: It is Time to Get Ready for Generations Z and Alpha*, 3 Gynecology & Obstetrics Clinical Med. 72–73, (May, 11, 2023)……………... ………………..……………………………………...…..14

American Medical Association*, Principles of Medical Ethics 2.1.3 Withholding Information from Patients*, American Medical Association, (2017), https://policysearch.ama- assn.org/policyfinder/detail/withholding%

___20information?uri=%2FAMADoc%2FEthics.xml-E-2.1.3.xml........................13

American College of Obstetricians and Gynecologists, *Code of Professional Ethics*, American College of Obstetricians and Gynecologists, (December 2018), at 2, https://www.acog.org/-/media/project/acog/ acogorg/files/pdfs/acog-policies/code-of-professional- ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf...........20

American College of Emergency Physicians, *Code of Ethics for Emergency Physicians*, American College of Emergency Physicians, (October 2023), at 6, https://www.acep.org/siteassets/new-pdfs/ policy-statements/code-of-ethics-for-emergency-physicians.pdf.....................19

America's Health Rankings, *Analysis of U.S. DHHS, CDC, National Center for Health Statistics, National Vital Statistics System via Health Resources and Services Administration, Maternal and Child Health Bureau, Federally Available Data (FAD) Resource Document, United Health Foundation, AmericasHealthRankings.org*……………………………….......................24

Anne Ambia, *Pregnancy Before 16 Increases Long-Term Health Complications for Girls and Babies*, UT Southwestern Medical Center, (April 11, 2023), https://utswmed.org/medblog /early-teen-pregnancy-health-risks/..................................................14

Anjali Nambiar, et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less With Complications in 2 Texas Hospitals After Legislation on Abortion*, 78, Obstetrical & Gynecological Survey 194 (April 2023), https://journals.lww.com/obgynsurvey/abstract/2023/ 04000/maternal_morbidity_and_fetal_outcomes_among.4.aspx.....................23

Brittni Frederiksen, et. al., *A National Survey of OBGYNs' Experiences After Dobbs*, KFF Health News, (June 21, 2023), https://www.kff.org/womens-health-policy/report/a-national -survey-of-obgyns-experiences-after-dobbs/.....................................23

Chantelle Lee, *A Woman Says She Was Denied Prenatal Care for*

*Being Unmarried Under a New Tennessee Law. Here's What to Know About It*, Time, (July 28, 2025), https://time.com /7306009/tennessee-prenatal-care-medical-ethics-defense-act/...........................9

*Chorioamnionitis*, Cleveland Clinic (September 6, 2022) https://my.clevelandclinic.org/health/diseases/12309-chorioamnionitis.............16

Daniel Grossman, et al., *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the Dobbs Decision,* UCSF, (May 2023), https://sites.utexas.edu/txpep/files/2023/05/ANSIRH-Care-Post-Roe-Report-Embargoed-until-15-May-23.pdf. ……………….…22

Dara E. Gleeson, Susan H. Busch, Jeannette R. Ickovics, *State-Level Prevalence of Maternity Care Deserts: Association With Healthcare Access, Utilization, and Outcomes Among Medicaid Recipients*, 4 AJPM Focus, 2025, https://www.sciencedirect.com/science/article/pii/S2773065425000501.....23, 24

Dov Fox, *The Abortion Double Bind*, 113, American J. of Public Health, 1068, (October 1, 2023), https://ajph.aphapublications.org/doi/full/ 10.2105/AJPH.2023.307369?role=tab__............................................................21

Eleanor Mahase, *Abortion in U.S.: Women in Ban States Are Twice as Likely to Die During Pregnancy or Childbirth, Report Warns*, 389 BMJ r879 (2025)……………………………………......…21

Guttmacher Institute*, Interactive Map: US Abortion Policies and Access After Roe*, Guttmacher Institute (Nov. 14, 2023), https://states.guttmacher.org/policies/texas/abortion-policies...........................15

Harris Meyer, *Malpractice Lawsuits Over Denied Abortion Care May Be on the Horizon*, KFF Health News, (June 23, 2023), https://kffhealthnews.org/news/article/malpractice-lawsuits-denied-abortion-care/ ........................................................21

*Health Outcomes in Tennessee*, America's Health Rankings, (2025), https://www.americashealthrankings.org/explore/ measures/Outcomes/TN……………………………………………......9

*HELLP Syndrome Overview*, Yale Medicine, (2024),
 https://www.yalemedicine.org/conditions/hellp-syndrome. ………............…..17

*How Post-Roe Laws Are Obstructing Clinical Care*, UCSF,
 (May, 16, 2023), https://www.ansirh.org/research/research/
 how-post-roe-laws-are-obstructing-clinical-care. ………………..………..…...22

Int'l Dual Loyalty Working Grp., *Dual Loyalty & Human Rights
 In Health Professional Practice*, PHR, (2002), at 16, https://phr.org/wp-
 content/uploads/2003/03/dualloyalties-2002-report.pdf......……....…….. 15, 18

Jacob P. Olejarczyk, Michael Young, *Patient Rights and Ethics*,
 StatPearls (November 28, 2022),
 https://www.ncbi.nlm.nih.gov/books/NBK538279/#:~:
 text=In%20healthcare%2C%20justice%20refers%20explicitly,
 be%20treated%20fairly%20and%20equitably....................................................19

Kaitlin Miller, *Tennessee Has Highest Rate of Hospital Closures Per Capita,
 What Are the Rural Impacts?*, Fox Chattanooga, (February 9, 2023),
 https://foxchattanooga.com/news/local/tennessee-
 has-highest-rate-of-hospital-closures-per-capita-what-are-the-rural
 impacts...............................................................................................................9

Katherine Ellison, Nina Martin, S*evere Complications for Women
 During Childbirth Are Skyrocketing — and Could Often Be Prevented*,
 PRO PUBLICA, (December 22, 2017),
 https://www.propublica.org/article/severe-complications-
 for-women-during-childbirth-are-skyrocketing-and-could-often-be-
 prevented. …………………………………..………………………...22

