**Nos. 25-5738/25-5739**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RACHEL WELTY; AFTYN BEHN

*Plaintiffs-Appellees-*
*Cross-Appellants,*

v.

BRYANT C. DUNAWAY; JASON LAWSON; JENNINGS HUTSON JONES; ROBERT J. CARTER; RAY WHITLEY; ROBERT J. NASH; GLENN R. FUNK; STACEY EDMONSON; BRENT COOPER; RAY CROUCH; HANS SCHWENDIMANN

*Defendants-Appellants-*
*Cross-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:24-cv-768

## DEFENDANTS' THIRD BRIEF

Jonathan Skrmetti
 *Attorney General & Reporter*

J. Matthew Rice
 *Solicitor General*

Madeline W. Clark
 *Principal Deputy*
 *Solicitor General*

Steven J. Griffin
 *Deputy Attorney General*

Aaron L. Bernard
 *Assistant Solicitor General*

Walker Anderson
 *Honors Fellow*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-0144
Madeline.Clark@ag.tn.gov

# TABLE OF CONTENTS

Introduction and Summary of Argument ................................................. 1

Argument ................................................................................................. 3

I.   Plaintiffs Lack Article III Standing. ............................................. 3

   A.   Plaintiffs failed to prove an intent to violate the Act. ............... 3

   B.   Plaintiffs failed to prove a certain threat of prosecution. ......... 15

II.  The Recruiting Restriction Does Not Violate the First Amendment. ................................................................................ 24

   A.   Plaintiffs' as-applied challenges either fail or doom their facial challenge. ................................................................... 24

   B.   The Act's "recruit" restriction is not unconstitutionally overbroad. .................................................................... 26

   C.   Plaintiffs have no First Amendment right to recruit someone else's child to leave the State to obtain a medical procedure without parental consent. ....................................... 40

III. The Recruiting Restriction Is Not Unconstitutionally Vague. ......... 44

   A.   The term "recruit" in the Act is not unconstitutionally vague. ................................................................................ 44

   B.   Plaintiffs' arguments lack merit. .......................................... 49

IV.  The District Court Granted Improper Relief. .................................. 55

   A.   Any injunction must be limited to the constitutional problem ................................................................................ 44

   B.   Any injunction must be limited to the parties. ......................... 49

Conclusion ........................................................................................ 64

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Pastides,*
  900 F.3d 160 (4th Cir. 2018)...............................................................16

*Alonso v. State,*
  228 So.3d 1093 (Ala. Crim. App. 2016) ..............................................47

*Ass'n of Am. Physicians & Surgeons v. FDA,*
  13 F.4th 531 (6th Cir. 2021) .................................................................5

*Atlas Life Ins. Co. v. W.I.S., Inc.,*
  306 U.S. 563 (1939)......................................................................61, 62

*Barton v. Barr,*
  590 U.S. 222 (2020).............................................................................12

*Bd. of Airport Comm'rs v. Jews for Jesus,*
  482 U.S. 569 (1987).............................................................................36

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989).............................................................................25

*Bennett v. Durham,*
  683 F.3d 734 (6th Cir. 2012)................................................................37

*Biden v. Texas,*
  597 U.S. 785 (2022).............................................................................61

*Birmingham v. Nessel,*
  2021 WL 5712150 (6th Cir. Dec. 2, 2021)...........................................18

*Boyce Motor Lines v. United States,*
  342 U.S. 337 (1952)......................................................................48, 51

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) .................................................................58

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) .................................................................43

*California v. Texas,*
  593 U.S. 659 (2021) .................................................................57

*Cameron v. Johnson,*
  390 U.S. 611 (1968) .................................................................46

*CASA, Inc. v. Trump,*
  606 U.S. 831 (2025) .............................................................60-64

*CASA, Inc. v. Trump,*
  No. 8:25-cv-00201-DLB (D. Md. Jan. 21, 2025) ...................................62

*Christian Healthcare Ctrs. v. Nessel,*
  117 F.4th 826 (6th Cir. 2024) ............................................. 1, 15, 19, 21

*Citizens United v. FEC,*
  558 U.S. 310 (2010) .................................................................59

*Clark v. Martinez,*
  543 U.S. 371 (2005) .................................................................10

*Cocroft v. Graham,*
  122 F.4th 176 (5th Cir. 2024) .........................................................39

*Commonwealth v. McGhee,*
  35 N.E.3d 329 (Mass. 2015) .................................................33, 47, 52

*Commonwealth v. Tarbox,*
  55 Mass. 66 (1848) .................................................................42

*Connection Distrib. Co. v. Holder,*
  557 F.3d 321 (6th Cir. 2009) ...................................................*passim*

*Crawford v. U.S. Dep't of Treasury*,
 868 F.3d 438 (6th Cir. 2017) ......................................................*passim*

*Davis v. Colerain Twp.*,
 51 F.4th 164 (6th Cir. 2022) .........................................................21

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
 158 F.4th 732 (6th Cir. 2025) ..........................................................15

*Dobbs v. Jackson Women's Health Org.*,
 597 U.S. 215 (2022)...........................................37, 39, 42, 44

*Doe v. Burlew*,
 165 F.4th 525 (6th Cir. 2026) ......................................................*passim*

*Doran v. Salem Inn*,
 422 U.S. 922 (1975)................................................................58, 59

*Emery v. Gowen*,
 4 Me. 33 (1826)..............................................................................41

*Erznoznik v. City of Jacksonville*,
 422 U.S. 205 (1975)...........................................................................5

*Ex parte Young*,
 209 U.S. 123 (1908)..........................................................................63

*FEC v. Cruz*,
 596 U.S. 289 (2022)..........................................................................10

*Fieger v. Mich. Sup. Ct.*,
 553 F.3d 955 (6th Cir. 2009)...............................................................4

*Fischer v. Thomas*,
 52 F.4th 303 (6th Cir. 2022) ...............................................................3

iv

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025).................................................................28, 42

*Free Speech Coal., Inc. v. Skrmetti,*
2025 WL 512049 (6th Cir. Jan. 13, 2025)................................12, 37, 40

*Friends of George's v. Mulroy,*
108 F.4th 431 (6th Cir. 2024) ......................................................*passim*

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) ............................................................37

*Glenn v. Holder,*
690 F.3d 417 (6th Cir. 2012)..............................................................24

*Gonzales v. Carhart,*
550 U.S. 124 (2007)....................................................................48, 51

*Grayned v. Rockford,*
408 U.S. 104 (1972)....................................................................45, 47

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund,*
527 U.S. 308 (1999)..........................................................................62

*Gun Owners of Am. v. Garland,*
19 F.4th 890 (6th Cir. 2021) ..............................................................6

*Hein v. Freedom From Religion Found., Inc.,*
551 U.S. 587 (2007)..........................................................................25

*Henderson v. Springfield R-12 School District,*
163 F.4th 478 (8th Cir. 2025) ............................................................18

*Hills v. Hobert,*
2 Root 48 (Conn. Super. Ct. 1793) ....................................................41

*Iancu v. Brunetti,*
588 U.S. 388 (2019).........................................................................30

*In re Sealed Case,*
   77 F.4th 815 (D.C. Cir. 2023)..................................................................44

*Inland Bulk Transfer Co. v. Cummins Engine Co.,*
   332 F.3d 1007 (6th Cir. 2003) ................................................................38

*Jones v. Tevis,*
   14 Ky. 25 (1823) ....................................................................................41

*Kaiser v. Armstrong World Indus.,*
   872 F.2d 512 (1st Cir. 1989) .................................................................37

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
   927 F.3d 396 (6th Cir. 2019)........................................................... 40, 43

*Kentucky v. Yellen,*
   54 F.4th 325 (6th Cir. 2022) ...................................................................6

*Kilborn v. Amiridis,*
   131 F.4th 550 (7th Cir. 2025) ...............................................................18

*Klein v. O'Brien,*
   884 F.3d 754 (7th Cir. 2018)..................................................................49

*L.W. ex rel. Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) ...................................................... 57, 58, 60

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024).................................................................................10

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010).............................................................22, 23

*Matal v. Tam,*
   582 U.S. 218 (2017).................................................................................30

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) .............................................................. 48

*Mattingly v. R.J. Corman R.R. Grp.*,
  90 F.4th 478 (6th Cir. 2024) ............................................................... 55

*McKay v. Federspiel*,
  823 F.3d 862 (6th Cir. 2016) .................................................... 18, 20, 23

*Mirabelli v. Bonta*,
  146 S.Ct. 797 (2026) ...................................................................... 41, 44

*Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*,
  155 F.4th 499 (6th Cir. 2025) ....................................................... 17, 19

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ................................................................... *passim*

*Morrison v. Bd. of Educ. of Boyd Cnty.*,
  521 F.3d 602 (6th Cir. 2008) ............................................................... 18

*Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*,
  806 F. Supp. 3d 166 (D.N.H. 2025) ...................................................... 64

*NetChoice, LLC v. Bonta*,
  152 F.4th 1002 (9th Cir. 2025) ...................................................... 36, 37

*NetChoice, LLC v. Bonta*,
  No. 25-2366, 2026 WL 694471 (9th Cir. Mar. 12, 2026) ................ 34, 37

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................. 11

*NRA v. Magaw*,
  132 F.3d 272 (6th Cir. 1997) ............................................................... 24

*Planned Parenthood v. Sundquist*,
  38 S.W.3d 1 (Tenn. 2000) .................................................................... 10

*Plunderbund Media LLC v. DeWine,*
312 F. Supp. 3d 654 (N.D. Ohio 2018)................................................18

*Plunderbund Media, LLC v. DeWine,*
753 F. App'x 362 (6th Cir. 2018).......................................................24

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992).........................................................................29

*Ramirez v. Collier,*
595 U.S. 411 (2022).........................................................................44

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015).........................................................................30

*Screws v. United States,*
325 U.S. 91 (1945)...........................................................................48

*Smith v. United States,*
508 U.S. 223 (1993).........................................................................45

*Somberg v. McDonald,*
117 F.4th 375 (6th Cir. 2024) ..........................................................17

*Speech First, Inc. v. Schlissel,*
939 F.3d 756 (6th Cir. 2019).......................................................16, 17

*State v. Deberry,*
651 S.W.3d 918 (Tenn. 2022)...........................................................50

*State v. Ducker,*
27 S.W.3d 889 (Tenn. 2000)...............................................................8

*State v. Mateyko,*
53 S.W.3d 666 (Tenn. 2001)...............................................................8

*State v. Welch,*
  595 S.W.3d 615 (Tenn. 2020).............................................................50

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)................................................................. 18, 19

*United States v. Hansen,*
  599 U.S. 762 (2023).............................................................*passim*

*United States v. Parrish,*
  942 F.3d 289 (6th Cir. 2019)...................................................... 45, 53

*United States v. Requena,*
  980 F.3d 30 (2d Cir. 2020) ...............................................................53

*United States v. Salerno,*
  481 U.S. 739 (1987).........................................................................53

*United States v. Snead,*
  No. 21-4333, 2022 WL 17975015 (4th Cir. Dec. 28, 2022) ...................47

*United States v. Stevens,*
  559 U.S. 460 (2010).........................................................................43

*United States v. Texas,*
  599 U.S. 670 (2023).........................................................................58

*United States v. Williams,*
  553 U.S. 285 (2008)............................................................. 45, 53, 54