Kavitha Surana, *Doctors Warned Her Pregnancy Could Kill Her. Then
 Tennessee Outlawed Abortion*, ProPublica (Mar. 14, 2023),
 https://www.propublica.org/article/tennessee-abortion-ban-
 doctors-ectopic-pregnancy..................................................................................13

Kendal Orgera and Atul Grover, *States with Abortion Bans See Continued
 Decrease in U.S. MD Senior Residency Applicants*,
 AAMC (May 9, 2024) https://www.aamc.org/about-us/
 mission-areas/clinical-care/post-dobbs-2024....................................................23

Kimberlee Kruesi, *Tennessee Would Criminalize Helping Minors Get Abortions Under Bill Heading to Governor*, Associated Press, (April 24, 2024), https://krcgtv.com/news/nation-world/ tennessee-would-criminalize-helping-minors-get-abortions- under-bill-heading-to-governor-04-24-2024..........................................................8

March of Dimes, *Maternity Care Desert*, March of Dimes, (April 2025) https://www.marchofdimes.org/peristats/data?top=23.........................................23

March of Dimes, *Maternity Care Desert: Tennessee, 2024 Report*, PeriStats, March of Dimes, https://www.marchofdimes.org/peristats/ data?top=23&lev=1&stop=641&reg=99&sreg=47&obj=9&slev=4.................24

Maria de la Calle, et al., *Younger Age in Adolescent Pregnancies is Associated with Higher Risk of Adverse Outcomes*, 18, Int'l. J. Env't. Rsch. & Pol'y Outcomes, (August 11, 2021), https://www.mdpi.com/1660-4601/18/16/8514.................................................14

Marvi V Maheshwari, et al., *Maternal and Neonatal Outcomes of Adolescent Pregnancy: A Narrative Review*, 14 Cureus Journal of Medical Science, (June 14, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9282583/ pdf/cureus-0014-00000025921.pdf...................................................................14

*Medical Indications for Abortion*, JAMA, (November 1, 2022), https://edhub.ama-assn.org/jn-learning/video-player/18733794.........................12

Maternal Mental Health Leadership Alliance, *New Maternal Mortality Data and Analysis Published by CDC and Commonwealth Fund*, Maternal Mental Health Leadership Alliance, (September 11, 2025), https://www.mmhla.org/articles/ new-maternal-mortality-data-and-analysis-published-by- cdc-and-commonwealth-fund...........................................................................21

Payal Shah, Akila Radhakrishnan, *It's Time to Call Abortion Bans What They Are —Torture and Cruelty*, The Nation, (June 9, 2023), https://www.thenation.com/article/society/abortion- bans-torture-cruelty/...................................................................………..12

Physicians for Human Rights, *Cascading Harms: How Abortion*

*Bans Lead to Discriminatory Care Across Medical Specialties*,
(September 30, 2025), https://phr.org/our-work/resources/
cascading-harms-how-abortion-bans-lead-to-discriminatory-
care-across-medical-specialties/..………………………………...........2, 11

Physicians for Human Rights, et al., *Criminalized Care: How Louisiana's
Abortion Bans Endanger Patients and Clinicians*, (March 19, 2024),
https://phr.org/wp-content/uploads/2024/03/PHR-Report-
Criminalized-Care-March-2024.pdf.…………………………………………2

Physicians for Human Rights, *Delayed and Denied: How Florida's
Six-Week Abortion Ban Criminalizes Medical Care,* (September 17, 2024),
https://phr.org/our-work/resources/delayed-and-denied-
floridas-six-week-abortion-ban/..........................................................................2

Physicians for Human Rights, et al., *Human Rights Crisis: Abortion
in the United States after Dobbs*, (April 18, 2023), 2, 18

Physicians for Human Rights, *In Clinicians' Own Words: How Abortion
Bans Impeded Emergency Medical Treatment for Pregnant Patients in Idaho*,
(March 18, 2024), https://phr.org/wp-content/uploads
/2024/03/PHR-Brief-EMTALA-Idaho-2024.pdf. ……………………….…...2

Physicians for Human Rights*, No One Could Say: Accessing Emergency
Obstetrics Information as a Prospective Prenatal Patient
in Post-Roe Oklahoma*, (April 2023), https://phr.org/wp-content/
uploads/2023/04/Oklahoma-Abortion-Ban-Report-2023.pdf…………..……...2

Tennessee House of Representatives Floor Session, 61st Legislative Day,
113th Gen. Assemb., (April 24, 2024)………………………………….…….. 8

*Tennessee Rural Health Facts 2024*, National Rural Health Association, (2024),
media/documents/advocacy/2025/2025-state-rural-health-graphics.pdf..............9

Working Group on Discrimination Against Women and Girls in Law
and Practice, *Women's Autonomy, Equality and Reproductive
Health in International Human Rights: Between Recognition,
Backlash and Regressive Trends* (October 2017),
https://www.ohchr.org/sites/default/files/Documents/Issues/
Women/WG/WomensAutonomyEqualityReproductiveHealth.pdf…..................15

Yael Eliner, et al., *Maternal and Neonatal Complications in Teen Pregnancies: A Comprehensive Study of 661,062 Patients*, J. of Adolescent Health, Vol. 70, Issue 6, 922 - 927 https://www.jahonline.org/article/S1054-139X(21)00684-4/fulltext...........................................................................................15

**IDENTITY AND INTEREST OF AMICUS CURIAE**[1]

For nearly 40 years, Physicians for Human Rights ("PHR") has used science and medicine to document and call attention to severe human rights violations around the world. PHR, which has shared in the Nobel Peace Prize, has rigorously investigated and documented a wide variety of attacks on health care providers who seek to provide impartial, comprehensive, evidence-based, and trauma-informed care to their patients.

Through PHR's longstanding efforts to promote human rights, PHR has developed an extensive network of partnerships with clinicians throughout the United States, including within the state of Tennessee. PHR's clinician partners are deeply committed to ensuring respect for health and human rights for their patients and have expertise in researching the impacts of national and state policies on patient health and rights.