*Universal Life Church Monastery Storehouse v. Nabors,*
  35 F.4th 1021 (6th Cir. 2022) ..........................................................23

*Veltor Underground v. USSBA,*
  143 F.4th 727 (6th Cir. 2025) .............................................................9

*Vidal v. Elster,*
  602 U.S. 286 (2024)..........................................................................30

*Viet v. Le,*
  951 F.3d 818 (6th Cir. 2020)........................................................40

*Vill. of Hoffman Ests. v. Flipside, Hoffman,*
  *Ests.,* 455 U.S. 489 (1982)....................................................48, 53

*Virginia v. Hicks,*
  539 U.S. 113 (2003).................................................................54

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)...........................................................45, 53

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021).................................................................21

*Woodlands Pride v. Paxton,*
  168 F.4th 293 (5th Cir. 2026) .................................................37

*Wright v. New Jersey,*
  469 U.S. 1146 (1985).............................................................48

*Yoder v. Bowen,*
  146 F.4th 516 (6th Cir. 2025) .................................................22

**Statutes**

18 U.S.C. § 1958(a).................................................................28

18 U.S.C. § 1461 ....................................................................39

18 U.S.C. § 1462 ....................................................................39

18 U.S.C. § 1590(a)(1).............................................................46

18 U.S.C. § 1591(a).............................................................46, 47

22 U.S.C. § 7102(11)(B).............................................................46

x

22 U.S.C. § 7102(12)(B) ...................................................................46

28 U.S.C. § 1331 ......................................................................61, 62

42 U.S.C. § 1983 ......................................................................61, 63

Ark. Code Ann. § 5-18-103(a) ........................................................46

Colo. Rev. Stat. § 18-3-504 ...........................................................46

Ga. Code Ann. § 16-5-46.................................................................46

Ind. Code § 35-42-3.5-1..................................................................46

Ill. Comp. Stat. § 5/10-9.................................................................46

Kan. Stat. ch. 31, § 35 ...................................................................41

Ky. Rev. Stat. Ann. § 529.110(1)(b)................................................46

La. Stat. Ann. § 14:46.2(A)(1).........................................................46

Mass. Gen. Laws Ann. ch. 265 § 50(a) ...........................................46

Miss. Code Ann. § 97-3-54.1............................................................46

N.C. Gen. Stat. § 14-43.11(a) .........................................................46

N.Y. Penal Law § 135.35.................................................................46

Neb. Rev. Stat. § 28.......................................................................46

Nev. Rev. Stat. § 201.300 ...............................................................46

Ohio Rev. Code Ann. § 2905.32.......................................................46

Tenn. Code Ann. § 1-3-105(b)..........................................................45

Tenn. Code Ann. § 39-11-302(a)......................................................14, 49

Tenn. Code Ann. § 39-13-308(a)............................................................46

Tenn. Code Ann. § 39-13-309 ................................................34, 46, 50

Tenn. Code Ann. § 39-15-201 ....................................................1, 13

Tenn. Code Ann. § 39-15-201(a)......................................................*passim*

Tenn. Code Ann. § 39-15-201(f)(1) ...................................... 11, 12, 25, 50

Tenn. Code Ann. § 47-18-129(a)............................................................11

Tenn. Code Ann. § 67-6-102(99)............................................................11

Tex. Penal Code Ann. § 20A.01(4)........................................................46

Utah Code Ann. § 76-5-308.5(2)............................................................46

Wash. Rev. Code § 9A.40.100................................................................46

Wis. Stat § 948.051(1) ..........................................................................46

**Other Authorities**

*#WeCount Report: April 2022 to June 2024*, Soc'y of Fam. Plan-
  ning (Oct. 22, 2024)............................................................................38

Antonin Scalia & Bryan A. Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012) .........................9

Health Committee Hearing (Feb. 21, 2024) ...........................................51

Kelly Puente, *Telehealth abortions surge in Tennessee despite near to-
tal ban: Study*, The Tennessean (March 24, 2026)................................39

Population Health Subcommittee Hearing (Feb. 13, 2024) ...................51

The Chicago Manual of Style (17th ed. 2017)...........................................7

*The Right to Recover for Malicious Alienation of A Child's Affections,*
   40 Harv. L. Rev. 771 (1927) ..............................................................42

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged law addresses a narrow problem—abortion trafficking. Contra Plaintiffs' scaremongering, it does not outlaw general "advoca[cy] for legal abortion" or information sharing. Second-Br. 23. It restricts only efforts to "intentionally recruit[], harbor[], or transport[]" a minor out of the State (or to illegal in-State operations) to obtain an abortion without parental consent. Tenn. Code Ann. § 39-15-201. And intentional recruiting requires an "intent to persuade." *Contra* Second-Br. 23.

That poses a standing problem for Plaintiffs. Plaintiffs aren't abortion traffickers, nor do they seek to be. Plaintiffs do not "set out to persuade their minor clients." *Id.* Indeed, their stated goal "is *never to persuade.*" Hearing Tr., R.39-1, 527 (24:16-18) (emphasis added). They can thus engage in their intended conduct without violating the law and without any threat of enforcement. The refusal to accept that "real-world win" cannot create Article III jurisdiction. *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 860 (6th Cir. 2024) (Murphy, J., concurring).

Even if they had standing, Plaintiffs cannot justify facial invalidation of the "recruit" restriction. Given Plaintiffs' as-applied theory, the Court shouldn't even reach the facial claim. And if it does, Plaintiffs don't

1

come close to proving facial overbreadth. "Plaintiffs agree that the recruitment provision could be constitutionally applied to adults recruiting unemancipated minors to obtain illegal abortions." *See* Second-Br. 44-45. That is a case ending concession. Because Plaintiffs chose to skip discovery, there's no record—none—to determine whether "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024).

Plaintiffs' vagueness theory fails too. The meaning of "recruits" is plain: conduct intended to persuade someone to engage in specific action. The term is widely used in similar state and federal statutes that prohibit trafficking. And the Act's scienter requirement removes any doubt, requiring the *intentional* recruiting of a minor *for the stated purposes* of helping them obtain an abortion that's illegal in Tennessee.

At a minimum, the district court's injunction cannot stand. The injunction should not cover the prohibition on "adults recruiting unemancipated minors to obtain illegal abortions"—which everyone agrees is constitutional. *See* Second-Br. 44-45. Nor should the injunction extend beyond the parties, under binding Supreme Court and Circuit precedent.

This Court should reverse.

2

## ARGUMENT

### I.   Plaintiffs Lack Article III Standing.

To establish pre-enforcement standing, Plaintiffs need to show both an intent to engage in "conduct arguably affected with a constitutional interest[] but proscribed by" the Act, as well as "a *certain* threat of prosecution" if they do so. *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454-55 (6th Cir. 2017) (quotations omitted).  They fail on both counts.

#### A.   Plaintiffs failed to prove an intent to violate the Act.

The Act's restriction on "recruit[ing]" prohibits adults from attempting to persuade a minor in Tennessee to obtain an elective abortion without parental consent.  Plaintiffs have repeatedly confirmed that they don't "set out to persuade their minor clients."  Second-Br. 23; *see id.* at 25 ("Plaintiffs deny setting out to persuade."); Hearing Tr., R.39-1, 527 (24:16-18) (Welty stating that her "goal as an advocate is *never to persuade someone.*" (emphasis added)); *see also id.* at 535 (56:1-5) (Behn).  That should end this case.  First-Br. 17-24.

**1.**  Plaintiffs insist they "need not prove conclusively that their speech violates the recruitment provision, but only that the provision '*arguably* proscribe[s] [their] speech.'"  Second-Br. 17 (quoting *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022)).  And therefore, according to

Plaintiffs, they need only show that their conduct falls within an arguable "construction" of the law. *Id.* That's wrong.

For pre-enforcement standing, the question is whether the *facts* arguably fall within the scope of a properly construed law, not whether a plaintiff offers an "arguable" interpretation of the *law*. The inquiry begins by "figur[ing] out what the [Act] proscribes." *Friends of George's v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024). Then, the Court determines whether Plaintiffs' intended behavior "arguably" falls within that proscription. *See, e.g.*, *id.* That analysis must occur under a proper "construction" of the restriction imposed, even in cases alleging a "purported 'chilling effect'" on speech. *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 965 (6th Cir. 2009).

This Court rejected this arguably-correct-interpretation argument (raised by some of the same counsel who represent Plaintiffs here) in *Friends of George's*. There, the intervenors contended that the plaintiff need only show its intended actions were proscribed under an "arguably correct" interpretation of the challenged law. Br. of Intervenors, 2023 WL 7195636, at *9-10, *Friends*, 108 F.4th 431. This Court held otherwise. It began by determining what the law *actually* proscribed based on the text,

"history of the relevant provisions," and precedent. 108 F.4th at 435-36. Only after settling that question did the Court turn to the factual question of whether the plaintiff had properly "allege[d] its intention to arguably" violate the law. *Id.* at 436. Plaintiffs' position here runs headlong into *Friends of George's.*

Plaintiffs' position also flouts Article III's rule against advisory opinions. Under Plaintiffs' view, anyone who can manufacture standing based on an "arguable" (but incorrect) interpretation of a law is entitled to an adjudication of the constitutionality of that law—regardless of whether the law, correctly interpreted, touches his conduct at all. That problem is particularly acute with overbreadth claims, where a court can find a statute unconstitutional without ever considering whether the statute covers the plaintiffs' conduct. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975) (finding prohibition on nudity at a "drive-in theater" overbroad without ever interpreting the scope of "drive-in theater"). The Court should not greenlight advisory opinions by allowing plaintiffs to assert an "injury" that "rests on a misinterpretation of the [challenged law]." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021).

5

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), does not say otherwise. Citing a footnote in *Yellen*, Plaintiffs say that "[i]f a challenged law 'when given one construction would establish jurisdiction and would defeat it when given another, then the plaintiff has established jurisdiction.'" Second-Br. 17 (quoting *Yellen*, 54 F.4th at 349 n.16) (cleaned up). But *Yellen* was a creature of *Chevron*'s since-discarded framework. Under *Chevron*, federal courts would defer to a federal agency's interpretation of a federal statute so long as it was a "permissible and reasonable" reading of the law. *Cf. e.g.*, *Gun Owners of Am. v. Garland*, 19 F.4th 890, 907 (6th Cir. 2021). *Yellen* recognized this and observed that the Treasury Department had not chosen between multiple "plausible" interpretations of the relevant statute. 54 F.4th at 337. It then reasoned that, because the States couldn't know in advance which interpretation the government might adopt, they faced a threat of enforcement if they suffered an injury under any permissible interpretation. *Id.* at 337-38. But once the government chose an interpretation (i.e., once the "proper" construction of the law was determined under *Chevron*), Kentucky *lost* standing; the mere existence of a plausible but *unchosen* interpretation did not suffice. *Id.* at 340. So if anything, *Yellen* hurts Plaintiffs' case.

6

**2.** Properly construed, the recruiting restriction prohibits intentional efforts *to persuade* minors to obtain elective abortions without parental consent. *See* First-Br. 17-21. Indeed, all appear to agree that the word "recruit" means "to persuade someone," or "to induce or enlist (a person) to participate." *Compare* First-Br. 17-18 *with* Second-Br. 18. So the crux of the parties' dispute, then, turns on whether the Act prevents only intentional actions to persuade (the State's interpretation) or imposes liability any time a listener is persuaded (Plaintiffs' interpretation, Second-Br. 18-19). The State has the better of the two views.