Since the U.S. Supreme Court reversed *Roe v. Wade,* 410 U.S. 113 (1973) ["*Roe*"] in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ["*Dobbs"*], PHR has been conducting rigorous and ongoing research to better

---

[1] Pursuant to Rule 37.6, amicus curiae affirms that no counsel for any party authored this brief in whole or in part and no person or entity, other than amicus, its members, or its counsel has made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

understand the impacts of state-level abortion bans on health care providers and hospitals, particularly in states with restrictive abortion legislation, such as Tennessee. *See* the following PHR reports: Cascading Harms: How Abortion Bans Lead to Discriminatory Care Across Medical Specialties (September 2025);[2] Criminalized Care: How Louisiana's Abortion Bans Endanger Patients and Clinicians (March 2024);[3] Delayed and Denied: How Florida's Six-Week Abortion Ban Criminalizes Medical Care (September 2024);[4] In Clinicians' Own Words: How Abortion Bans Impede Emergency Medical Treatment or Pregnant Patients in

---

[2] Physicians for Human Rights, *Cascading Harms: How Abortion Bans Lead to Discriminatory Care Across Medical Specialties*, PHR, (September 30, 2025) https://phr.org/our-work/resources/cascading-harms-how-abortion-bans-lead-to-discriminatory-care-across-medical-specialties/.

[3] Physicians for Human Rights, *Criminalized Care: How Louisiana's Abortion Bans Endanger Patients and Clinicians*, PHR (March 19, 2024), https://phr.org/wp-content/uploads/2024/03/PHR-Report-Criminalized-Care-March-2024.pdf.[4] Physicians for Human Rights, *Delayed and Denied: How Florida's Six-Week Abortion Ban Criminalizes Medical Care*, PHR (September 17, 2024) https://phr.org/our-work/resources/delayed-and-denied-floridas-six-week-abortion-ban/.

[4] Physicians for Human Rights, *Delayed and Denied: How Florida's Six-Week Abortion Ban Criminalizes Medical Care*, PHR (September 17, 2024) https://phr.org/our-work/resources/delayed-and-denied-floridas-six-week-abortion-ban/.

Idaho (March 2024);[5] and No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-Roe Oklahoma (April 2023).[6]

It is PHR's belief that the combination of our medical expertise, extensive clinician network, and rigorous research uniquely positions us to present guidance to this Court and submit this amicus brief, bringing the results of our research to bear. PHR believes it is critical to ensure that Tennessee physicians can treat patients in a way that is consistent with medical standards of care and adheres to professional ethical principles for the ultimate benefit of their patients and the citizens of Tennessee. PHR, therefore, presents this brief to explain its support for the position of Appellees/Cross-Appellants.

## SUMMARY OF ARGUMENT

Under Tennessee's legislative scheme, physicians' care of their pregnant patients' health is insufficiently considered. Physicians are effectively required to delay and/or deny proper care, resulting in potential harm to their pregnant patients. Physicians then face an impossible choice of either following the

---

[5] Physicians for Human Rights, *In Clinicians' Own Words: How Abortion Bans Impede Emergency Medical Treatment or Pregnant Patients in Idaho*, PHR (March 2024) https://phr.org/wp-content/uploads/2024/03/PHR_Idaho-Fact-Finding-Brief.pdf.

[6] Physicians for Human Rights, *No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-Roe Oklahoma*, PHR (April 25. 2023) https://phr.org/our-work/resources/oklahoma-abortion-rights/.

Tennessee statutory abortion scheme and jeopardizing their patients' health or acting in accordance with basic medical standards of care and professional ethics. The difficulties of this choice are only exacerbated by the harsh civil and criminal penalties clinicians may face for violating the Tennessee statutory scheme, which places them in a "double bind" where physicians may also face civil medical malpractice liability if they follow the law by delaying or deciding not to treat.

In at least three ways, the Tennessee "abortion trafficking act" [hereinafter the "Tennessee Act"] dangerously restricts the ability of Tennessee physicians to provide the best treatment to their patients. First, the Tennessee Act ignores the medical interrelationship between Tennesseans who live along the border in one of the eight Tennessee border states and the medical care that they might routinely receive across the border in an adjoining state. Second, the ambiguous and poorly defined wording, particularly the unclear concept of "recruiting," places a chilling effect upon a physician's ability to give appropriate medical advice to unemancipated pregnant minors. Finally, there is great uncertainty and inherent risk when a physician attempts to navigate Tennessee's exceptions to its strict abortion ban.

The Tennessee medical community is already feeling the brunt of these laws, which is only likely to worsen as clinicians leave the state or choose not to train in Tennessee due to fear of criminalization. Maternal mortality and morbidity in

Tennessee are increasing to record levels and will continue to increase with the ever more limited access to essential reproductive healthcare. Indeed, a growing number of areas in Tennessee are already "maternity care deserts," increasing the risk of poor pregnancy outcomes, the use of emergency rooms for pregnancy care, and the need to go to an adjoining state for care, which may be exacerbated by the effects of the Tennessee Act.

## ARGUMENT

### I. THE PROVISIONS OF THE TENNESSEE ABORTION ACTS THAT IMPLICATE PHYSICIANS' ABILITY TO CARE FOR THEIR PATIENTS

The Tennessee Act creates an offense known as "abortion trafficking of a minor" when an adult who is not a parent or legal guardian "intentionally recruits, harbors, or transports a pregnant unemancipated minor" "for the purpose of … [c]oncealing an act that would constitute a criminal abortion under § 39-15-213" or "[o]btaining an abortion-inducing drug" "regardless of where the abortion is to be procured." Tenn Code Ann. §§ 39-15-201(a), (c)(1).