Start with the text. The Act requires an adult to "intentionally recruit" an unemancipated minor. Tenn. Code Ann. § 39-15-201(a). That language uses "recruit" as a verb, focusing on the "action the subject"—the speaker—"exerts on the object"—the unemancipated minor. The Chicago Manual of Style ¶ 5.98 (17th ed. 2017). A violation therefore turns on the speaker's actions, not the listener's reaction. So by the plain text, the Act imposes a "nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the defendant's conduct achieves." *State v.*

7

*Mateyko*, 53 S.W.3d 666, 673 (Tenn. 2001) (citing *State v. Ducker*, 27 S.W.3d 889, 896-97 (Tenn. 2000)).

Plaintiffs don't respond to this argument. *Compare* First-Br. 24-26 *with* Second-Br. 17-25. They ignore that the statute uses "recruit" as a verb. And they ignore the difference between a nature-of-the-conduct offense and a results-based offense. Instead, Plaintiffs strawman the State's argument (at 20-21) by latching onto the State's use of "intentional targeting" to describe the intentional attempt to persuade. Whatever the label—"intentional targeting," "intentional persuasive communication," "conduct intended to persuade," etc.—the Act focuses on the speaker's conduct, not the listener's reaction. So the relevant question is not whether minors *were* persuaded to have an abortion by learning more information, *contra* Second-Br. 18-21, but whether an adult "seek[s] to persuade" the minor. *Id.* at 18 (quotations omitted).

Plaintiffs' Uncle Sam poster example illustrates. Second-Br. 21. A poster saying "I *Want You*" to join the Army seeks to persuade: The speaker is trying to convince the listener to take some action. *Id.* If Plaintiffs told minors, "I *want you* to come with me to get an out-of-state abortion without your parents' consent," that'd be recruiting. But that's

*not* what Plaintiffs do. And they've said so *repeatedly*. They merely share information or advocate for access. First-Br. 21-22.

Canons of construction confirm what the plain meaning of "recruit" already makes clear. First-Br. 18-20. "[W]ords are known by the company they keep," *Veltor Underground v. USSBA*, 143 F.4th 727, 735-36 (6th Cir. 2025), so the meaning of "harbor[]" and "transport[]" necessarily limit the breadth of "recruit[]," *see* First-Br. 19. Plaintiffs (at 21) refuse to contend with that statutory context, maintaining that "'recruit[],' 'harbor[],' and 'transport[]'" should not be "read together" because they have "nothing in common." That's wrong: All three involve some affirmative effort to traffic a minor. That "common quality" may be a general one, but it's general in the relevant sense, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 196 (2012)—it underscores the Act's focus on the conduct of the speaker (the intentional attempt to persuade), not the listener's reaction, *see* First-Br. 19-20.

Plaintiffs' attempt to dodge the constitutional avoidance canon fares even worse. Their claim that constitutional-avoidance principles "do[] not apply to standing" is as unsubstantiated as it is illogical. Second-Br. 22. No authority commands that peculiar result, which would

9

require the Court to adopt one interpretation for standing but a different interpretation for the merits. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (holding that "statutes … do—in fact, must—have a *single*, best meaning") (emphasis added). Plaintiffs' citation (at 22) to *FEC v. Cruz*, 596 U.S. 289 (2022), simply repackages their erroneous argument that this Court needn't actually interpret the challenged statute to assess standing.[1] *Supra* 3-6.

Plaintiffs' avoidance argument is also self-defeating. The constitutional-avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *accord Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 7 (Tenn. 2000). Plaintiffs' merits position is that a broad interpretation of the statute "raises serious constitutional doubts." *Clark*, 543 U.S. at 381. So "accept[ing] as valid the merits of Plaintiffs' legal claims," Second-Br. 22

---

[1] In *Cruz*, the parties agreed on the scope of the law, and the Court "assume[d]" that the law "unconstitutionally burden[ed]" the plaintiffs' speech. 596 U.S. at 298. *Cruz*'s reference to "the merits" was a reference to the First Amendment analysis, not the scope of the law. *See generally id.* at 296-302.

10

(cleaned up), the Court must narrowly "construe the statute to avoid constitutional [overbreadth] problems." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

Finally, Plaintiffs are wrong (at 22-23) that the State's interpretation would render superfluous Tenn. Code Ann. § 39-15-201(f)(1). That statute states: "This section does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor." *Id.* But Tennessee's legislature routinely uses this "does not include" or "does not apply" structure to clarify the scope of a law.[2] For example, elsewhere, the legislature clarified that "[t]he term 'textbook' does not include a computer or computer software." Tenn. Code Ann. § 67-6-102(99). That in no way suggests that, but for that clarification, the plain meaning of "textbook" *would* include a computer. The same goes here. "[R]edundancies are common in statutory drafting—

---

[2] *See* Tenn. Code Ann. § 47-18-129(a) ("[P]rohibition" on sale of novelty cigarette lighters "does not apply to the transportation of novelty lighters."); *id.* § 68-131-303(1)(B) ("The term 'art supplies' does not apply to economic poisons[.]"); *id.* § 47-22-401(5)(C) ("'Debit card' does not include paper checks."); *id.* § 67-6-102(97)(B) ("'Tangible personal property' does not include signals broadcast over the airwaves."*); id.* § 39-17-402(11)(D) ("'Drug' does not include devices or their components, parts, or accessories.").

11

sometimes in a congressional effort to be doubly sure." *Barton v. Barr*, 590 U.S. 222, 239 (2020); *see also Free Speech Coal., Inc. v. Skrmetti*, 2025 WL 512049, at *3 n.2 (6th Cir. Jan. 13, 2025). That's all § 39-15-201(f)(1) does; it makes doubly sure that the provision of medical information regarding pregnancy care isn't included.

Plaintiffs "press the [meaning of recruit] toward the most expansive reading possible" given the "odd incentives created by the overbreadth doctrine." *United States v. Hansen*, 599 U.S. 762, 781 (2023). But their interpretation flouts the plain text, misapplies interpretive canons, and is at odds with common sense. In the context of a trafficking law, it makes no sense to read the word "recruit" to cover the mere "provi[sion of] information" or general "advoca[cy] for legal abortion." Second-Br. 23. This Court should interpret "intentionally recruit" in the Act to require an intentional effort to persuade. And Plaintiffs do not persuade.

**3.** Even if Plaintiffs' interpretation of "recruit" is right, they still failed to show an intent to violate the Act because they lack the necessary *mens rea.* The Act requires that a person "*intentionally* recruit" and do so "*for the purpose of*" inducing a minor's abortion without parental consent. Tenn. Code Ann. § 39-15-201(a) (emphasis added). Plaintiffs, however,

12

testified that they do no such thing.  Welty explained that her "goal … is *never to persuade someone*," but always to "let them make their own decision."  Hearing Tr., R.39-1, 527 (24:16-18) (emphasis added).  Behn agreed:  Her sole goal is to "provide [a minor] information about abortion so that she *can make her own decision*"—not "to persuade her to get an abortion."  *Id.* at 535 (56:1-5) (emphasis added).  By their own accounts, Plaintiffs do not violate the Act.

Plaintiffs say (at 23-24) that "[a]lthough" they "may not initially set out to persuade their minor clients, once the client decides to have an abortion, [Plaintiffs] speak with the purpose of helping and encouraging those minors to carry out their plans."  That conflates *post-decision* "support[] and encourag[ement]," *id.* at 23, with *pre-decision* recruiting.  Recruiting entails "persuad[ing]" or "induc[ing]" an unemancipated minor to obtain an elective abortion.  First-Br. 17-21.  By definition, there's no recruiting if the minor has already made her "plans" or "cho[sen] a path."  Second-Br. 23-24.  Depending on the form it takes, support and encouragement *after* that point might be prohibited "harbor[ing]" or "transport[ing]," *see* Tenn. Code Ann. § 39-15-201, but it wouldn't be *recruiting*.

13

Next, Plaintiffs argue that "[u]nder Tennessee law, an act is intentional either if the actor intends the result or merely intends to engage in the conduct." Second-Br. 23. And because Plaintiffs "intend to engage in their speech," the argument goes, they "satisfy" the Act's intent "element." *Id.* That's wrong. The Act doesn't say a person must "intentionally speak"; it says they must "intentionally recruit." So the person must "conscious[ly] … engage in the conduct"—i.e., they must consciously act to persuade. Tenn. Code Ann. § 39-11-302(a). That's confirmed by reading "intentionally recruit" in context. The Act prohibits only "intentionally … recruit[ing] … a pregnant unemancipated minor" for a specified "*purpose.*" Tenn. Code Ann. § 39-15-201(a) (emphasis added). The Act's text thus requires intent to recruit, not just intent to speak. First-Br. 27-28.

Finally, Plaintiffs note that someone "who wishes to challenge the constitutionality of a law is not required to confess that he will in fact violate the law." Second-Br. 18 (quotations omitted). True enough. But here, where Plaintiffs affirmatively testified that they *won't* violate it, they should be held to that controversy-ending testimony. *See Friends*, 108 F.4th at 437 (Plaintiff's "own testimony … failed to show any intention to even arguably violate [the challenged law].").

14

### B.    Plaintiffs failed to prove a certain threat of prosecution.

Even if Plaintiffs did intend to violate the Act, they failed to prove a "*certain* threat of prosecution." *Crawford*, 868 F.3d at 455; First-Br. 28-36.  Plaintiffs disagree, arguing that they've shown both "objective" and "subjective" chill.  Those arguments miss the mark.

**1.** Plaintiffs first fault the State for "skip[ping] the objective-chill analysis."  Second-Br. 26.  But this argument was never raised below, so the State had no reason to rebut it.  Rather, Plaintiffs discussed "chill" without distinguishing between "objective" and "subjective" to claim standing.  Plaintiffs' MSJ, R.56, 701-15; Plaintiffs' Resp. to Defs' MSJ, R.71, 894-95 (same).

This Court routinely does the same.  This Court has decided pre-enforcement standing in scores of cases.  And it almost never distinguishes between "objective" and "subjective" chill.  Rather, the "inquiry distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *See, e.g.*, *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024); *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 742 (6th Cir. 2025) (en banc).  That's because whatever the theory of chill, "a credible threat of

15

enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (quotations omitted).

Plaintiffs misconstrue the reference to "objective chill" in *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). There, a group of students argued that a university's "Bias Response Team" chilled their speech. But unlike here, there was clearly a credible risk that the Bias Response Team would respond to plaintiffs' speech. The Team maintained a "log of reported bias incidents" detailing their pursuit of previous violators, and the Court found no reason to believe that they wouldn't similarly pursue plaintiffs. 939 F.3d at 762. Instead, the issue was whether the Bias Response Team could impose a "real consequence that objectively chills speech." *Id.* at 765. Unlike a prosecutor, the Teams "ha[d] no direct punitive authority" against violators and could only "make referrals" to the police or other university offices. *Id.* at 763. So, there, the threat of enforcement existed; the question was whether the limited enforcement power was a real enough consequence to chill

16

speech. *Id.* at 765; *see also Somberg v. McDonald*, 117 F.4th 375, 380 (6th Cir. 2024) (*Schlissel* "hinged on the fact that the Response Team was a constituent part of the University … [with] the power to punish students."). Whereas, here, everyone agrees that the enforcement power at issue (the ability to prosecute) could chill speech; the question is whether there is a credible threat of enforcement.