The offense of so-called abortion trafficking is a "Class A misdemeanor [that] shall be punished by imprisonment for eleven (11) months and twenty-nine (29) days." *Id.* § 39-15-201(b). Additionally, an individual "who violates subsection (a) [of the statute] may be held liable in a civil action for the wrongful death of an unborn child who was aborted [by the biological mother of the unborn child]," by the

biological father of the unborn child unless conception occurred through an act of rape or incest, or by the parent or legal guardian of the unemancipated minor. *Id.* § 39-15-201(e)(1)–(2). As part of this civil action, the plaintiff may recover economic damages, noneconomic damages, punitive damages, reasonable attorney fees, and court costs. *Id.* § 39-15-201(e)(3).

Any physician treating an unemancipated pregnant minor is subject to this law. The text does endeavor to limit the Tennessee Act's application to physicians, stating that it "does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor," *Id.* § 39-15-201(f)(1), and it "does not prohibit a licensed physician or another person from calling an ambulance for a minor patient if a medical emergency, as defined in § 39-15-218, exists." *Id.* § 39-15-201(f)(3). However, the Tennessee Act's limitations explicitly "[do] not include performing or attempting to perform an abortion … or arranging for travel for the unemancipated minor to procure an abortion or an abortion-inducing drug without the consent of the unemancipated minor's parent or legal guardian." *Id.* § 39-15-201(f)(2).

The Tennessee Act was written to operate in conjunction with Tennessee's near-total ban on abortions, enacted shortly after the U.S. Supreme Court overturned *Roe* in 2022. *See id.* § 39-15-211. Under these statutory restrictions, a Tennessee physician's ability to consider the treatment of pregnancy termination is permitted

only under certain very narrow exceptions for a "[m]edical emergency," which is defined as:

> [A] condition that, in the physician's good faith medical judgment… so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

*Id.* § 39-15-211(a)(3). This statute then defines "[s]erious risk of the substantial and irreversible impairment of a major bodily function" as:

> [A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function. Such conditions include preeclampsia, inevitable abortion, and premature rupture of the membranes and, depending upon the circumstances, may also include, but are not limited to, diabetes and multiple sclerosis, but does not include any condition relating to the woman's mental health.

*Id.* § 39-15-211(a)(5).

## II. THE TENNESSEE ACT DANGEROUSLY RESTRICTS PHYSICIANS' ABILITY TO TREAT THEIR PATIENTS

The Tennessee Act unreasonably interferes with a physician's ability to provide care for patients in multiple ways.

### A. Lack of Consideration for Needed or Routine Out-of-State Medical Treatment

The discussion regarding the "out of state purpose" of the Tennessee Act during the Tennessee legislative proceeding included an explanation made by the bill's House sponsor, Representative Jason Zachary, in response to a question by a fellow

legislator asking what "an adult recruiting these minors … would look like." Representative Zachary provided the example of a lawsuit filed by the Missouri Attorney General against Planned Parenthood for allegedly recruiting adolescents in Missouri to have abortions in Kansas – which Planned Parenthood denied and have nothing to do with Tennessee at all.[7] Nevertheless, Representative Zachary argued on the floor: "There's a video, you can go look at the video. Google the story of recruiting children to take them across state lines to abort their babies, to kill their babies in utero." Tennessee House of Representatives Floor Session, 61st Legislative Day, 113th .https://tnga.granicus.com/player/clip/30327?view_id=705&redirect=true.

Yet, even if accepted at face value, this example ignores the interrelationship between residents of Tennessee and out-of-state physicians. In using the general terminology which encompasses all out-of-state physicians, the Tennessee Act fails to consider how medicine is practiced in Tennessee and ignores the fact that Tennessee borders eight other states: Alabama, Arkansas, Georgia, Kentucky, Mississippi, Missouri, North Carolina, and Virginia. Care by out-of-state physicians

---

[7] Kimberlee Kruesi, *Tennessee Would Criminalize Helping Minors to Get Abortions Under Bill Heading to Governor*, Associated Press, (April 24, 2024), https://krcgtv.com/news/nation-world/tennessee-would-criminalize-helping-minors-get-abortions-under-bill-heading-to-governor-04-24-2024.

for those living in Tennessee border areas is routine. The same is true for physician referrals to nearby specialists.

Even the metropolitan suburbs of Memphis and Chattanooga reach into the states of Mississippi and Georgia, respectively. In rural areas of Tennessee that border other states, Tennessee residents must deal with the fact that access to prenatal care is hindered by a limited number of healthcare facilities. In fact, 51 out of 51 rural counties in Tennessee have been designated Healthcare Professional Shortage Areas for primary care physicians.[8] And since 2010, nine rural hospitals have closed,[9] the highest rate per capita of any state in the nation.[10] Partially as a result, Tennessee ranks 44th among states in overall care and 46th in health outcomes.[11] Moreover, beyond this clear paucity of medical care for Tennesseans, the recently enacted Medical Ethics Defense Act (SB 955/HB 1044) authorizes medical practitioners to deny prenatal care (or any other care) to unmarried pregnant patients, which would

---

[8] *Tennessee Rural Health Facts 2024*, National Rural Health Association, (2024), https://www.ruralhealth.us/nationalruralhealth/media/documents/advocacy/2025/2025-state-rural-health-graphics.pdf.
[9] *Id.*
[10] Kaitlin Miller, *Tennessee Has Highest Rate of Hospital Closures Per Capita, What Are the Rural Impacts?*, Fox Chattanooga, (February 9, 2023), https://foxchattanooga.com/news/local/tennessee-has-highest-rate-of-hospital-closures-per-capita-what-are-the-rural-impacts.
[11] *Health Outcomes in Tennessee*, America's Health Rankings, (2025), https://www.americashealthrankings.org/explore/measures/Outcomes/TN.

include almost all unemancipated minors.[12] Thus, demarcating medical care between Tennessee and all areas outside of Tennessee does not reflect the reality of medical care for many people residing in Tennessee.

Also unanswered are the following questions: Are Tennessee general practitioners to be responsible for policing the medical practices of nearby but out-of-state specialists that they may routinely refer to? If a physician refers a patient for out-of-state care in line with custom and practice (including where out-of-state care is closer geographically than in-state care), and that care ultimately includes an abortion, has the Tennessee practitioner violated the law by making this referral?