By blending those two concepts, Plaintiffs eliminate the second step of the pre-enforcement standing test: the credible-threat-of-enforcement requirement. Plaintiffs say that "[a] law imposes an objective chill if it is 'regulatory, proscriptive, or compulsory' and the plaintiff's speech is subject to the regulations, proscriptions, or compulsions." Second-Br. 26. But all laws regulate and proscribe. And it's the first step of the pre-enforcement standing inquiry that looks to whether "the plaintiff's speech is subject" to the law. *See supra* Part I.A. This Court should reject Plaintiffs' attempt to establish pre-enforcement standing without showing a credible threat of enforcement. *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 512 (6th Cir. 2025) ("Without demonstrating a credible threat of enforcement of the [challenged] provision, Plaintiffs have not … establish[ed] an Article III

17

preenforcement injury."); *McKay v. Federspiel*, 823 F.3d 862, 867-70 (6th Cir. 2016); *Crawford*, 868 F.3d at 454; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 164-76 (2014).

Plaintiffs' gesture (at 26) to out-of-circuit authority goes nowhere. *Henderson v. Springfield R-12 School District*, 163 F.4th 478 (8th Cir. 2025) (en banc), didn't set out a separate test for "objective chill"; it said that if someone "self-censor[s]" then the self-inflicted chilling must be "objectively reasonable," *id.* at 492-93. This Court has used nearly identical language in the context of applying the *McKay* factors. *Birmingham v. Nessel*, 2021 WL 5712150, at *2 (6th Cir. Dec. 2, 2021) (citing *McKay* and noting plaintiff must establish "objective harm" to have pre-enforcement standing); *see also Plunderbund Media LLC v. DeWine*, 312 F. Supp. 3d 654, 662 (N.D. Ohio 2018) (Plaintiffs must show "facts that objectively support a reasonable fear that they will be prosecuted under the statute."); *Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025) (similar).

The upshot: Plaintiffs cannot rely on their subjective feelings about a law, dress it up as an "objective chill," and then parlay that into an injury-in-fact that bypasses *McKay*. *Cf. Morrison v. Bd. of Educ. of Boyd*

18

*Cnty.*, 521 F.3d 602, 608-09 (6th Cir. 2008). Rather, the Court must ensure a credible threat of enforcement exists, *see Driehaus*, 573 U.S. at 159, based on the *McKay* factors and surrounding circumstances, *Moms for Liberty*, 155 F.4th at 510.

**2.** Plaintiffs next argue that their "subjective chill," paired with other "further indication[s] that the risk of prosecution is real," suffices for standing. Second-Br. 27 (quotation omitted). But neither the *McKay* factors nor the surrounding factual circumstances favor Plaintiffs.

*First*, the *McKay* factors uniformly cut against standing. *See* First-Br. 35-41. Sensing as much, Plaintiffs downplay their importance, saying (at 28) that "courts in this circuit sometimes look to" the *McKay* factors when determining whether a credible threat of enforcement exists. That undersells *McKay*. This Court has "repeatedly and recently … applied *McKay* in pre-enforcement challenges," and it has described it as "settled circuit law." *Christian Healthcare*, 117 F.4th at 851.

Next, Plaintiffs argue (at 29) that "some combination" of the *McKay* factors "show that [they] credibly fear prosecution." Not so. All agree that neither of the first two factors—history of enforcement and receipt of warning letters—are present. *See* Second-Br. 30-31. Plaintiffs are right

19

that this absence is not by itself *fatal* to their standing, *see id.*; *see also* First-Br. 32 (agreeing on this point), but it must cut against Plaintiffs— lest this Court lower the standing bar for pre-enforcement challengers who have the *least* evidence of enforcement risk.  First-Br. 32-33.

For the third factor, Plaintiffs cannot show any "attribute of the challenged [Act] makes enforcement easier or more likely."  823 F.3d at 869.  They point (at 31-32) to features of "Tennessee's unique grand jury system," the prosecutorial obligations of "district attorneys general," and even their own "identities and the nature of their speech."  But this factor focuses on "attribute[s] of *the challenged statute*," *McKay*, 823 F.3d at 869, not a State's "broader criminal law scheme," and certainly not the "Plaintiffs' identities," *contra* Second-Br. 31-32.  This Court has already rejected nearly identical attacks (again, by some of the same counsel).  *Friends*, 108 F.4th at 440; *cf.* Br. of Intervenors, 2023 WL 7195636, at *14-15.  The Act is "a *standard criminal law* with no attributes making enforcement easier or more likely."  *Friends*, 108 F.4th at 440 (emphasis added).

Plaintiffs also highlight (at 31-32) the Act's authorization of private-party wrongful-death suits.  That is at least an attribute of the Act, but it's unclear how it helps Plaintiffs establish standing here.  Any injury

20

stemming from *private* enforcement is neither traceable to *Defendants* nor redressable by an injunction against them. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). Even the district court here recognized that while a civil enforcement mechanism "makes *civil* enforcement easier, it does not make *criminal* enforcement easier—the type of enforcement that plaintiffs fear." Mem. Op., R.81, 1117-18.

The final *McKay* factor asks whether Defendants have "refus[ed] to disavow enforcement of the challenged statute against a particular plaintiff." *Friends*, 108 F.4th at 339 (quotations omitted). Plaintiffs insist this factor supports them. Second-Br. 32. First, they fault Defendants (at 32) for not responding to Welty's pre-suit letter. But that letter demanded that Defendants "disavow all enforcement" of the Act, R.1-4, 27, in "the abstract," *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). As this Court has emphasized, it is "unrealistic to expect a defendant to disavow a law's enforcement as applied to fluid and future facts that are unclear" at the time of the request. *Christian Healthcare*, 117 F.4th at 850 (cleaned up).

Besides, Defendants *have* consistently disavowed any intent to prosecute Plaintiffs for their intended conduct. *See, e.g.*, First-Br. 29-32; MSJ

21

Mem., R.69, 829-32, 835-36; Supp. PI Resp., R.39, 512-17; MTD Mem., R.26, 265-69; PI Resp., R.22, 224-29. Plaintiffs argue otherwise based on out-of-context excerpts from Defendants' earlier filings. *See* Second-Br. 33. But those excerpts cannot defeat Defendants' consistent position that Plaintiffs' intended conduct *is not* prohibited recruiting.[3] Plaintiffs also try to escape Defendants' consistent disavowals by insisting this Court recently held "that disavowal must come 'in a non-litigation context' and be 'more than a mere litigation position.'" Second-Br. 33. But that isn't quite right. This Court did say that disavowal "must be more than a mere litigation position," *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) (quoting *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010)), but it did not say that disavowals "must 'come in a non-litigation context,'" *id.* Indeed, the decision *Yoder* quoted explicitly *blessed* in-litigation disavowals where the government defendants "disavowed any interpretation of the

---

[3] Plaintiffs' reliance on these excerpts fails on its own terms anyway. In the cited filing, which notably predates Plaintiffs' testimony clarifying the nature of their intended speech, Defendants said only that "*if* the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in," that speech could be prosecuted if it were incident to crime. PI Opp'n, R.22, 221-22 (emphasis added).

statute that would make it applicable in any way to [plaintiffs]." *Lopez*, 630 F.3d at 788 (cleaned up). That's exactly what Defendants did here.

Beyond *McKay*, the remaining circumstances that Plaintiffs identify change nothing. Contrary to Plaintiffs' assertion (at 29), this Court in *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022), did not rely on the "explanation" for a challenged law to find a certain threat of prosecution. The Court focused on the statutory text, which it noted "explicitly ban[ned]" the plaintiffs' intended conduct, and it observed that "[*n*]*o* explanation for that ban has been provided other than to target [the plaintiffs]." 35 F.4th at 1034-35 (emphasis added). That observation is not a license to mine a law's legislative history for stray language that could be construed as threatening—particularly when district attorneys, not legislators, enforce the law.

Plaintiffs' reliance (at 29-30) on the Act's recent enactment and criminal penalties is similarly misplaced. If anything, criminal penalties are harder to enforce, given the requirement of probable cause to initiate criminal proceedings and proof beyond a reasonable doubt to convict. First Br. at 34-35. Plaintiffs seem to think that there's always a credible threat of enforcement so long as the law "has not fallen into desuetude."

23

Second Br. 29 (quotations omitted).  But that contradicts a mountain of precedent.  *E.g.*, *Friends*, 108 F.4th at 440; *Crawford*, 868 F.3d at 454; *Glenn v. Holder*, 690 F.3d 417, 423-24 (6th Cir. 2012); *Plunderbund Media, LLC v. DeWine*, 753 F.App'x 362, 372 (6th Cir. 2018).  And Plaintiffs offer nothing to show that the recruitment provision in *this Act* is likely to be enforced against *these Plaintiffs* by *these Defendants*—that's what matters for pre-enforcement standing.  *See NRA v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997).

## II.  The Recruiting Restriction Does Not Violate the First Amendment.

### A.  Plaintiffs' as-applied challenges either fail or doom their facial challenge.

Plaintiffs argue that "[t]he recruitment provision violates the First Amendment as applied to Plaintiffs' speech."  Second-Br. 34.  That's wrong.  And if it's right, then this Court shouldn't reach Plaintiffs' facial challenge.

**1.** Plaintiffs' as-applied challenge turns on what it means to "intentionally recruit."  Tenn. Code Ann. § 39-15-201(a).  As explained above, "intentionally recruit" requires an adult to intentionally persuade a minor to obtain an abortion without the consent of her parents.  *See supra* 7-12.  But Plaintiffs insist that "intentionally recruit" sweeps broadly

24

enough to cover "public advocacy" and virtually any "discussion of abortion care." Second-Br. 15. If the State's interpretation is right, then Plaintiffs' as-applied challenges fail, because the Act doesn't apply to their speech. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 607 (2007).

So Plaintiffs are wrong to claim (at 34-35) that the State "mount[s] no challenge" to the district court's as-applied ruling. Defendants directly addressed the failure of Plaintiffs' as-applied challenge: "Plaintiffs' *as-applied challenges fail* because the Act does not apply to their intended speech." First-Br. 39 (emphasis added). And that's exactly what this Court should hold.

**2.** But if this Court disagrees, adopts Plaintiffs' interpretation, and "sustain[s]" the district court's "as-applied ruling," Second-Br. 35, then it shouldn't reach Plaintiffs' facial challenge. "It is not the usual judicial practice," nor "generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989). "Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not

25

to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Id.* at 485; *see* Thomas More Amicus Br. 16-17 (compiling further examples). Especially where Plaintiffs admit "the as-applied ruling is … sufficient to sustain the district court's judgment," Second Br. 35, the Court need not proceed to consider the "disfavored" facial claim, *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (en banc) (quotations omitted).

## B.　The Act's "recruit" restriction is not unconstitutionally overbroad.

Plaintiffs cannot prove facial invalidity. Facial challenges are "hard to win"—even in the First Amendment context. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). To prevail, Plaintiffs needed to present proof that the Act's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. But Plaintiffs skipped discovery altogether. And without a record as to how a law works in "*all* of its applications," *id.* at 744 (emphasis added), Plaintiffs cannot possibly satisfy the stringent overbreadth standard. First-Br. 49-53. The district court filled these evidentiary gaps with intuition and rhetorical questions. *Id.* at 51-53. Plaintiffs' arguments on appeal cannot cure that error.