### B. The Vagueness of the Act has a Chilling Effect on a Physician's Ability to Treat Patients

The Tennessee Act defines "abortion trafficking" as "intentionally recruit[ing], harbor[ing], or transport[ing] a pregnant unemancipated minor." Tenn. Code Ann. § 39-15-201(a). However, the statute never defines what constitutes recruiting or harboring for the purpose of "[o]btaining an abortion-inducing drug" or "concealing . . . a criminal abortion," which may be considered to include legal abortions in other states. *Id.* Indeed, when the District Court held a hearing on August

---

[12] *See* Chantelle Lee, *A Woman Says She Was Denied Prenatal Care for Being Unmarried Under a New Tennessee Law. Here's What to Know About It*, Time, (July 28, 2025) https://time.com/7306009/tennessee-prenatal-care-medical-ethics-defense-act/. The woman in question was in her thirties, in a relationship for 15 years, and had to go to Virginia for her prenatal care. An unemancipated minor would not have that option.

30, 2024, Plaintiff Welty testified that she was worried that by providing information to pregnant minors that abortion is safe, common, and normal, as well as on the means of obtaining a legal abortion, she would be considered to have "recruited" a minor if that minor decided to pursue a legal abortion out of state. *See Welty v. Dunaway*, No. 3:24-cv-00768, (M.D. Tenn. 2025) at 12–14 (memorandum opinion granting Plaintiffs' Motion for Preliminary Injunction in part and denying it in part).

In addressing the "recruitment" language and finding for the plaintiffs, the District Court noted, "No one associated with [the statute] seems to have a particularly clear picture of what the provision is supposed to prohibit—not the prosecutors who will be called on to enforce it; not the state attorneys called on to defend the statute in court; and, it seems, not even the individuals who drafted the provision itself, who appear to have simply pulled the recruitment-focused language from other, preexisting statutes in which that language makes more sense." *Id.* at 4.

Consistent with the District Court's conclusion, the chilling effect of this broad prohibition on "recruitment" is not tempered by the carve out that this law "does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor." Tenn Code Ann. § 39-15-201(f)(1). Certain medical diagnoses may require a physician to discuss the possibility of a safe, legal abortion.[13] At what point will the law treat this consultation as

---

[13] *See, e.g.*, PHR, *Cascading Harms*, *supra* note 2.

"recruitment"? Without real clarity, is that decision left to the whim of an individual prosecutor?

Routine medical practice requires a physician to suggest or recommend an abortion in circumstances where a pregnant patient has a pre-existing disease that is associated with high maternal morbidity and mortality, such as cystic fibrosis, sickle cell disease, Marfan syndrome, lupus nephritis, cardiomyopathy, and pulmonary hypertension.[14] While most patients with these medical conditions can have a successful pregnancy, for some patients understanding that there is a risk of death or life-altering consequences, such as organ damage if pregnancy is continued, may lead them to seek an abortion.[15] With the law vague and undefined, may a zealous prosecutor argue that giving such a consultation violates the "recruitment" provision of the Tennessee Act?

Consider the example of Mayron Hollis, a resident of Tennessee. Hollis learned that her pregnancy was "endangering her life," prompting her to seek an abortion, which was the appropriate medical treatment for her condition.[16] Nonetheless, she was denied this treatment in Tennessee despite her clinicians recognizing this was

---

[14] *See, Medical Indications for Abortion*, JAMA, (November 1, 2022), https://edhub.ama-assn.org/jn-learning/video-player/18733794.
[15] *Id.*
[16] Payal Shah & Akila Radhakrishnan, *It's Time to Call Abortion Bans What They Are —Torture and Cruelty*, The Nation (June 9, 2023), https://www.thenation.com/article/society/abortion-bans-torture-cruelty/.

the standard of care. "Hollis was forced to endure a dangerous pregnancy and birth, where she ultimately suffered severe hemorrhaging and lost her uterus, destroying her ability to give birth to any more children."[17] Her clinicians reported anguish in watching Hollis suffer due to the legal prohibition on medically indicated care.[18] While Hollis was not an unemancipated minor, explaining the need for an abortion to a minor under similar circumstances could be considered "recruitment."

To a physician, absent the Tennessee Act this discussion on appropriate medical care would constitute a routine part of physician-patient communications. The American Medical Association's code of ethics maintains that "truthful and open communication between physician and patient is essential for trust in the relationship and for respect for autonomy."[19] The physician-patient relationship is the cornerstone of providing competent medical care. Physicians must be able to have open, honest conversations with their patients. These conversations must include treatment options and risks associated with any medical condition.

---

[17] *Id*.

[18] Kavitha Surana, *Doctors Warned Her Pregnancy Could Kill Her. Then Tennessee Outlawed Abortion*, ProPublica (Mar. 14, 2023), https://www.propublica.org/article/tennessee-abortion-ban-doctors-ectopic-pregnancy.

[19] American Medical Association, *AMA Principles of Medical Ethics 2.1.3 Withholding Information from Patients*, American Medical Association (2017), https://policysearch.ama-assn.org/policyfinder/detail/withholding%20information?uri=%2FAMADoc%2FEthics.xml-E-2.1.3.xml.