26

**1.** Plaintiffs start by arguing that the overbreadth standard does not apply because laws that "discriminate[] based on viewpoint" are per se "facially unconstitutional." Second-Br. 35. "Every viewpoint-based law," they say, "could be applied to unprotected speech, but that has never stopped the Supreme Court from striking down content- and viewpoint-based laws on their face, without addressing overbreadth." *Id.* at 37. That assertion does not withstand scrutiny.

First, Plaintiffs' argument flouts *NetChoice*. There, the Supreme Court made clear that "[a] law with a plainly legitimate sweep may be struck down in its entirety … only if the law's unconstitutional applications substantially outweigh its constitutional ones." *NetChoice*, 603 U.S. at 723-24. There's no exception for facial challengers claiming viewpoint discrimination. In fact, the NetChoice plaintiffs themselves raised viewpoint discrimination arguments, yet the Court never so much as hinted that the facial-challenge analysis differed for those claims. Resp. Br., at 32-35, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (No. 22-277), 2023 WL 8437866. Indeed, the Court has repeatedly said that the "only" way a plaintiff can prove facial invalidity in the First Amendment context is "to show" that a law's "unconstitutional applications are substantially

27

disproportionate to the statute's lawful sweep." *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 481 n.7 (2025) (cleaned up); *Hansen*, 599 U.S. at 770.

Setting aside precedent, Plaintiffs' position makes little sense. Imagine a viewpoint-based law that in 1% of applications unconstitutionally regulates protected speech, but in the other 99% of applications can be constitutionally applied to unprotected speech. *See* Second-Br. 44-45 ("Plaintiffs agree that the recruitment provision could be constitutionally applied to adults recruiting unemancipated minors to obtain illegal abortions.") Under Plaintiffs' view, that law is still per se unconstitutional because *NetChoice*'s test simply doesn't apply. That cannot be right.

At minimum, Plaintiffs' viewpoint-based exception to overbreadth (at 36-37) cannot govern in the speech-incident-to-crime context. Bans on crime facilitating speech are typically viewpoint laden—namely, they punish speech facilitating illegal conduct but permit speech opposing illegal conduct. *E.g.*, *Hansen*, 599 U.S. at 766 (upholding ban on "encouraging or inducing illegal immigration" (cleaned up)). For instance, a law banning murder-for-hire criminalizes speech promoting another person to commit a murder. *See, e.g.*, 18 U.S.C. § 1958(a). In some sense, that's

28

a viewpoint-based distinction: A person cannot *encourage* murder but can *discourage* murder. Under Plaintiffs' rule, that law "discriminates based on viewpoint," Second-Br. 37, and must be held unconstitutional "regardless of whether some of the speech to which it applies might be constitutionally unprotected," *id.* That outcome is as absurd as it is wrong.

That's why this case differs from *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). *R.A.V.* didn't involve a law promoting versus discouraging crime. It involved a viewpoint-based law that was unconstitutional in all applications. *Id.* at 395. So, at most, *R.A.V.* illustrates that a *NetChoice* analysis may be unnecessary where no hypothetically constitutional applications of the challenged law exist. But, here, Plaintiffs "agree" (at 44-45) that the Act "could be constitutionally applied to adults recruiting unemancipated minors to obtain illegal abortions," meaning a *NetChoice*-style comparison is necessary.

The remaining cases cited by Plaintiffs (at 37) don't move the ball. Each of the cited cases pre-date *NetChoice*, *Hansen*, and *Paxton*. On top of that, they're distinguishable. *Reed*, for instance, wasn't a viewpoint discrimination case, and the defendants never argued that the local

signage ordinance could be constitutionally applied to unprotected speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015). And the others involve trademark law—a "unique context" with a distinct relationship to the First Amendment. *Vidal v. Elster*, 602 U.S. 286, 299-301 (2024); *see Iancu v. Brunetti*, 588 U.S. 388 (2019); *Matal v. Tam*, 582 U.S. 218 (2017). *Iancu* and *Matal* are also factually distinct. "[F]ederal trademark registration" confers a government "benefit[]," *Brunetti*, 588 U.S. at 401 (Roberts, C.J., concurring in part and dissenting in part), but this case involves criminal laws where the State has a unique interest in preserving applications that comport with the Constitution. First-Br. 53-54.

**2.** Under the overbreadth framework, this Court must "first determine what [the law] covers." *Hansen*, 599 U.S. at 770. For the reasons stated above, the Court should read "intentionally recruit" to require an adult to intentionally persuade a minor to obtain an abortion without the consent of her parents. *See supra* 7-12; First-Br. 17-21. Plaintiffs' contrary arguments flout the text and established interpretive principles. *Id.* And while Plaintiffs resist application of the constitutional-avoidance doctrine at the standing stage, Second-Br. 22, they never explain why that interpretive canon doesn't squarely foreclose their reading for

30

purposes of the overbreadth analysis, *id.* at 41-44. The Court should adopt the State's interpretation of "intentionally recruit."

**3.** Whatever the proper interpretation, the recruiting restriction is not facially invalid under *NetChoice*'s overbreadth standard. First-Br. 37-44. Plaintiffs' contrary arguments fail on the law and the facts.

*First*, Plaintiffs try to narrow the constitutional applications of the recruit restriction. The State identified numerous circumstances in which the recruiting restriction can be applied to speech integral to criminal activity: (1) adults recruiting minors for elective abortions in the 12 States that bars such procedures, (2) adults recruiting minors for elective abortion in 26 States that require parental notification or consent, (3) recruiting incident to the crimes of "harboring" and "transporting" minors in this State, and (4) recruiting incident to other criminal conduct. *See* First-Br. 39-44. Plaintiffs' attacks on those constitutional applications are limited—and unpersuasive.

For the first two buckets, Plaintiffs agree that the restriction "could be constitutionally applied to adults recruiting unemancipated minors to obtain illegal abortions." *See* Second-Br. 44-45. So for recruiting to obtain an abortion in the 12 States that prohibit elective abortions,

31

Plaintiffs concede constitutionality.  First-Br. 40-42.

Plaintiffs attempt to chip away at the second bucket.  They argue (at 46-48) that "all but one of the [26] states requiring parental involvement in the abortion decision offer a judicial bypass alternative" and that it'd be unconstitutional to prevent an adult from "notifying" a minor "of judicial bypass options in parental-consent states."  Even accepting as much, that means the law can be constitutionally applied to adults recruiting minors for elective abortions *without a judicial bypass* in these States—which all agree are "illegal abortions."  Second-Br. 44-45; *see also* First-Br. 41-42.

For the third bucket, Plaintiffs assert (at 43-44) that there cannot be "recruiting incident to the crimes of 'harboring' and 'transporting' minors."  Plaintiffs accept that "recruitment" is "a separate offense from harboring or transporting."  Second-Br. 43.  And they don't contest the constitutionality of the "transport" provision.  *Id.* at 10 (challenge confined to "the recruitment provision").  But they misunderstand the State's point.  The State is not arguing that the recruiting restriction applies "if the adult 'recruits' the minor to be harbored or transported."  *Id.* at 43. It's arguing that it's a crime to "transport" a minor out of State to obtain

32

an illegal abortion without parental consent.  And if someone "recruits" a minor to leave the State to obtain that abortion, that "recruit[ment]" is speech "integral to" the (uncontested) crime of "transport[ing]."  *Hansen*, 599 U.S. at 783; First-Br. 42-43.

Finally, Plaintiffs claim (at 43) that speech "incident to extortion, coercion, or the concealment of other criminal conduct" isn't covered by the word "recruit."  That's wrong.  Just because coercion and extortion involve an added layer of nefariousness does not categorically bar those actions from the recruitment provision's reach.  *See Commonwealth v. McGhee*, 35 N.E.3d 329, 339 (Mass. 2015) (using drugs, alcohol, and money to induce vulnerable women into prostitution could establish culpability under an anti-trafficking statute that prohibited "recruit[ing]" but did not include "coerc[ing]").  They still involve an element of intentional persuasion, i.e., recruitment.  For example, a college freshman who blackmails his high-school girlfriend into getting an abortion still "persuades" her to take the action.  First-Br. 43.  As does a statutory rapist who threatens violence to ensure his fourteen-year-old victim undergoes an abortion to conceal the crime.  *Id.*  So too does a sex trafficker who offers drugs or money to an underaged sex worker to get an abortion to

33

hide his criminal enterprise. Tenn. Code Ann. § 39-13-309. The means may be different, but the result is the same: unprotected speech used to violate or conceal the violation of an otherwise valid Tennessee law.

At bottom, though, the Court need not agree with the State as to exact contours of the constitutional applications. All agree that constitutional applications exist. *See* Second-Br. 44-45. And that means the Court needs "a developed record on the various applications of the" the challenged law. *NetChoice, LLC v. Bonta*, No. 25-2366, 2026 WL 694471, at *13 (9th Cir. Mar. 12, 2026).

**4.** This Court lacks the record necessary to consider how the recruiting restriction works in "*all* of its applications" and determine whether "the law's unconstitutional applications substantially outweigh its constitutional ones." *NetChoice*, 603 U.S. at 724, 744 (emphasis added). Plaintiffs here developed no record; they skipped discovery entirely. That leaves critical factual questions unanswered. How many applications occur in States where elective abortions are illegal? How many applications occur in States that require parental consent? And how frequently is judicial bypass granted in those States? How often is there recruitment incident to other criminal conduct? There's no way for

this Court to know.  Because "[t]he record leaves these questions unclear," reversal is warranted.  *Doe v. Burlew*, 165 F.4th 525, 533 (6th Cir. 2026); First-Br. 49-53.

Plaintiffs insist that they needn't "meet a particular evidentiary bar" because "[l]itigation by hypothetical … is sometimes *required* in free-speech cases," Second-Br. 39 (cleaned up), and they argue that the Supreme Court "has repeatedly struck down laws as facially overbroad … without requiring a detailed factual accounting of the law's applications," *id.* at 39-40.  Yet the central case on which they rely, *see id.* at 39, found a facial challenge *failed* for lack of "actual fact[s]."  *Connection Distrib.*, 557 F.3d at 336 (quotation omitted).

And the other cited cases, Second-Br. 40, predate the Supreme Court's decision in *NetChoice*, in which the Court made clear that facts are *required* for a facial-overbreadth challenge.  *NetChoice* reversed the decisions below because "the record [was] underdeveloped."  603 U.S. at 726.  Indeed, "the record [being] incomplete" was a driving force behind the decision.  *Id.* at 734, 744.  The separate opinions reiterated that the facial-challenge inquiry is  "fact intensive,"  *id.* at 747 (Barrett, J., concurring), and "impossible" to conduct without a developed "factual

35

record," *id.* at 760-61 (Thomas, J., concurring in the judgment); *see also id.* at 748-49 (Jackson, J., concurring in part and concurring in the judgment) ("[C]ourts must make sure they carefully parse" the facts and evaluate how "the regulated activities *actually function*" in a facial challenge); *id.* at 766 (Alito, J., concurring in the judgment) (noting "the incompleteness of th[e] record" resolved "the facial unconstitutionality question" because the Court "d[id] not know how" the law applied).