## C. Ambiguity in Tennessee's Medical Exceptions Are Made More Concerning By the Tennessee Act

Pregnancy can be riskier as a medical condition for adolescents than adults. Indeed, adolescents, for example, are at greater risk for preeclampsia, preterm premature rupture of the membrane, increased incidence of pregnancy-induced hypertension, anemia, sexually transmitted diseases, operative vaginal deliveries (forceps/vacuum), postpartum depression, and maternal deaths."[20] One

---

[20] Maria de la Calle, et al., *Younger Age in Adolescent Pregnancies is Associated with Higher Risk of Adverse Outcomes*, 18, Int'l. J. Env't. Rsch. & Pol'y Outcomes, (August 11, 2021), https://www.mdpi.com/1660-4601/18/16/8514; Marvi V Maheshwari, et al., *Maternal and Neonatal Outcomes of Adolescent Pregnancy: A Narrative Review*, 14 Cureus 1, (June 14, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9282583/#:~:text=Girls%20with%20teen%20pregnancy%20are,18%20%5B3%2C11%5D; Anne Ambia, *Pregnancy Before 16 Increases Long-Term Health Complications for Girls and Babies*, UT Southwestern Medical Center, (April 11, 2023), https://utswmed.org/medblog/early-teen-pregnancy-health-risks/ ("Young patients were more likely than older teens to develop high blood pressure in pregnancy (preeclampsia) and give times more likely to have eclampsia (a condition associated with high blood pressure that causes seizures in pregnancy). Their babies were more likely to: [b]e born before 37 weeks[,] [h]ave a low birthweight[, and] [n]eed extra care in the neonatal intensive care unit (NICU)."); Afshin Azimirad, *Pregnancy in Adolescence: It is Time to Get Ready for Generations Z and Alpha*, 3 Gynecology & Obstetrics Clinical Med. 72–73, (May, 11, 2023), https://www.sciencedirect.com/science/article/pii/S2667164623000374 (listing medical conditions including preeclampsia, premature rupture of membranes, preterm birth, small for gestational age and low birth weight, maternal mortality, and adolescent trauma).

study found that compared to non-teen pregnancies, teen pregnancies had "a relatively large (23 percent) increase in the adjusted odds of eclampsia."[21]

      The Tennessee statutory scheme, meanwhile, has been classified as one of the most restrictive groups of laws on abortion, while including some of the most extensive civil and criminal penalties.[22] Likely because of this, Tennessee's medical exceptions purport to leave good faith discretion to physicians. However, Tennessee's exceptions in Tenn Code Ann. § 39-15-211(a)(3) do not really provide meaningful medical guidance as the exceptions rely on legal definitions that to physicians are vague, narrow, and non-clinical. Significantly, under this restrictive and uncertain landscape, physicians are unable to clearly determine whether their good faith assessment of medical necessity is sufficient legally to provide medical care using their knowledge, training, and experience along with adhering to their extensive obligations as medical professionals.[23]

---

[21] Yael Eliner, et al., *Maternal and Neonatal Complications in Teen Pregnancies: A Comprehensive Study of 661,062 Patients*, J. of Adolescent Health, Vol. 70, Issue 6, 922 - 927 https://www.jahonline.org/article/S1054-139X(21)00684-4/fulltext.

[22] *See* Guttmacher Institute, *Interactive Map: US Abortion Policies and Access After Roe*, Guttmacher Institute (Nov. 14, 2023), https://states.guttmacher.org/policies/texas/abortion-policies.

[23] Int'l Dual Loyalty Working Grp., *Dual Loyalty & Human Rights in Health Professional Practice Proposed Guidelines & Institutional Mechanisms*, PHR (2002), at 16, https://phr.org/wp-content/uploads/2003/03/dualloyalties-2002-

Notably, the exceptions articulated by TN Code § 39-15-211(a)(3) have the prerequisite that the condition the physician is dealing with "necessitate[s] the immediate performance or inducement of an abortion" in order " to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create." Tenn Code Ann. § 39-15-211(a)(3). However, in medical clinical practice, the choices are rarely this clear.

For instance, serious infections, including infections after the amniotic sac surrounding the fetus has ruptured, could, absent abortion care, lead to "sepsis" – a serious condition in which the infection-fighting processes turn on the body and can cause death if not treated expeditiously.[24] But this is not always the case. Does Tennessee law require physicians to wait to perform an abortion until the pregnant patient's condition has worsened to the point where the patient's life is irrefutably at risk due to infection?

---

report.pdf; Working Group on Discrimination Against Women and Girls in Law and Practice, *Women's Autonomy, Equality and Reproductive Health in International Human Rights: Between Recognition, Backlash and Regressive Trends* (October 2017), https://www.ohchr.org/sites/default/files/Documents/Issues/Women/WG/WomensA utonomyEqu alityReproductiveHealth.pdf.

[24] See e.g. *Chorioamnionitis*, Cleveland Clinic (September 6, 2022) Chorioamnionitis: Causes, Symptoms, Diagnosis & Treatment.

Preeclampsia is a condition of pregnancy diagnosed by dangerously high blood pressure, which results in a 24 percent maternal mortality rate.[25] But 76 percent of patients with preeclampsia will survive, meaning that if a physician chooses to perform an abortion, that physician cannot say more likely than not that the condition would result in maternal mortality.

Citing the evidence presented by PHR in its amicus brief to the U.S. Supreme Court, Justice Jackson recognized that "Physicians for Human Rights … have looked at Idaho's law and says it prevents a lot of things in circumstances in which the federal government would require them." *Moyle v. United States*, 144 S. Ct. 2015 (2024)*; Tr. of Oral Arg.* at 62, *Moyle v. United States*, No. 23-726 (S. Ct. Apr. 24, 2024). In her written opinion, Justice Jackson then, citing PHR's amicus brief, noted that the same medical condition can pose different risks for treatment by a physician:

> Idaho cannot credibly maintain that its law always permits abortions in cases of PPROM or pre-eclampsia such that its mandate never conflicts with federal law. The same medical condition can present with different risks in different patients. See, e.g., Brief for Physicians for Reproductive Health as Amicus Curiae 10-11; Brief for Physicians for Human Rights as Amicus Curiae 11-19. And, often, a doctor simply does not know what the risks are or whether a patient might face death.

*Moyle v. United States,* 144 S. Ct. 2015, 2025 (2024) (J. Jackson, concurring in part and dissenting in part). But under the Tennessee statutory scheme, that

---

[25] *HELLP Syndrome Overview*, Yale Medicine (2024), https://www.yalemedicine.org/conditions/hellp-syndrome.

determination is always subject to being challenged at grave risk to the physician. Moreover, this concern about diagnostic clarity is only exacerbated when treating a more at-risk minor.