To be sure, there may be cases where no facts are needed. Some laws may so flagrantly violate the First Amendment that they are unconstitutional in *all* of their hypothetical applications. *E.g.*, *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574-75 (1987) (holding resolution banning all "First Amendment activities" unconstitutionally overbroad). But in this case, *everyone* admits that there are some constitutional and some unconstitutional applications of the Act. *See* Second-Br. 44-45. Therefore, this Court must ask: what is the balance between those two buckets? *NetChoice*, 603 U.S. at 724. *That* question cannot be answered by hypotheticals. It requires "a massive amount of information," *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1020 (9th Cir. 2025), to conduct the "daunting, if not impossible, task," of weighing the law's applications.

36

*NetChoice*, 603 U.S. at 745 (Barrett, J., concurring).

In the wake of *NetChoice*, this Court has recognized the need for a factual record to support a facial challenge. *Burlew*, 165 F.4th at 533; *Free Speech Coal.*, 2025 WL 512049, at *2; *accord Connection Distrib.*, 557 F.3d at 336. As have other Circuits. *See, e.g.*, *Woodlands Pride v. Paxton*, 168 F.4th 293, 307-08 (5th Cir. 2026); *Bonta*, 152 F.4th at 1022; *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669-70 (8th Cir. 2024); *Bonta*, 2026 WL 694471, at *13. This Court should not "distort[] First Amendment doctrine[]" just because abortion is at issue. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 (2022).

Next, Plaintiffs claim that "even if a factual showing were required," they "presented ample evidence that the law is overbroad." Second-Br. 40. Not so.

*First*, try as Plaintiffs might, "an appellate brief cannot take the place of materials in the summary judgment record itself." *Kaiser v. Armstrong World Indus.*, 872 F.2d 512, 518 (1st Cir. 1989). And the statistics cited in the appellate briefing are missing from the summary-judgment record. *See* First-Br. 50. So they are "too late[,] because appellate briefs may not supplement the record below." *Bennett v. Durham*, 683 F.3d 734,

738 (6th Cir. 2012) (citing *Inland Bulk Transfer Co. v. Cummins Engine Co.,* 332 F.3d 1007, 1012 (6th Cir. 2003)).

*Second*, the statistics themselves are far afield from this case. Plaintiffs cite to surveys of general post-*Dobbs* abortion trends. *See* Second-Br. 46-47 nn. 4-7. Most of the data are generalized national trends that say nothing about Tennessee, nor whether such trends are predictive of Tennesseans. *Id.* at 46 nn. 4-6. And they say nothing about minors nor who or what influenced those decisions. *Id.*

Plaintiffs' sole Tennessee-specific source is the Society of Family Planning's "*#WeCount Report.*" *Id.* at 47 n.7. Plaintiffs use the *#WeCount Report* to offer a comparison between 2020 and 2023 on the total number of abortions obtained by Tennesseans. But that changes nothing about this case. For one, the report says nothing about minors, let alone when or how minors obtain abortions. *#WeCount Report: April 2022 to June 2024* at 2, Soc'y of Fam. Planning (Oct. 22, 2024), https://perma.cc/BCC6-6E95. For two, the report itself "caution[s] against making direct inferences that compare 2020 and 2023 data over time" because of data limitations. *Id.* at 28. Yet Plaintiffs do exactly that. *See* Second-Br. 47.

38

Finally, in the absence of facts, Plaintiffs resort to guesswork. They assert that "[g]iven the availability of legal, safe abortion care in many states …, it would make no sense to recruit a minor for an illegal abortion in Tennessee, and it would be especially bizarre to recruit a minor to get an abortion in another state where it is illegal." *Id.* at 45. But that's exactly what the dissenters in *Dobbs* said would happen. *Dobbs*, 597 U.S. at 408 (Breyer, Sotomayor, Kagan, JJ., dissenting). And reports suggest that illegal abortions are occurring in Tennessee. Kelly Puente, *Telehealth abortions surge in Tennessee despite near total ban: Study*, The Tennessean (March 24, 2026), https://perma.cc/J7ER-6M3F; *see* 18 U.S.C. §§ 1461-62; *Cocroft v. Graham*, 122 F.4th 176, 182 (5th Cir. 2024). Plaintiffs' assertion is also entirely beside the point—they needed to demonstrate overbreadth with "actual fact[s]." *Connection Distrib.*, 557 F.3d at 336 (quotation omitted); First-Br. 49-53; *see supra* 34-37. This Court ought not—and indeed, may not—invalidate a duly-enacted Tennessee law based on Plaintiffs' and the district court's guesses about fact-bound questions like the likelihood of minors traveling to obtain abortions. *See* First-Br. 52. The record contains vanishingly few facts about how the Act will apply on the ground. Plaintiffs' eleventh-hour attempt

39

to compensate for that absence with general abortion-trend data is too little too late.

Simply put, "'a facial-challenge analysis requires more' than what [Plaintiffs] did here." *Burlew*, 165 F.4th at 533 (quoting *Free Speech Coal.*, 2025 WL 512049, at *2). The "utterly barren" record here does not come close to satisfying the summary judgment standard. *Connection Distrib.*, 557 F.3d at 338-39; *see Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

### C. Plaintiffs have no First Amendment right to recruit someone else's child to leave the State to obtain a medical procedure without parental consent.

And this all assumes there is a constitutional right to recruit other people's kids to leave the State to obtain a medical procedure without their parents' consent. There isn't. First-Br. 44-48

Plaintiffs reluctantly accept that there is "a history and tradition of protecting parental rights over medical decision-making for their minor children." Second-Br. 48. That's undebatable. This Court has held that "children do not possess the right to make medical decisions for themselves." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418-19 (6th Cir. 2019). And the Supreme Court recently reaffirmed

40

that parents have "the right not to be shut out of participation in decisions regarding their children's" mental and physical health. *Mirabelli v. Bonta*, 146 S.Ct. 797, 803 (2026) (per curiam).

Plaintiffs claim (at 48) that even accepting the parents' rights, "that would not affect the First Amendment analysis unless there were also a historical tradition of regulating third-party *speech* about such decisions." But there is such a historical tradition. First-Br. 45-46. For example, States historically made it a crime to "entice away" a minor "from her father, mother, guardian, or other person having legal charge of her person, without their consent," for either legal or illegal purposes. Mich. Rev. Stat. ch. 153, § 24 (1846); *see also, e.g.*, Mass. Rev. Stat. ch. 165, §§ 1-2 (1860) (same); 1 Kan. Stat. ch. 31, § 35 (1868) (similar). Founding-era common law likewise recognized the tort of "enticing" a minor away from his parents—even for otherwise lawful purposes. *Jones v. Tevis*, 14 Ky. 25, 25 (1823); *see also, e.g.*, *Hills v. Hobert*, 2 Root 48, 48 (Conn. Super. Ct. 1793) ("action" for father when "minor daughter [was] enticed away"); *Emery v. Gowen*, 4 Me. 33, 39 (1826) (action grounded in "parental rights"); Note, *The Right to Recover for Malicious Alienation of*

41

*A Child's Affections*, 40 Harv. L. Rev. 771, 772 & nn.4-5 (1927) (collecting cases).

This "tradition of proscription" encompassed speech about reproduction—and abortion. *Contra* Second-Br. 49; ACLU Br. 8-9. In Massachusetts, "an advertisement, by the defendant, of an instrument for sale by him for the prevention of conception" "clearly constitute[d] an offence" under a law against "language and descriptions manifestly tending to the corruption of the morals of youth." *Commonwealth v. Tarbox*, 55 Mass. 66, 67 n.*, 72 (1848); *see* Mass. Rev. Stat. ch. 130, § 10 (1836); *see also Paxton*, 606 U.S. at 473 (collecting historical authorities). And on the heels of passing the Fourteenth Amendment, Congress prohibited mailing "any advertisement" "giving information" "designed or intended for … procuring an abortion" including "where, or how, or of whom, or by what means [an abortion] before may be obtained or made." Act of March 3, 1873, 17 Stat. 598, 599. This prohibition on advertising abortion applied even where state law did not ban abortion itself—i.e., even where abortion was "legally available." Second-Br. 48; *see also Dobbs*, 597 U.S. at 248-49. States also banned recruitment for abortion, with no geographic limitation on where the abortion was to be performed. *See, e.g.*,

42

Mass. Rev. Stat. ch. 83 (1847) (making it illegal to "circulate" any "advice" on how to obtain an abortion); N.Y. Laws ch. 260, § 1 (1845) (making it illegal to "advise" abortion); Vt. Pub. Act No. 33 (1846) (same).  So contra Plaintiffs' contention, this *is* a "categor[y] of speech that ha[s] been historically unprotected."  Second-Br. 49 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

Nor can Plaintiffs shoehorn this case into *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011).  For one, *Brown* recognized that the State's restriction on violent entertainment would have "fare[d] better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence."  *Id.* at 795.  Here, though, there is such a "longstanding tradition."  *Id.*; First-Br. 45-46.  For two, there was no countervailing constitutional right at issue in *Brown*.  Here, there is—an accepted parental right over medical decision-making.  *Kanuszewski*, 927 F.3d at 418-19.  So the "speech [here], while fully protected when directed to adults, may be restricted when directed towards minors."  *Friends*, 108 F.4th at 438 (quotations omitted).

Even if history does not exclude the recruitment provision from heightened scrutiny, it shows why the law satisfies it.  First-Br. 47-48;

43

*see Ramirez v. Collier*, 595 U.S. 411, 427-28 (2022) (history guiding strict-scrutiny analysis). The protection of parents' rights to direct their kids' medical treatment is undoubtedly a compelling government interest. *See Mirabelli*, 146 S.Ct. at 802-03. So too is respect for prenatal life. *See Dobbs*, 597 U.S. at 301. And the requirement of written, notarized consent is narrowly tailored. It ensures parental consent before a minor faces a life-changing (and indeed life-ending) decision. "[L]ess restrictive alternatives would not accomplish the government's goals equally or almost equally effectively." *In re Sealed Case*, 77 F.4th 815, 830 (D.C. Cir. 2023) (cleaned up).

## III. The Recruiting Restriction Is Not Unconstitutionally Vague.

Vagueness does not offer an alternative ground for affirmance. The Act's use of "recruit" is not unconstitutionally vague, as the district court recognized. Mem. Op., R.81, 1128-29. And even if the term "recruit" could be considered vague in certain applications, Plaintiffs failed to carry their heavy burden of supporting a *facial* vagueness challenge.

### A. The term "recruit" in the Act is not unconstitutionally vague.

The Act's use of "recruit" raises no vagueness problem. The Due Process Clause's "void for vagueness" doctrine ensures that a "person of

44

ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law. *Grayned v. Rockford*, 408 U.S. 104, 108 (1972). But "perfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *United States v. Williams*, 553 U.S. 285, 306 (2008). The vagueness doctrine only protects against laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up).