## III. WHAT TENNESSEE PHYSICIANS FACE UNDER THE ACT -- CONFLICTING REQUIREMENTS AND A DIFFICULT FUTURE

Before the Tennessee abortion restriction statutes were enacted, physicians were able to make good faith determinations about whether abortion care was medically necessary based both upon an individualized assessment of a pregnant patient's medical needs and their medical knowledge and experience. Now, Tennessee physicians are unable to determine whether their good faith assessment of medical need is sufficient to legally provide medically necessary care. This is particularly true for unemancipated minors. Instead of making decisions based solely on experience and their advanced medical training, physicians must also consider whether treatment might put them at risk of ethical, civil, or criminal liabilities.[26]

### A. Dual Loyalty: Conflict Between Tennessee Law and a Physician's Ethical Obligations

---

[26] Physicians for Human Rights et al., *Human Rights Crisis: Abortion in the United States after Dobbs*, (April 18, 2023), https://phr.org/wp-content/uploads/2023/04/4.13.23_UN_SR_briefingPaper_FINAL.pdf

Tennessee's medical exceptions present physicians with the impossible choice of "dual loyalty"[27] - that is, a situation where physicians are unable to fully comply with both the law and their ethical obligations as medical practitioners. This is because Tennessee mandates that the physician's first obligation is to comply with its statutes. At times, however, it is impossible to comply with both.

As a result, in dealing with an emergency situation, the Tennessee Acts can prevent physicians from complying with two fundamental recognized principles for the provision of quality medical care: (i) beneficence, or the duty to provide beneficial care to their patients; and (ii) nonmaleficence, or "do no harm," seeking to ensure that a patient will be no worse off physically, emotionally, or otherwise after treatment than before.[28] As stated by the American College of Emergency Physicians, physicians assume a fundamental duty to serve the best interests of their patients, and the welfare of their patients should form the basis of any physician's medical judgment.[29]

---

[27]   Int'l Dual Loyalty Working Grp., *supra* note 23.

[28]   Jacob P. Olejarczyk, Michael Young, *Patient Rights and Ethics*, StatPearls (November 28, 2022), https://www.ncbi.nlm.nih.gov/books/NBK538279/#:~:text=In%20healthcare%2C%20justice%20refers%20explicitly,be%20treated%20fairly%20and%20equitably.

[29] American College of Emergency Physicians, *Code of Ethics for Emergency Physicians*, American College of Emergency Physicians, (October 2023), at 6, https://www.acep.org/siteassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf.; American College of Obstetricians and Gynecologists, *Code of Professional Ethics*, American College of Obstetricians and Gynecologists, (December 2018), at 2, https://www.acog.org/-

## B. Conflict Caused by Harsh Criminal and Civil Penalties

The Tennessee Act carries a criminal penalty of eleven months and twenty-nine days imprisonment. In addition, Tennessee physicians face the risk of losing their medical licenses and the ability to practice medicine, as well as reputational harm, steep fines, and other professional penalties if charged. Ultimately, these fines and penalties mean physicians can lose the ability to support themselves – often after a decade or more of education.

Each time a Tennessee doctor refers an unemancipated minor out of state or gives information that might lead a patient to conclude that pregnancy termination is the best course, the physician is exposed to criminal investigation and prosecution and the revocation of their license. Under these circumstances, it is natural that they will hesitate to give the care they believe to be optimal and, as a result, their patients may suffer and their conditions may deteriorate.

## C. Conflict Caused by the Potential for Civil Malpractice Suits

The medical exceptions to the Tennessee statutes also subject physicians to potential civil injuries beyond those provided by statute. This situation, recognized

---

/media/project/acog/acogorg/files/pdfs/acog-policies/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf.

as the "Abortion Double Bind," refers to when abortion bans trap clinicians between the risk of civil liability for ending a pregnancy that is not perilous enough to qualify for the state's medical exceptions and the risk of malpractice liability for not appropriately treating a dangerous pregnancy[30] which ultimately results in injuries or death to the pregnant patient that is argued to have been preventable. As a result, physicians are faced with two terrible options: either leave their patients to suffer harm and risk civil liability or perform an abortion and risk criminal and civil prosecution.

### D. Likely Long-Term Effect on the Practice of Obstetrics and Gynecology in Tennessee

The Tennessee statutes, and similar laws around the country, have increased maternal mortality and morbidity.[31] The United States has the highest maternal mortality rate of all high-income countries.[32] Additionally, for every person in the

---

[30] Dov Fox, *The Abortion Double Bind*, *113*, American J. of Public Health, 1068, (October 1, 2023), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2023.307369?role=tab.; Harris Meyer, *Malpractice Lawsuits Over Denied Abortion Care May Be on the Horizon*, KFF Health News, (June 23, 2023), https://kffhealthnews.org/news/article/malpractice-lawsuits-denied-abortion-care/. Note that H.B. 3058 has passed.
[31] Eleanor Mahase, *Abortion in U.S.: Women in Ban States Are Twice as Likely to Die During Pregnancy or Childbirth, Report Warns*, 389 BMJ r879 (2025).
[32] Maternal Mental Health Leadership Appliance, *New Maternal Mortality Data and Analysis Published by CDC and Commonwealth Fund*, Maternal Mental Health Leadership Alliance, (September 11, 2025) https://www.mmhla.org/articles/new-maternal-mortality-data-and-analysis-published-by-cdc-and-commonwealth-fund.

United States who dies because of pregnancy or childbirth, up to 70 suffer

hemorrhages, organ failure, or other significant complications, amounting to more

than one percent of all births.[33]

   Across the United States, there have been numerous cases of pregnant patients

who have suffered preventable harm or trauma, including nearly dying or in fact

dying, because physicians have either delayed providing abortion care or outright

denied it.[34] A national study conducted in the wake of *Dobbs* found that "health

care providers have seen increased morbidity, exacerbated pregnancy

complications, an inability to provide time-sensitive care, and increased delays in

obtaining care for patients in states with abortion bans."[35]  Findings from a

different study established that changes in practice "were associated with a

---

[33] Katherine Ellison, Nina Martin, *Severe Complications for Women During Childbirth Are Skyrocketing - and Could Often Be Prevented*, Pro Publica, (December 22, 2017), https://www.propublica.org/article/severe-complications-for-women-during-childbirth-are-skyrocketing-and-could-often-be-prevented.