As the district court rightly recognized, the Act's recruiting restriction "does not sink to that [indeterminate] level." Mem. Op., R.81, 1128. "When a word is not defined by statute," courts "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993); *see also* Tenn. Code Ann. § 1-3-105(b) ("[U]ndefined words shall be given their natural and ordinary meaning[.]"). As explained above, the term "recruits" has a "well understood" and "widely used" meaning in both common usage and in similar state

45

and federal statutes. *Cameron v. Johnson*, 390 U.S. 611, 616 (1968). The common dictionary definitions of "recruit" collectively confirm that, in this context, the Act's reference to "recruit" means "to persuade someone," or "to induce or enlist (a person) to participate." *Supra* 7. The term is also routinely used in similar statutes across the country that prohibit the "trafficking" of persons for certain purposes. *See, e.g.*, Tenn. Code Ann. §§ 39-13-308(a) (making it a crime to "[r]ecruit[]," "harbor[]," or "transport[]" another person for the purpose of human trafficking), 39-13-309(a)(2) (same for sex trafficking); 18 U.S.C. §§ 1590(a)(1) (human trafficking), 1591(a) (sex trafficking).[4] In fact, the federal code uses "recruit" (and "harbor" and "transport") to *define* "trafficking." 22 U.S.C. §§ 7102(11)(B), (12)(B). That those laws have been enforced for decades dispels the notion that the term "recruits" is so vague that a

---

[4] *See also, e.g.*, Ala. Code § 13A-6-1529(a)(2); Ark. Code Ann. § 5-18-103(a); Colo. Rev. Stat. § 18-3-504; Ga. Code Ann. § 16-5-46; 720 Ill. Comp. Stat. § 5/10-9; Ind. Code § 35-42-3.5-1; Ky. Rev. Stat. Ann. § 529.110(1)(b); La. Stat. Ann. § 14:46.2(A)(1); Mass. Gen. Laws Ann. ch. 265 § 50(a); Mich. Comp. L. Ann. § 750.462e; Miss. Code Ann. § 97-3-54.1; N.C. Gen. Stat. § 14-43.11(a); Neb. Rev. Stat. § 28- 830; Nev. Rev. Stat. § 201.300; N.Y. Penal Law § 135.35; Ohio Rev. Code Ann. § 2905.32; Tex. Penal Code Ann. § 20A.01(4); Utah Code Ann. § 76-5-308.5(2); Wash. Rev. Code § 9A.40.100; Wis. Stat § 948.051(1).

46

"person of ordinary intelligence" cannot know what is prohibited. *Grayned*, 408 U.S. at 108.

Indeed, courts have repeatedly rejected vagueness challenges to trafficking statutes that use the *same term* challenged here. The Fourth Circuit, for example, held that "each of the verbs at issue in [18 U.S.C.] § 1591"—including "recruits," "harbors," and "transports"—"has an ordinary meaning that would provide a person of ordinary intelligence fair notice of what conduct is prohibited." *United States v. Snead*, No. 21-4333, 2022 WL 17975015, at *4 (4th Cir. Dec. 28, 2022). The Massachusetts Supreme Judicial Court likewise rejected a vagueness challenge to a near-identically worded state law. *McGhee*, 35 N.E.3d at 339. And the Alabama Court of Criminal Appeals similarly upheld a state sex-trafficking law that prohibited "recruit[ing]," "harbor[ing]," and "transport[ing]," concluding it was "not unconstitutionally vague." *Alonso v. State*, 228 So.3d 1093, 1101-02 (Ala. Crim. App. 2016).

The Ninth Circuit's recent *Matsumoto* decision confirms this. That case addressed an Idaho law that, much like the Act, prohibits "'procur[ing] an abortion' … for an unemancipated minor by 'recruiting … [a] pregnant minor' with the intent to conceal the abortion from the

47

minor's parents or guardian." *Matsumoto v. Labrador*, 122 F.4th 787, 794-95 (9th Cir. 2024) (quoting Idaho Code Ann. § 18-623). The law, the court concluded, did "not fall afoul of the vagueness line." *Id.* at 805.

The Act's scienter requirement eliminates any lingering constitutional concerns. Such requirements, the Supreme Court has explained, "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.,* 455 U.S. 489, 499 (1982). This is because "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States*, 325 U.S. 91, 102 (1945). The Supreme Court has consistently followed this reasoning to conclude that a scienter requirement "alleviate[s any] vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *Wright v. New Jersey*, 469 U.S. 1146, 1152 n.5 (1985) (Brennan, J., dissenting); *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952).

Here, the Act applies only when "[a]n adult *intentionally* recruits … a pregnant unemancipated minor within [Tennessee]" for a specific

48

purpose. Tenn. Code Ann. § 39-15-201(a) (emphasis added). "Intentional" is the most culpable mental state. *See id.* § 39-11-302(a). It requires an intentional attempt to persuade. *Supra* 7-14. When the Act is read with that steep requirement in mind, it is hard to see how anyone could accidentally violate its "recruitment" prohibition. Again, the law does not prohibit recruiting in the abstract; it prohibits it when done "*for the purpose* of" facilitating a minor's elective abortion without parental consent. *Id.* § 39-15-201(a) (emphasis added).

The Act's recruiting provision, in short, is not unconstitutionally vague. Mem. Op., R.81, 1129.

### B. Plaintiffs' arguments lack merit.

Plaintiffs never "even *try* to engage" with the district court's analysis rejecting vagueness. *Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018); *see* Second-Br. 2, 11 (acknowledging district court's vagueness decision only in the statement of jurisdiction and statement of the case). And their arguments before this Court miss the mark. Second-Br. 51-56.

Plaintiffs first assert that because "recruit" is "susceptible to a wide array of possible meanings," it must be unconstitutionally vague. *Id.* at 52 (cleaned up). But almost every word has multiple possible meanings.

49

As even Plaintiffs admit (at 53), "[t]hat a word has multiple meanings" doesn't "render a statute vague."

But Plaintiffs contend (at 53) that none of "the usual meanings of 'recruit' … apply" and that "the word 'recruit' is an awkward fit in the abortion context." Nonsense. The standard meaning of recruit—"to persuade someone," Second-Br. 18 (quoting *Recruit*, Cambridge Dictionary)—fits the situation comfortably. That usage is no more "awkward" "in the abortion context," *id.* at 53, than it is in the sex trafficking context, Tenn. Code Ann. § 39-13-309 (prohibiting "[r]ecruit[ing] … another person for the purpose of providing a commercial sex act"). In both settings, the term refers to persuading a person to engage in a particular activity. Plaintiffs' attempts to conjure awkwardness (at 53) ignores this ordinary and widely accepted meaning of "recruit."

Plaintiffs next (at 53-54) rely on isolated statements from the Act's legislative history that purportedly show the provision's vagueness. But Tennessee courts rely on legislative history only as a last resort. *See, e.g.*, *State v. Welch*, 595 S.W.3d 615, 624 (Tenn. 2020). Comments from individual legislators (even an Act's sponsor) "are not effective to change the clear meaning of the language of the act." *State v. Deberry*, 651 S.W.3d

50

918, 930 (Tenn. 2022). Plaintiffs' approach to legislative history shows exactly why. Plaintiffs hand-pick "two examples" (at 53) to bolster their argument, but they ignore repeated statements from the Act's sponsors rejecting the notion that the recruitment provision covers mere "counseling" or dissemination of information about out-of-state abortion clinics. *See* Health Committee Hearing at 1:06:30-1:06:55, https://tinyurl.com/4nez799r (Feb. 21, 2024) (Rep. Leatherwood); *id.* at 1:07:51-1:07:57 (Rep. Zachary); *see also* Rep. Zachary, Population Health Subcommittee Hearing at 11:18-11:52, https://tinyurl.com/37bumxp4 (Feb. 13, 2024). It cannot be the case that a law is unconstitutionally vague merely because individual legislators offer differing views of the law. That'd sanction untold gamesmanship.

Plaintiffs' attempts (at 54) to downplay the scienter requirement likewise fail. For starters, ample (and recent) precedent holds that a scienter requirement "alleviate[s any] vagueness concerns." *Gonzalez*, 550 U.S. at 149; *Boyce Motor Lines*, 342 U.S. at 342. Tennessee does not have a unique intentionality standard that distinguishes it from the multitude of other cases that account for scienter when analyzing vagueness.

51

Plaintiffs also ignore the Act's specific text. It says an adult cannot "intentionally recruit" a minor "*for the purpose of*" obtaining an elective abortion or concealing it from the minor's parent. That plain text requires intent to recruit, not intent to speak. *Supra* 14; *McGhee*, 90 N.E.3d at 339 (finding use of "knowingly" showed that the statute's "clear and deliberate focus … is the intent of the perpetrator, not the means used … to accomplish his or her intent."). Requiring juries to make that intent determination is hardly novel. "[C]ourts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred." *Williams*, 553 U.S. at 306 (quotations omitted).

Plaintiffs finally quibble (at 55-56) with Defendants' proffered examples, arguing they only "muddy the waters" because "'recruitment' and 'coercion' are different concepts." Again, although recruitment does not *require* coercion, it is undeniable that coercive activity *can* be a form of prohibited recruitment if it persuades or induces someone to engage in specific conduct. *Supra* 33.

52

At bottom, the district court did not err in holding the recruitment provision is not unconstitutionally vague. The Due Process Clause requires only "fair notice" of the Act's reach, *Parrish*, 942 F.3d at 295, not "perfect clarity and precise guidance," *Williams*, 553 U.S. at 304 (quoting *Ward*, 491 U.S. at 794). The Act meets that standard.

**3.** Even if "recruit" could be considered impermissibly vague in certain applications, Plaintiffs failed to carry their burden of establishing *facial* invalidity.

Normally, "litigants mounting a facial challenge to a statute ... 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *Hansen*, 599 U.S. at 769 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In the context of a facial vagueness challenge, that generally means "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 497. That rule has been relaxed in vagueness challenges implicating First Amendment rights and other narrow circumstances. *United States v. Requena*, 980 F.3d 30, 39-40 (2d Cir. 2020). But exactly how the test has been relaxed remains unclear. Even assuming an overbreadth-like comparison is required, though, courts "vigorously

53

enforce[] the requirement that a statute's" unconstitutional applications "be substantial ... relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292 (emphasis omitted), and place the burden of making that showing squarely on the challenger, *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

Here, Plaintiffs did not prove any vague applications—much less establish that "the ratio of unlawful-to-lawful applications" is "lopsided enough to justify the strong medicine of facial invalidation." *Hansen*, 599 U.S. at 784 (quotations omitted).  Indeed, a plethora of applications plainly fall within the scope of the statute—for example, an employee of an abortion-advocacy organization who persuades a minor to leave the State to obtain an illegal abortion without her parent's consent, or who convinces a minor to purchase a mail-order, abortion-inducing drug without her parent's knowledge.  Put simply, there are countless applications of the Act that raise no vagueness issue whatsoever.  The term "recruit" is not *facially* invalid for vagueness.

## IV.   The District Court Granted Improper Relief.

At a minimum, this Court should narrow the injunction.

### A.   Any injunction must be limited to the constitutional problem.

Any injunction must be limited to the purportedly "unconstitutional applications of the law while preserving [its] other valid applications." First-Br. 53-54 (quoting *Connection Distrib.*, 557 F.3d at 342).   If the problem is that the Act applies to "protected speech about *legal* abortions," Second-Br. 5 (emphasis added), the solution is not to enjoin *all* applications of the law.   Indeed, even Plaintiffs admit the law can be constitutionally applied to speech about "abortions that are illegal where they occur, including because the minor lacks parental consent for an abortion in a state where such consent is required."  Second-Br. 38.  The Supreme Court has repeatedly limited injunctions in First Amendment cases to the specific applications that extend beyond constitutional bounds.  First-Br. 53-54 (compiling cases).  Plaintiffs offer no reason why the Court couldn't do so here.  *See* Second-Br. 56-61 (failing to respond to the States' argument).  And "[w]ith no counter," Plaintiffs "cannot prevail on this issue." *Mattingly v. R.J. Corman R.R. Grp.*, 90 F.4th 478, 489 n.1 (6th Cir. 2024).