[34] Daniel Grossman, et al., *Care Post-Roe: Documenting Cases of Poor- Quality Care Since the Dobbs Decision,* UCSF, (May 2023), https://sites.utexas.edu/txpep/files/2023/05/ANSIRH-Care-Post-Roe-Report-Embargoed-until-15-May-23.pdf.

[35] *How Post-Roe Laws Are Obstructing Clinical Care*, UCSF, (May 16, 2023), https://www.ansirh.org/research/research/how-post-roe-laws-are-obstructing-clinical-care; Brittni Frederiksen, et. al., *A National Survey of OBGYNs' Experiences After Dobbs*, KFF Health News, (June 21, 2023), https://www.kff.org/womens-health-policy/report/a-national-survey-of-obgyns-experiences-after-dobbs/.

doubling of severe morbidity for patients presenting with pre-labor rupture of membranes and other complications before 22 weeks gestation."[36]

Research affirms that states that restrict abortion also have fewer doctors providing care to pregnant people, creating "maternity care deserts."[37] One study by the Association of American Medical Colleges found that post-*Dobbs,* medical residency applications for Tennessee declined across specialties 12.7 percent from 2023 to 2024, with OB/GYN applications declining 20.9 percent.[38] The states with the most restrictions also had a highest prevalence of maternity care deserts,

---

[36] Anjali Nambiar, et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less With Complications in 2 Texas Hospitals After Legislation on Abortion*, 78, Obstetrical & Gynecological Survey 194 (April 2023), https://journals.lww.com/obgynsurvey/abstract/2023/04000/maternal_morbidity_and_fetal_outcomes_among.4.aspx.

[37] Dara E. Gleeson, Susan H. Busch, Jeannette R. Ickovics, *State-Level Prevalence of Maternity Care Deserts: Association With Healthcare Access, Utilization, and Outcomes Among Medicaid Recipients*, 4 AJPM Focus, 2025, https://www.sciencedirect.com/science/article/pii/S2773065425000501. A maternity desert is defined as "counties across the U.S. in which access to maternity care services is limited or absent, either through lack of services or barriers to a woman's ability to access that care within counties. Specifically, a maternity care desert is any county without a hospital or birth center offering obstetric care and without any obstetric clinicians. Obstetric clinicians include obstetricians, family physicians who reported delivering babies, certified nurse midwives and nurse midwives." March of Dimes, *Maternity Care Desert*, March of Dimes, (April 2025) https://www.marchofdimes.org/peristats/data?top=23.

[38] Kendal Orgera and Atul Grover, *States with Abortion Bans See Continued Decrease in U.S. MD Senior Residency Applicants*, AAMC (May 9, 2024) https://www.aamc.org/about-us/mission-areas/clinical-care/post-dobbs-2024.

namely Idaho, Texas, Oklahoma, and Tennessee.[39] According to the March of Dimes, as of 2024, 36.8 percent of Tennessee counties are maternity care deserts, and an additional 21.1percent of counties have low or moderate access to adequate maternity care.[40] Tennessee also has one of the highest maternal mortality rates in the United States.[41]

In conclusion, the Tennessee statutory abortion scheme places dangerous limitations on the practice of good medicine by Tennessee practitioners. As time passes, this will only increase the pressure on physicians in Tennessee, likely resulting in fewer doctors and increasing the prevalence of maternity care deserts.

## IV. CONCLUSION

This Court should rule in favor of Plaintiff-Appellee/Cross-Appellants.

---

[39] Dara E. Gleeson, Susan H. Busch, Jeannette R. Ickovics, *State-Level Prevalence*, *supra* note 38.

[40] March of Dimes, *Maternity Care Desert: Tennessee, 2024 Report*, PeriStats, March of Dimes, https://www.marchofdimes.org/peristats/data?top=23&lev=1&stop=641&reg=99&sreg=47&obj=9&slev=4.

[41] America's Health Rankings, *America's Health Rankings Analysis of U.S. DHHS, CDC, National Center for Health Statistics, National Vital Statistics System via Health Resources and Services Administration, Maternal and Child Health Bureau, Federally Available Data (FAD) Resource Document*, United Health Foundation, AmericasHealthRankings.org; *2024 State Scorecard on Women's Health and Reproductive Care*, Commonwealth Fund (July 18, 2024) https://www.commonwealthfund.org/publications/scorecard/2024/jul/2024-state-scorecard-womens-health-and-reproductive-care#:~:text=The%20highest%20rates%20of%20maternal,obstetric%20providers%20offering%20obstetric%20care.

Respectfully submitted,

<u>/s/Mary A. Parker</u>

Mary A. Parker
Parker & Crofford
5115 Maryland Way
Brentwood, TN 37027
(615) 244-2445
mparker@parker-crofford.com
*Counsel of Record*

Gerson H. Smoger
Smoger and Associates
4228 Hallmark Drive
Dallas, TX 75229
(510) 531-4529
gerson@texasinjurylaw.com

Payal K. Shah
Kimberly Saltz
Physicians for Human Rights
520 Eighth Avenue, Suite 2300
New York, NY 10018
(646) 564-3720
pshah@phr.org

Counsel for Amicus Curiae
Physicians for Human Rights

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume requirements of FED. R. APP. P. 32(a)(7)'s type volume limitation because the brief contains 5,245 words, excluding the parts of the brief that FED. R. APP. P. 32(a)(7) exempts.

The foregoing complies with FED. R. APP. P. 32(a)(5)'s type-face requirements and FED. R. APP. P. 32(a)(6)'s type style requirements because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Mary A. Parker*
Mary A. Parker

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of February 2026, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mary A. Parker*
Mary A. Parker