55

## B.    Any injunction must be limited to the parties.

Any injunction must be limited to Welty and Behn.

As a threshold matter, Plaintiffs claim (at 56-57) that the State "misrepresent[s] … the scope of the injunction" below by calling it a "statewide injunction[]." But those are the district court's words, not the State's—the district court explicitly claimed authority to issue "statewide injunctions," Mem. Op., R.81, 1130-31, and then "enjoin[ed] enforcement of the recruiting prong of the statute" without limitation, *id.* at 1131. Plaintiffs attempt to graft a district-specific limitation onto the injunction. Second-Br. 56. But that geographic limitation doesn't flow from the district court's order; it flows from the scope of the Defendants' prosecutorial authority. Regardless, whether the injunction extends statewide or "within … the Middle District of Tennessee," the district court enjoined enforcement of "the recruitment provision *against nonparties.*" Second-Br. 56-57 (emphasis added). That was wrong for three independent reasons.

1. *As-Applied Relief.* As-applied relief calls for "a narrow injunction that bars the defendant from enforcing the law as applied to the *specific plaintiff* and the *specific conduct* found constitutionally protected."

56

*Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026); *see also* Second Br. 59 (admitting as much). If the Court finds a constitutional problem, it should rule only on Plaintiffs' as-applied claims. *Supra* 24-26. So only Welty and Behn should obtain relief.

**2. *Constitutional Limits.*** The district court's order also exceeds Article III's limits on the judicial power. Article III requires injunctions to "operate with respect to specific parties," never with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quotations omitted). So an "order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023); *see* First-Br. 55-59.

Plaintiffs counter that "*CASA* expressly declined to resolve" whether "Article III prohibits nonparty relief." Second-Br. 61 n.12. Agreed. But *this Court* has resolved that question. In *L.W.*, this Court held that, under Article III, injunctions "*must* operate in a party-specific … manner," absent "a properly certified class or an extraordinary reason." 83 F.4th at 490 (emphasis added). That holding binds subsequent panels absent en banc review or an intervening, contradictory Supreme

57

Court decision. Kentucky-Br. 5-7. And Plaintiffs' cite (at 61 n.12) to Justice Kavanaugh's solo opinion in *CASA* isn't intervening precedent—particularly given that other Justices think Article III limits non-party relief. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 693-94 (2023) (Gorsuch, J., concurring in the judgment, joined by Thomas and Barrett, JJ.). The bottom line, though, is that this Court doesn't have to (or get to) pick sides in that debate: *L.W.* did so, and it binds here.

Plaintiffs also argue (at 57-59) that the "usual rule" of party-specific relief "does not apply to the overbreadth doctrine." That's wrong. First-Br. 58-59. As below, Plaintiffs pull dicta from cases that either used loose language or merely recognized the effects of vertical stare decisis. First-Br. 56-59; *see also Broadrick v. Oklahoma*, 413 U.S. 601, 618 (1973) (no injunction because Plaintiffs failed to prove overbreadth); *Hicks*, 539 U.S. at 123-24 (same); *Hansen*, 599 U.S. at 782-85 (same); *Connection Distrib.*, 557 F.3d at 338-41 (same); *Netchoice*, 603 U.S. at 743-45 (same). None of that authority creates a special non-party rule for overbreadth.

And Plaintiffs flat out ignore the Supreme Court's binding decision in *Doran v. Salem Inn*, 422 U.S. 922, 931-34 (1975). *Doran* deemed a law overbroad yet limited the injunction to the parties. The Court held:

58

"neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." *Id.* at 931. *Doran* remains good law. And despite heavy reliance on *Doran* by the State, First-Br. 3, 58-59, and amicus, Kentucky-Br. 16-17, Plaintiffs offer no response.

Plaintiffs claim (at 58 n.11) that the State's position "would all but eliminate the distinction between as-applied and facial challenges in district court." Not true. For as applied claims, courts grant injunctions only for a plaintiff's "*specific conduct.*" *Burlew*, 165 F.4th at 530. And for facial challenges, courts "grant injunctions that prohibit the government from enforcing the law against the plaintiff *in any circumstance*—not just as applied to *specific conduct.*" *Id.* So there remains a "distinction between facial and as-applied challenges" with respect to "the breadth of the remedy employed by the Court." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

Likewise, the notion that "[a] plaintiff who meets the more demanding standard for facial invalidity would receive nothing" is just wrong. Second-Br. 58 n.11. The relief differs. *See Burlew*, 165 F.4th at 530. And

59

the plaintiff receives a different avenue to raise a First Amendment challenge. In many instances, a plaintiff cannot raise an as-applied argument—meaning the only way the plaintiff obtains *any* relief is through a facial challenge. *See, e.g.*, *Hansen*, 599 U.S. at 769 (challenger couldn't raise First Amendment challenge as to his own speech but could raise facial overbreadth challenge).

It's Plaintiffs' position, not the State's, that leads to head-scratching outcomes. Plaintiffs never explain how it would make sense to prevent courts from issuing injunctive relief beyond the parties when a statute is unconstitutional in *all its applications*, *see L.W.*, 83 F.4th at 490, yet allow nonparty relief when a law is unconstitutional in *a substantial number of applications*. Both precedent and logic foreclose Plaintiffs' position.

**3. *Statutory Limits.*** Even assuming an overbreadth carveout to Article III's constitutional limits, the district court's injunction exceeds the *statutory* limits on federal courts' authority. The Judiciary Act of 1789 grants federal courts the authority to issue only the "sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *CASA, Inc. v. Trump*, 606 U.S. 831, 841 (2025) (quotations omitted). And at the founding, injunctions were limited to "restrain[ing]

60

the actions of particular officers against particular plaintiffs." *Id.* at 842 (cleaned up). Courts "consistently rebuffed requests for relief that extended beyond the parties," even in cases "where the plaintiff successfully challenged the constitutionality of a [state] law." *Id.* at 843.

In response, Plaintiffs contend (at 60) that "the injunction here was issued pursuant to different statutory authority, and thus implicates a different historical tradition"—pointing to the "cause of action" in 42 U.S.C. § 1983 and "federal-question jurisdiction" under 28 U.S.C. § 1331. That argument fails a couple times over.

*First*, Plaintiffs cannot shift the relevant time period by pointing to a cause of action or subject-matter jurisdiction. Having "a cause of action in equity" is not the same as being entitled "to equitable relief in a federal court." *Atlas Life Ins. Co. v. W.I.S., Inc.*, 306 U.S. 563, 570 (1939). The same goes for subject-matter jurisdiction. A court's power to hear a given case is distinct from its authority to grant a particular remedy. *See Biden v. Texas*, 597 U.S. 785, 801 (2022). Section 1331's Reconstruction-era grant of subject-matter jurisdiction over federal questions did not expand a court's equitable powers, which derive from the Judiciary Act of 1789. The Judiciary Act is what "prescribes the body of doctrine" when "a

61

district court has jurisdiction as a federal court" and "exercise[s] … the extraordinary powers of a court of equity." *Atlas Life*, 306 U.S. at 568. The question a court "must ask" is "whether the relief respondents requested here was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund*, 527 U.S. 308, 319 (1999).

Proving the point, *CASA* was a § 1331 case. *CASA, Inc. v. Trump*, No. 8:25-cv-00201-DLB (D. Md. Jan. 21, 2025), Dkt. No. 1, at *7 (complaint citing § 1331). In *CASA*, the plaintiffs (represented by some of the same counsel here) made the same argument they do now: "Other developments in law, such as expanding federal question jurisdiction, 28 U.S.C. § 1331 … expanded the scope of disputes within the cognizance of the federal courts." *CASA* Brief in Opposition, 2025 WL 1173002, at *31. The Supreme Court rejected that position, holding: "The Judiciary Act of 1789" is "still today … *what authorizes the federal courts to issue equitable remedies.*" *CASA*, 606 U.S. at 841 (quotations omitted, emphasis added). *CASA* requires courts exercising federal-question jurisdiction to look to Founding-era equity practice. *Id.* It forecloses the notion that § 1331 permits courts to look to a different—and later—historical tradition. *Contra* Second-Br. 60-61.

62

*Second*, even looking at the 1870s doesn't help Plaintiffs. Second-Br. 60. Like the district court, Plaintiffs point to *Ex parte Young*, 209 U.S. 123 (1908). But that decision came over 30 years after § 1983 and § 1331. And, more importantly, *the Supreme Court has already rejected the notion that* Ex parte Young *supports non-party relief*. First-Br. 63-64 (citing *CASA*, 606 U.S. at 846 n.9); Kentucky-Br. 14-15. There is no straight-face reading of *CASA* that supports the notion that there's "a wider range of equitable remedies against state official than against federal ones." Second-Br. 61.

Plaintiffs next contend (at 61) that "a district-specific injunction more readily fits within our Nation's tradition of equitable remedies than does a nationwide injunction." But the district court didn't limit its injunction to a particular district; it enjoined defendants from enforcing the recruiting provision against "*anyone*." 606 U.S. at 839. The Defendants just so happen to have jurisdiction only within a single district.

Regardless, Plaintiffs point to no historical evidence of district-specific injunctions. *See* Second-Br. 61. And they point to no precedent—not a single case—that blesses a "district-specific injunction." *Id.* That's unsurprising: Basically all of *CASA*'s reasoning contradicts that

63

contention. *CASA* commands a "party-specific understanding of what equitable remedies do" and explains that federal courts have long "refus[ed] to grant relief to nonparties." 606 U.S. at 844 (quotations omitted). A district-wide injunction violates this principle of party-specific relief just as much as a nationwide injunction. *Cf. Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*, 806 F. Supp. 3d 166, 210 (D.N.H. 2025) (drawing no distinction between nationwide and statewide relief). Indeed, *CASA* specifically divorced its reasoning from geography, saying the question isn't "*where* [the injunction] applies, but *whom* it protects." 606 U.S. at 837 n.1.

Plaintiffs are right about one thing: Equity is "flexible." Second-Br. 61 (quoting *CASA*, 606 U.S. at 846). But that "flexibility is confined within the broad boundaries of traditional equitable relief." *CASA,* 606 U.S. at 846 (quotations omitted). And traditional equitable relief, as *CASA* explains, squarely rejects the district court's non-party injunction.

## CONCLUSION

This Court should reverse.

64

Dated: April 1, 2026                    Respectfully submitted,


Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

*/s/Madeline W. Clark*
Madeline W. Clark
  *Principal Deputy Solicitor General*

Steven J. Griffin
  *Deputy Attorney General*

Aaron L. Bernard
  *Assistant Solicitor General*

Walker Anderson
  *Honors Fellow*

OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
Madeline.Clark@ag.tn.gov
(615) 253-0144
*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,695 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/Madeline W. Clark*
Madeline W. Clark
*Principal Deputy*
*Solicitor General*

## CERTIFICATE OF SERVICE

On April 1, 2026, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/Madeline W. Clark*
Madeline W. Clark
  *Principal Deputy*
  *Solicitor General*
